# <u>EXHIBIT A</u>

Case 2:15-cv-02296-SM-DEK Document 73-3 Filed 01/15/15 Page 2 of 85

```
 1
 2              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA
 3
      KURIAN DAVID, et al.,              )
 4                                       )
                    Plaintiffs,          )
 5                                       )
                    vs.                  )  08-1220
 6                                       )
      SIGNAL INTERNATIONAL, LLC, et al.,)
 7                                       )
                    Defendants.          )
 8    ---------------------------------)
      Related Case:                      )
 9    EQUAL EMPLOYMENT OPPORTUNITY        )
      COMMISSION,                        )
10                                       )
                    Plaintiffs,          )
11                                       )
                    And                  )  12-557
12                                       )
      SABULAL VIJAYAN, et al.,           )
13                  Plaintiff-Intervenors,)
                                         )
14                  vs.                  )
                                         )
15    SIGNAL INTERNATIONAL, LLC,         )
                    Defendant.           )
16    ---------------------------------)
      Related case:                      )
17    LAKSHMANAN PONNAYAN ACHARI, et al.) 13-6218
                                         )
18                  Plaintiffs,          )
                                         )
19                  vs.                  )
20    SIGNAL INTERNATIONAL, LLC,         )
                    Defendant.           )
21    ---------------------------------)
22        DEPOSITION OF LOUISE I. SHELLEY, Ph.D.
                  New York, New York
23            Monday, September 22, 2014
24    Reported by:
      Philip Rizzuti
25    JOB NO. 84660
```

Page 2

```
 1
 2
 3                  September 23, 2014
 4                  9:05 a.m.
 5
 6        Deposition of LOUISE I. SHELLEY,
 7   Ph.D., held at the offices of Crowell
 8   & Moring, 590 Madison Avenue, New
 9   York, New York, pursuant to notice,
10   before Philip Rizzuti, a Notary Public
11   of the State of New York
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2             A P P E A R A N C E S:
 3
 4        CROWELL & MORING
 5        Attorneys for Plaintiffs
 6             590 Madison Avenue
 7             New York, NY 10022
 8        BY:  ALAN HOWARD
 9             HUGH SANDLER
10
11        HANGARTNER RYDBERG & TERRELL
12        Attorneys for Signal Defendants
13             701 Poydras Street
14             New Orleans, LA 70170
15        BY:  ERIN HANGARTNER
16             BRIAN ROUX
17
18
19
20        LAW OFFICES OF STEPHEN SHAPIRO
21        Attorneys for Dewan Defendants
22             700 Camp Street
23             New Orleans, LA 70130
24        BY:  STEPHEN SHAPIRO
25             (Via Phone)
```

Page 4

```
 1
 2             A P P E A R A N C E S:
 3
 4        ASIAN AMERICAN LEGAL DEFENSE AND
 5        EDUCATION FUND
 6        Attorneys for Plaintiffs
 7             99 Hudson Street
 8             New York, NY 10013
 9        BY:  IVY SURIYOPAS
10             DAHSONG KIM
11
12        KILPATRICK TOWNSEND & STOCKTON
13        Attorneys for Samuel Plaintiffs
14             1100 Peachtree Street Northeast
15             Atlanta, GA 30309
16        BY:  SHANE RAMSEY
17
18
19   ALSO PRESENT VIA CONFERENCE CALL:
20        PATRICIA BOWMAN, ESQ.
21        JOHN FLEMING, ESQ. Sutherland Asbill
22        DANIEL WERNER, ESQ. SPLC
23        NAOMI TSU, ESQ. SPLC
24
25
```

Page 5

```
 1
 2        IT IS HEREBY STIPULATED AND AGREED,
 3   by and between counsel for the respective
 4   parties hereto, that the filing, sealing and
 5   certification of the within deposition shall
 6   be and the same are hereby waived;
 7        IT IS FURTHER STIPULATED AND AGREED
 8   that all objections, except as to the form
 9   of the question, shall be reserved to the
10   time of the trial;
11        IT IS FURTHER STIPULATED AND AGREED
12   that the within deposition may be signed
13   before any Notary Public with the same force
14   and effect as if signed and sworn to before
15   the Court.
16
17
18
19
20
21
22
23
24
25
```

Page 6

```
 1               Shelley
 2    L O U I S E  I.  S H E L L E Y, Ph.D.,
 3       called as a witness, having been duly
 4       sworn by a Notary Public, was examined
 5       and testified as follows:
 6    EXAMINATION BY
 7    MR. HOWARD:
 8            MR. HOWARD:  Would you mark as
 9       Shelley Exhibit 1, expert report.
10            (Shelley Exhibit 1, expert report,
11       marked for identification, as of this
12       date.)
13       Q.   Professor Shelley, I have had
14    marked as Exhibit 1 to this deposition an
15    expert report that was provided to us in your
16    name on August 29, 2014, and I ask if you are
17    familiar with this report?
18       A.   I am.
19       Q.   Ours is not a signed copy, did you
20    ever sign a copy of this report?
21       A.   Yes.  This one is not a signed
22    copy.  I think it is electronically signed
23    when I submitted it.
24       Q.   Well we can use this unsigned
25    copy, but assume that, can I assume that
```

Page 7

```
 1               Shelley
 2    everything in here accurately states your
 3    opinions?
 4       A.   It does.
 5       Q.   Did you personally draft this
 6    report entirely yourself?
 7       A.   Yes.
 8       Q.   How long did that take you?
 9       A.   Hours.
10       Q.   How many hours?
11       A.   Probably a few dozen hours.
12       Q.   Let me ask how many hours in total
13    have you spent on this case, and by this case,
14    let me ask you differently.
15            When were you first engaged by
16    Signal or its counsel to be an expert witness
17    in any of the cases against Signal brought on
18    behalf of Indian H-2B workers?
19       A.   I was contacted in May.
20       Q.   May of this year?
21       A.   Yes.  And I started working on the
22    case in July.
23       Q.   So from the time you began work in
24    this matter in July of 2014 until August 29,
25    2014 when you submitted your expert report in
```

Page 8

```
 1               Shelley
 2    the David case how many hours in total had you
 3    worked on the matter?
 4       A.   I have to do my arithmetic.
 5    Approximately a hundred hours.
 6       Q.   Now your reports in the Texas
 7    cases, the Samuel and Joseph cases, were
 8    submitted at the end of July; correct?
 9       A.   Correct.
10       Q.   How much of that hundred hours or
11    so have been spent prior to submitting the
12    reports in the Texas cases?
13       A.   The first month I spent about -- I
14    spent about probably 75 hours I think.
15       Q.   So 75 hours in July before
16    submitting the report in the Texas case?
17       A.   I have to check.  If you want I
18    can check my files.
19       Q.   I will ask you to do that during a
20    break.  Then you spent an additional 25 hours
21    in August for purposes of the report you
22    submitted in the David case?
23       A.   I will have to check that, but
24    approximately, probably a little bit more,
25    maybe 30 hours, maybe 35.
```

Page 9

```
 1               Shelley
 2       Q.   How were the 30 or 35 hours spent
 3    between submitting the report in the Texas
 4    cases and your report in the David case?
 5       A.   I reviewed many different
 6    materials that were available for the
 7    Louisiana case that were not available for the
 8    Texas case.
 9       Q.   What kind of materials?
10       A.   For example T visa applications or
11    submissions.
12       Q.   How many T visa applications or
13    submissions did you review for purposes of the
14    report in the David case?
15       A.   All of them that were provided to
16    me, so about ten of them.
17       Q.   And how much are you being
18    compensated per hour by Signal in this case?
19       A.   I am being paid 400 an hour for my
20    work, and 200 for travel time.
21       Q.   Is that your standard rate for
22    expert work?
23       A.   No, it is much, much less.
24       Q.   What is your standard rate?
25       A.   I receive as much as 900 an hour.
```

3 (Pages 6 to 9)

Case 2:15-cv-02296-SM-DEK  Document 73-3  Filed 01/15/15  Page 5 of 85

Page 10

Shelley

1
2    Q.   Why in this case have you decided
3  to give a discount to Signal?
4    A.   Because I feel very strongly about
5  this case, that there has been an injustice
6  done to Signal.  I feel concerned about the
7  validity of this case, and I also am very
8  concerned about the viability of Signal and
9  its employment to its workers.
10   Q.   What makes you concerned about the
11 viability of Signal?
12   A.   Because of all the expenditures on
13 this lawsuits and also the damage that has
14 been done to it's reputation, it makes it
15 difficult for them to get business.
16   Q.   What do you base that statement
17 on; I mean have you done any assessment of the
18 economics of Signal since the case was filed
19 versus before the case was filed?
20   A.   I have talked to the senior
21 management of Signal, yes.
22   Q.   Other than talking to the senior
23 management of Signal what independent research
24 have you done on the economics of the Signal
25 business to validate the statement you just

Page 11

Shelley

1
2  made?
3    A.   I have looked at some of the
4  balance sheets of Signal.  I have looked at
5  many hours I have spent on the financial
6  records of Signal.
7    Q.   You have spent many hours looking
8  at the financial records?
9    A.   Yes.
10   Q.   Which financial records?
11   A.   Payroll, how many people are on
12 staff, payments.
13   Q.   Payments to their general employee
14 population?
15   A.   Yes.
16   Q.   What did the examination of
17 financial records such as payments and payroll
18 to employees tell you about the impact of this
19 lawsuit on Signal's business?
20   A.   I cannot say.  I am not a
21 financial analyst, but it appears that there
22 are fewer people on payroll at some times more
23 recently than in the past.
24   Q.   Did you do any historical
25 assessment of the variance in Signal's payroll

Page 12

Shelley

1
2  over historical time periods prior to the
3  lawsuit being filed?
4    A.   No.
5    Q.   Did you do any financial
6  assessment of the profits that Signal earned
7  from the Indian H-2B program?
8    A.   I am not studying the profits of
9  Signal, I am looking at the overall payment
10 structure of Signal.
11   Q.   Are you a financial or economic
12 expert in any way?
13   A.   I have worked for years doing
14 financial cases concerning international money
15 laundering and have, you know, poured over
16 records in the past.
17   Q.   Is it your understanding that you
18 are being offered in this case as an expert to
19 opine on the impact of this lawsuit on
20 Signal's economic viability?
21   A.   No.
22   Q.   Are you being asked to give any
23 economic opinions in this case?
24   A.   The only economic opinions I am
25 giving in this case, or I should say financial

Page 13

Shelley

1
2  opinions, are in reference to the expenditures
3  of the workers at Signal, their payments, and
4  what is deemed reasonable for them to spend.
5    Q.   What is deemed to be reasonable
6  for whom to spend?
7    A.   The workers.
8    Q.   I am sorry, you need to explain
9  that statement to me.  For the workers to
10 spend on what?
11   A.   On housing, food, what their
12 income is, whether their salaries have been
13 paid.
14   Q.   Understood.  Understanding that
15 you personally drafted each and every word of
16 this report I want to examine a bit about the
17 methodology that you applied to reach some of
18 the -- to reach comfort level with making some
19 of the factual statements and assertions you
20 make.
21        By way of example if I could ask
22 you to turn to page 28 of your report, about a
23 third of the way down the page there is a
24 statement that said:  Signal was exempt from
25 OSHA standards for the housing of its H-2B

| Page 14 | Page 15 |
|---|---|

Page 14

Shelley

1
2   workers, but nonetheless tried to comply
3   because it wanted to meet an established
4   standard.
5       A.   Uh-hum.
6       Q.   Are you an expert on OSHA
7   standards?
8       A.   No, but I did go and look at OSHA
9   standards and who they applied to before
10  writing that statement.
11      Q.   And --
12      A.   I do know how to do research.
13      Q.   That is what I wanted to ask.  I
14  want to know what research you did to make a
15  determination to be able to write the sentence
16  that Signal was exempt from OSHA standards?
17      A.   I read several documents on where
18  OSHA standards apply to under the H visa
19  program.
20      Q.   Can you identify for me a place in
21  the OSHA standards where it says that it is
22  not applicable to H-2B program?
23      A.   I cannot give you a statute of it,
24  but I read it.
25      Q.   You read that statement?

Page 15

Shelley

1
2       A.   Yes.
3       Q.   Have you read the reports of the
4   OSHA experts in this case?
5       A.   I have read some of the government
6   reports, I am not sure if I read all of the
7   OSHA reports.
8       Q.   I am asking about the expert
9   reports in this case submitted by expert
10  witnesses on the OSHA issue in this case?
11      A.   I don't think so.
12      Q.   Are you aware for example that the
13  David plaintiffs submitted an expert report
14  from someone who worked at OSHA on the issue
15  as to whether OSHA applied to the H-2B camps?
16      A.   I am not aware.  I don't think I
17  read that.
18      Q.   Did you call anybody at OSHA as
19  part of your research to put in your expert
20  report the statement that OSHA did not apply
21  to the H-2B housing at Signal?
22      A.   I did not call anyone when I read
23  this in some OSHA -- some statements on the H
24  visa program.
25      Q.   How come you didn't cite the

Page 16

Shelley

1
2   material that you relied on for that statement
3   in your expert report?
4       A.   I can say that may be an
5   oversight.
6       Q.   I mean is there anywhere in this
7   report I can find what it is that you relied
8   on to make that statement?
9       A.   I can go and do an addendum to
10  this report and find you what I used, because
11  I used many, many sources.
12      Q.   Well that would be helpful.
13          Professor Shelley, let's turn if
14  you would please to page 43 of your report, at
15  the bottom of the page paragraph 63 you state:
16  In conclusion Signal did not have access to
17  information that would allow it to be aware of
18  the problem of recruiters making false
19  promises to it's potential workers in India.
20  Neither did it have a reason to suspect that
21  the local lawyer and recruiter would be
22  engaged in duplicitous practices.
23          Did I read that correctly?
24      A.   Yes.
25      Q.   First of all what duplicitous

Page 17

Shelley

1
2   practices are you referring to there?
3       A.   There are several duplicitous
4   parts of this.  First that the recruiters
5   starting in 2003 have been recruiting workers
6   from India for other places of employment, and
7   then when they had not placed those workers
8   they approached Signal after Katrina and
9   informed Signal that they had people ready to
10  be employed by them.
11      Q.   What was duplicitous about that?
12      A.   They did not explain to Signal
13  that they had advertised for workers
14  previously offering them Green Cards.  They
15  didn't explain to Signal that they had charged
16  excessive amounts of money for the
17  recruitment.  Nor did they explain that the
18  workers were in some cases waiting for
19  documents from other companies.
20      Q.   What else did you have in mind
21  when you referred to the duplicitous practices
22  of the recruiters and the local lawyer?
23      A.   Those were the major points that I
24  considered.  I also considered the Indian case
25  against Sachin Dewan, it is his appeal for the

TSG Reporting - Worldwide - 877-702-9580

Page 18

```
 1              Shelley
 2   dropping of his license.
 3        Q.   I am not asking about the source
 4   for your information, I wanted to know what
 5   you were referring to when you referred to the
 6   duplicitous practices, you mentioned --
 7        A.   When I read that report it
 8   confirmed that these were duplicitous
 9   practices.
10        Q.   So you are referring to the false
11   promises or the promise for Green Cards?
12        A.   Yes.
13             MR. ROUX:  Objection.
14        Q.   And the excessive recruiting fees
15   that were charged; correct?
16        A.   And also as I said the fact that
17   the workers were in process for other
18   employers.
19        Q.   For each of those three elements
20   is it your opinion that Signal did not have
21   access to information that would allow it to
22   be aware of those issues; that is what you
23   state here; correct?
24        A.   I believe that it did not have
25   access to this information.
```

Page 19

```
 1              Shelley
 2        Q.   At what point in time did Signal
 3   gain access to this information?
 4             MR. ROUX:  Objection as to the
 5   form.
 6        A.   Can you clarify your question?
 7        Q.   Certainly.  Let's take it one
 8   piece at a time.  The fact that the workers in
 9   India were being charged, to use your words,
10   excessive or exorbitant recruiting fees, at
11   what point in time did Signal gain access to
12   that information?
13             MR. ROUX:  Objection as to the
14   form.
15        Q.   If ever; is it your opinion that
16   they never gained access to that
17   information -- let's step back.
18             They know it now, right, since the
19   lawsuit was filed; is that correct?
20             MR. ROUX:  Objection as to the
21   form.
22        A.   Should I answer?
23             MR. ROUX:  Yes.
24        A.   There were workers who arrived at
25   Signal, and after they had been at Signal for
```

Page 20

```
 1              Shelley
 2   a period began to tell some of the people that
 3   they were working with that they had paid high
 4   recruiting fees to come to Signal.
 5        Q.   And when they told these people
 6   that did Signal in your view then have access
 7   to the information that the Indian workers
 8   were paying excessive recruiting fees?
 9        A.   If you call access to information
10   the kind of financial receipts that have been
11   filed in this case, that they certainly did
12   not have access to when they learned this.
13        Q.   What information, when you said in
14   your report that Signal did not have access to
15   information that would allow it to be aware of
16   the problem, and you substitute excessive fees
17   as part of the problem, what information in
18   your mind would have been necessary for Signal
19   to be aware of the problem?
20        A.   Can you be specific?
21        Q.   Be more specific.  You seem to be
22   making a differentiation between information
23   that was being provided by the workers who
24   arrived at Signal in fact orally communicating
25   that they had paid all of these fees from some
```

Page 21

```
 1              Shelley
 2   kind of hard financial data and receipts.  Am
 3   I correct about that?
 4        A.   I am making a point that when
 5   Signal entered into this relationship with the
 6   recruiters in India, the local recruiter and
 7   the lawyer, they did not know any of this
 8   background.
 9        Q.   Okay, and my question is when did
10   they become aware of the fact that these
11   workers were being charged excessive fees by
12   their recruiters and their lawyer?
13             MR. ROUX:  Objection as to the
14   form.
15        A.   Some of the management of Signal,
16   some of the staff of Signal only learned of
17   this after the workers arrived at Signal.
18        Q.   When did management of Signal, and
19   by management I include senior vice president
20   Ron Schnoor, when did they, management and
21   Mr. Schnoor learn that the workers had been
22   charged excessive fees by the recruiters and
23   the lawyer?
24        A.   When there was concern expressed
25   on a larger scale by some of the workers at
```

Page 22

Shelley

1
2  Signal.
3      Q.   How long after the arrival of the
4  very first worker did that happen?
5      A.   Several months into their stay.
6      Q.   So it is your testimony that it
7  was not until several months after the workers
8  arrived that senior management of Signal
9  including Ron Schnoor learned that the workers
10 had been paying excessive recruiting fees to
11 the recruiters and the lawyer; am I correct?
12     A.   It was not prior to the process.
13 I cannot give you an exact time line within
14 the organization, but this was not something
15 that they were aware of prior to the workers
16 arrival.
17     Q.   But you know, don't you, that the
18 workers didn't all come at once; correct?
19     A.   That is correct.
20     Q.   Do you know in fact when the first
21 worker did arrive?
22     A.   Yes, the first workers arrived in
23 2006.
24     Q.   Do you recall when in 2006?
25     A.   I would have to consult my notes.

Page 23

Shelley

1
2      Q.   If I were to represent to you that
3  the first workers arrived on Halloween into
4  November 1, 2006 would that refresh your
5  recollection?
6      A.   Yes it would.
7      Q.   Do you know how many workers
8  arrived in that first wave?
9      A.   The workers arrived on different
10 plane loads, so there were dozens of them that
11 came up until the amount reached several
12 hundred workers, but not immediately.
13     Q.   Break it down.  Do you know how
14 many workers arrived in those first couple of
15 days in November of 2006?
16     A.   I have read how many workers came,
17 I cannot recall exactly how many were there
18 the first days.
19     Q.   But you are aware then as you
20 described that over the ensuing months
21 additional waves of workers came to work from
22 India to Signal?
23     A.   Yes.
24     Q.   Do you remember when the last
25 workers arrived?

Page 24

Shelley

1
2      A.   There were workers through 2007
3  arriving.
4      Q.   Do you know when the five
5  plaintiffs in the David case whose trial is
6  coming up in January, when they arrived?
7      A.   I have read in their reports when
8  they arrived.
9      Q.   You don't recall it offhand?
10     A.   I know some of them were very
11 early in the process.
12     Q.   And some were late?
13     A.   Some of them were later.
14     Q.   Now coming back to the issue when
15 in that -- if your understanding in the period
16 of months during which the waves of workers
17 were coming from India, did Signal management,
18 including Ron Schnoor, learn about the
19 excessive recruiting fees early in that
20 process or later in that process, later in
21 those few months?
22     A.   In early 2007 there were serious
23 concerns expressed by the workers and the
24 management learned about this.
25     Q.   And to your understanding the

Page 25

Shelley

1
2  management had no access to information that
3  would allow it to be aware of the problem of
4  the excessive fees before early 2007; is that
5  correct?
6          MR. ROUX:  Objection as to the
7      form.
8      A.   My concern when I wrote this
9  statement on this that you are asking about
10 refers to the problems of engaging and
11 recruiting workers.  So as I said here Signal
12 did not have access to information that would
13 allow it to be aware of the problem of
14 recruiters making false promises to it's
15 potential workers in India.  That does not
16 concern what happened once the workers arrived
17 in the United States.  That concerned what
18 happened in India before Signal entered into
19 this relationship with the recruiters.
20     Q.   But there is a third category of
21 time that I am particularly interested in
22 Professor Shelley.  You have got the category
23 of time before November 1, 2006 when all the
24 workers are in India, okay, are you with me so
25 far?

7 (Pages 22 to 25)

Page 26

```
            Shelley
 1
 2      A.   Yes.
 3      Q.   You have a point in time after all
 4  the workers have arrived at Signal sometime in
 5  2007; correct?
 6      A.   Correct.
 7      Q.   I want to talk about the time in
 8  between November 1, 2006 and the time the last
 9  worker arrives in 2007.  Are you with me?
10      A.   Uh-hum.
11      Q.   During those several months there
12  are still workers in India; correct?
13      A.   Yes.
14      Q.   Signal at that point if it was
15  aware of the problems as you describe it and
16  the duplicitous practices as you describe it
17  in your report could have made the decision
18  not to bring in another single worker to
19  Signal who has paid exorbitant recruiting fees
20  or been lied to about getting Green Cards,
21  Signal could have made that decision; correct?
22           MR. ROUX:  Objection as to the
23      form.  You can answer.
24      A.   Signal tried to work with the
25  process that it had, and Signal broke with
```

Page 27

```
            Shelley
 1
 2  it's relationship with the recruiter and the
 3  lawyer in this process.
 4      Q.   When?
 5      A.   As they became more aware of what
 6  the extent of the problems were they ended
 7  their recruiting contract.
 8      Q.   Did you think that was an
 9  appropriate thing for them to do?
10      A.   Yes.
11      Q.   Because once they became aware
12  that the recruiters and the lawyer were
13  engaged in this as you described it
14  duplicitous practices, it would have been
15  wrong for Signal to continue to work with
16  them; is that correct?
17           MR. ROUX:  Objection as to the
18      form.
19      A.   There is a complex problem here in
20  that as an employer when you learn of a worker
21  and their debts and what they say that they
22  owe, then are you going to dismiss them and
23  say I was deceived and deport them back.
24      Q.   We are not talking about the
25  workers who are at Signal now, I am talking
```

Page 28

```
            Shelley
 1
 2  about the workers who are in India.  If Signal
 3  were to learn that those workers still in
 4  India were being charged exorbitant fees and
 5  were being given false promises about getting
 6  Green Cards through Signal, then as I
 7  understood it you said that Signal should and
 8  did take the appropriate step of ceasing work
 9  with those recruiters and lawyer.  Do I have
10  that wrong?
11           MR. ROUX:  Objection as to the
12      form.
13      A.   Signal attempted to recruit
14  individuals through its own procedures to
15  ensure that individuals were not paying
16  excessive fees.
17      Q.   Did that apply to a single one of
18  these India H-2B workers?
19      A.   No, it applied to a group of
20  Indian workers that they sought to get and
21  avoid this process.
22      Q.   When did they do that?
23      A.   They did that in 2006 to '7.
24      Q.   Who told you that?
25      A.   I interviewed people who went and
```

Page 29

```
            Shelley
 1
 2  worked with a recruiter in India.
 3      Q.   Who did you interview?
 4      A.   I interviewed one of the senior
 5  staff at Signal.
 6      Q.   Who was that; was that Darrell
 7  Snyder?
 8      A.   I talked to Darrell, yes.
 9      Q.   And he told you he went over to
10  India to try to recruit Indian workers himself
11  without going through this process?
12      A.   With an alternative recruiter to
13  avoid this process, yes.
14      Q.   That was in later 2007, right,
15  because of all the problems they figured out
16  with the recruiters and lawyer they used to
17  bring in the 500 workers who are all
18  plaintiffs in these cases; right?
19           MR. ROUX:  Objection as to the
20      form.
21      A.   The planning for that was done
22  earlier than 2007.
23      Q.   Then why did Signal keep working
24  with -- strike that.
25           For the workers who were still in
```

## Page 30

```
 1              Shelley
 2    India when Signal learned of the problems and
 3    the duplicitous practices as you described it,
 4    what should Signal have done?
 5          MR. ROUX:  Objection as to the
 6    form.
 7       A.   I think that Signal worked in the
 8    circumstances that it did to try and provide
 9    the workers well paid employment.
10       Q.   Just so I understand this, I want
11    to understand your opinion in this regard
12    precisely.  You have got workers in India,
13    including some of the plaintiffs in this case
14    who are going to trial in January, if Signal
15    learns that those workers had been charged
16    excessive recruiting fees, fees that Signal
17    itself calls excessive, and learns that those
18    people believed that they are coming over to
19    work at Signal because they are going to get
20    Green Cards, that is what they have been
21    promised, you think it is okay in that
22    circumstance for Signal to say that is fine,
23    send us the workers because we will at least
24    give them good paying jobs?
25          MR. ROUX:  Objection.
```

## Page 31

```
 1              Shelley
 2       A.   No.
 3       Q.   What should Signal have done in
 4    that hypothetical?
 5          MR. ROUX:  Objection as to the
 6    form.
 7       A.   Signal tried to get it's recruiter
 8    that it had been working with to refund the
 9    money to the workers.
10       Q.   Was Signal successful in that
11    attempt?
12       A.   No.
13       Q.   Did Signal bring in any workers
14    after -- or did Signal continue to work with
15    the recruiter and the lawyer after they
16    refused to give refunds?
17       A.   It tried to work with them to
18    force them to refund the money.
19       Q.   And it was unsuccessful, was it
20    not?
21       A.   It was not successful.
22       Q.   So if it is unsuccessful in
23    getting them to refund the money is it still
24    okay then for Signal to bring in these workers
25    because they can say hey, at least we tried to
```

## Page 32

```
 1              Shelley
 2    get them a refund?
 3       A.   Signal was concerned about the
 4    debt of the workers.  The question is what has
 5    been done to recover the debt of the workers.
 6       Q.   So it is your testimony, I want to
 7    know the opinion you are giving here.  You
 8    have got workers in India who Signal has not
 9    brought to the United States yet, and you
10    agree with me that Signal could have made the
11    decision as to those workers, don't send them
12    to work at Signal, we are not going to employ
13    workers who have been charged excessive fees
14    or lied to about Green Cards.  Signal could
15    have made that choice; correct?
16       A.   I am not sure that Signal
17    understood the extent of the deception in
18    reference to the Green Cards.
19       Q.   I did ask you earlier about when
20    they learned about the fees and you said that
21    was in 2007 I believe?
22       A.   Right.
23       Q.   When did Signal learn about the
24    deception with respect to the Green Cards?
25          MR. ROUX:  Objection as to the
```

## Page 33

```
 1              Shelley
 2    form.
 3       A.   There was some discussion of Green
 4    Cards, but that was separate from some of the
 5    understanding on the extent of the recruiting
 6    fees.
 7       Q.   But my question was when did
 8    Signal, to use your words in your report, have
 9    access to information that would allow it to
10    be aware of the problem, and in this case the
11    problem being the false promise of Green
12    Cards?
13          MR. ROUX:  Objection as to the
14    form.
15          MR. SHAPIRO:  Objection as to the
16    form.
17       A.   I cannot say definitively when
18    senior management understood that there was a
19    deception in regards to Green Cards.
20       Q.   Professor Shelley, in your report
21    the next sentence you say:  Signal was not
22    engaged in human trafficking at any stage of
23    the process with the H-2B workers, either at
24    their recruitment, on their arrival in the
25    United States, or in their employ.
```

| Page 34 |
| --- |

Shelley

1
2    And you base that opinion that you
3  give on the fact that in your view Signal did
4  not have access to information that would have
5  allowed it to become aware of the problem;
6  correct?
7        MR. ROUX:  Objection as to the
8    form.
9        A.   No.
10       Q.   What is the relation between those
11  two sentences and the paragraph?
12       A.   My understanding of what human
13  trafficking is is what determined my statement
14  here.
15       Q.   You chose to put two sentences
16  next to each other in your report, and this
17  report is all I have to go on as to what your
18  opinion is.  So I will tell you how I read
19  this and if it is wrong please let me know.
20       I read this as you saying Signal
21  didn't have the information to let them know
22  that these recruiters and the lawyer they were
23  working with were engaged in these duplicitous
24  practices, the exorbitant fees, the false
25  promises of Green Cards, so Signal was not

| Page 35 |
| --- |

Shelley

1
2  involved or engaged in human trafficking in
3  connection with those problems?
4        MR. ROUX:  Objection.
5        Q.   Am I missing something?
6        A.   You are missing the definition of
7  human trafficking.
8        Q.   We will get to the definition of
9  human trafficking.  I want to know for
10  purposes of your opinion that Signal was not
11  engaged in human trafficking, of what
12  relevance or significance or importance is it
13  to you that in your view Signal was not -- did
14  not have access to information to let it be
15  aware of the problem, the duplicitous
16  practices being performed by the recruiters
17  and the lawyer?
18       A.   That is a piece of it, but not the
19  entirety of it.
20       Q.   Is it an important piece of it?
21       A.   It is a piece of it, that is all I
22  will say.
23       Q.   You understand that the
24  plaintiffs' allegations in this case relate to
25  forced labor; correct?

| Page 36 |
| --- |

Shelley

1
2        A.   Correct.
3        Q.   And according to the plaintiffs in
4  this case some of the significant elements of
5  the forced labor in this case are the fact
6  that they had to go in debt to pay these
7  exorbitant recruiting fees; is that correct?
8        A.   Correct.
9        Q.   And that they did so based on a
10  false promise that Signal was going to sponsor
11  them for Green Cards?
12        MR. ROUX:  Objection as to the
13    form.
14       Q.   You understand that; correct?
15       A.   They were lied to that this was
16  going on, yes.
17       Q.   So those are important elements of
18  the claim in this case; correct?
19        MR. ROUX:  Objection as to the
20    form.
21       A.   They are part of the claim.
22       Q.   And your opinion is Signal is not
23  responsible for the exorbitant fees or the
24  lies about Green Cards because Signal was
25  unaware of them; correct?

| Page 37 |
| --- |

Shelley

1
2        MR. ROUX:  Objection as to the
3    form.
4        A.   Signal did not contract for these
5  workers, it was not part of the recruitment
6  process starting in 2003 in which these lies
7  were made to the workers.
8        Q.   Signal contracted with Michael Pol
9  and Global Resources, did it not?
10       A.   Yes.
11       Q.   Signal gave a broad power of
12  attorney to Sachin Dewan, the India recruiter,
13  did it not?
14        MR. ROUX:  Objection as to the
15    form.
16       A.   It gave them power of attorney,
17  yes.
18       Q.   Signal engaged Malvern Burnett not
19  just once, but twice in December of 2006 and
20  in September of 2007; is that correct?
21       A.   Yes.
22       Q.   During 2006 the workers who were
23  recruited to work at Signal in India by Mr.
24  Pol, Mr. Dewan and Mr. Burnett were promised
25  that Signal would sponsor them for Green

TSG Reporting - Worldwide - 877-702-9580

## Page 38

```
 1              Shelley
 2  Cards, were they not?
 3          MR. ROUX:  Objection as to the
 4  form.
 5      A.   Can you repeat that?
 6      Q.   The recruits in 2006 that came to
 7  work at Signal were promised that Signal would
 8  sponsor them for Green Cards; is that correct?
 9          MR. ROUX:  Objection as to the
10  form.
11      A.   Promised by whom?
12      Q.   Sachin Dewan, Michael Pol and
13  Malvern Burnett?
14      A.   They advertised offering them
15  employment with Green Cards.
16      Q.   Now is it of relevance to your
17  opinion in this case that Signal was not
18  involved in human trafficking the fact that
19  according to your opinion Signal did not have
20  access to information to become aware of the
21  Green Card promises or the exorbitant fees;
22  yes or no?
23          MR. ROUX:  Objection.
24      A.   Yes it is relevant.
25          MR. SHAPIRO:  Objection.
```

## Page 39

```
 1              Shelley
 2      Q.   So I take it it would also be of
 3  relevance to you when Signal became aware of
 4  that information and what they did about it;
 5  correct?
 6          MR. ROUX:  Objection as to the
 7  form.
 8      A.   Yes.
 9      Q.   And in that regard you have
10  testified that they became aware of the
11  exorbitant fees early 2007, my question now is
12  when did they become aware of the false
13  promises about Green Cards?
14      A.   In the period between 2006 and
15  2007.
16      Q.   At the time that Signal became
17  aware of the false promises of Green Cards in
18  the period of time between 2006 and 2007 were
19  there still Indian H-2B workers in India that
20  had not been brought to work at Signal through
21  the recruiters and lawyer in this case?
22          MR. ROUX:  Objection as to the
23  form.
24      A.   There were workers waiting to
25  come, yes.
```

## Page 40

```
 1              Shelley
 2      Q.    So is it a fair statement based on
 3  your understanding of the records as you just
 4  described it, Signal did make a decision to
 5  continue to bring at least some of the workers
 6  from India to work at Signal despite knowing
 7  that they had been falsely promised Green
 8  Cards?
 9          MR. ROUX:  Objection as to the
10  form.
11      A.   Signal was engaged in this period
12  in trying to take action against the lawyers
13  that were involved in this case.
14      Q.   My question Professor Shelley --
15  can you read back my question please.
16          (Record read.)
17      Q.   That is a yes or no question?
18      A.   Yes.
19      Q.   And in your opinion was that an
20  appropriate decision to make?
21          MR. ROUX:  Objection as to the
22  form.
23      A.   It is a very complex decision and
24  not one taken in isolation because Signal was
25  doing other things at the time same to address
```

## Page 41

```
 1              Shelley
 2  the problem that it found was existing with
 3  the work force that had arrived.
 4      Q.   What steps did Signal take when it
 5  made the decision to continue bringing workers
 6  from India to work at Signal despite knowing
 7  of the false promise of Green Cards to correct
 8  the falsity of that promise; that is to make
 9  sure that the workers before they got on the
10  plane in India knew that Signal was not
11  intending to get them Green Cards?
12          MR. ROUX:  Objection as to the
13  form.
14      A.   Signal was working with the
15  recruiters, it was working with the bar
16  association to try and deal with the problem
17  of the local recruiter, and it was trying to
18  address the problems that it had in terms of
19  recruitment fees and in terms of the
20  misrepresentations that had been made to the
21  workers.
22      Q.   My question to you is what precise
23  actions did Signal take to make sure the
24  workers who were still in India whom Signal
25  now knew had been falsely promised Green Cards
```

Case 2:15-cv-02296-SM-DEK Document 72-2 Filed 01/15/15 Page 13 of 85
Case 1:13-cv-00499-MAC-ZJH Document 92-3 Filed 01/15/15 Page 13 of 85 PageID #:
1678

| Page 42 | Page 43 |
|---|---|
| Shelley | Shelley |
| 1 | 1 |
| 2  received accurate information about their | 2  Q.  Did any of those conversations |
| 3  immigration status before getting on the plane | 3  relate to tell the workers they are not |
| 4  to come to work for Signal; can you identify | 4  getting Green Cards; an instruction from |
| 5  anything? | 5  Signal to correct the false premise on which |
| 6      MR. ROUX:  Objection as to the | 6  these workers were coming to work at Signal? |
| 7  form. | 7      MR. ROUX:  Objection as to the |
| 8      A.   I know there were communications | 8  form. |
| 9  with the recruiter.  I do not know what the | 9      A.   Signal was not making these |
| 10  recruiter did in response to all of that. | 10  promises, therefore the question comes is what |
| 11      Q.   Have you seen any -- you say you | 11  did Sachin Dewan say to them, because these |
| 12  have reviewed thousands of E-mails in this | 12  promises were not made in Signal's offer of |
| 13  case.  Have you seen any E-mail, written | 13  employment that was shown to the witness and |
| 14  communication between anyone at Signal and any | 14  which they signed. |
| 15  recruiter telling them please tell the workers | 15      Q.   It was made in the written letters |
| 16  who are still in India before they get on the | 16  from Sachin Dewan before the workers got on |
| 17  plane that they are not getting Green Cards? | 17  the plane, right, you have seen those that say |
| 18      A.   I have seen communications between | 18  Signal is going to sponsor you for a Green |
| 19  Signal and recruiters on their problems with | 19  Cards? |
| 20  the recruitment process. | 20      MR. ROUX:  Objection as to the |
| 21      Q.   Anything relating to what I just | 21  form. |
| 22  said? | 22      A.   I have seen the documents that the |
| 23      A.   I have known that there were | 23  workers signed in which they were not told -- |
| 24  conversations with Sachin Dewan, between | 24  they did not sign that they were getting a |
| 25  Signal and Sachin Dewan. | 25  Green Card from Signal. |

| Page 44 | Page 45 |
|---|---|
| Shelley | Shelley |
| 1 | 1 |
| 2      Q.   Have you seen any documents that | 2      A.   I was provided a set by counsel on |
| 3  the workers signed before getting on the plane | 3  many topics that I asked for. |
| 4  to come to the United States that said on | 4      Q.   Did you ask counsel to show you |
| 5  Dewan letterhead the company Signal will | 5  any documents that showed that the workers |
| 6  sponsor you for an employment based Green | 6  were being promised that Signal was going to |
| 7  Cards? | 7  sponsor them for Green Cards? |
| 8      MR. ROUX:  Objection as to the | 8      MR. ROUX:  Objection as to the |
| 9  form. | 9  form. |
| 10      A.   I have not seen anybody has signed | 10      A.   I asked for documents on |
| 11  anything saying that they will get a Green | 11  everything concerning the recruitment process, |
| 12  Cards through their employment at Signal with | 12  concerning the employment, the conditions of |
| 13  Signal.  Their work agreement did not say | 13  employment, the pay, the offers of agreement. |
| 14  that. | 14      Q.   I want to come back to the point |
| 15      Q.   The work agreement with Signal? | 15  that you made that -- am I understanding |
| 16      A.   Yes. | 16  correctly that it is your opinion that Signal |
| 17      Q.   And you have not seen these other | 17  did not need to take affirmative steps to |
| 18  agreements? | 18  correct the false promise being made to the |
| 19      MR. ROUX:  Objection as to the | 19  workers who were still in India about Green |
| 20  form. | 20  Cards because those promises were being made |
| 21      Q.   Let me ask you this.  How were the | 21  by Dewan, Pol and Burnett and not made by |
| 22  thousands of E-mails and documents that you | 22  Signal itself; is that your opinion? |
| 23  say you have reviewed in this case selected; | 23      MR. ROUX:  Objection as to the |
| 24  did you ask to see everything or were you just | 24  form. |
| 25  provided a set by counsel? | 25      A.   I did not say that they were not |

| Page 46 | Page 47 |
|---|---|

**Page 46**

Shelley

1  
2 taking affirmative steps. They were working  
3 with the individuals who were directly  
4 involved who had their power of attorney.  
5     Q. Were they successful in getting  
6 their agents, the recruiter with the power of  
7 attorney, Michael Pol with whom they had a  
8 contract, Malvern Burnett with whom they had a  
9 contract, to correct the false promises before  
10 the workers got on the plane?  
11     A. They were not.  
12     MR. SHAPIRO: Objection to the  
13 form.  
14     A. They were working with them. They  
15 were working with the Bar Association of the  
16 State of Louisiana.  
17     Q. When did they do that?  
18     A. I cannot give you the date, but I  
19 have read documents on that.  
20     Q. So do I understand your testimony  
21 correctly though that it is important to your  
22 opinions in this case that your view is that  
23 Signal was actively working with it's  
24 recruiters and lawyers and the bar association  
25 to try to clear up these duplicities that were

**Page 47**

Shelley

1  
2 involved before bringing all the workers to  
3 Signal?  
4     A. Yes, they were working on this.  
5     Q. And that is important to your  
6 opinions?  
7     A. It is a piece of it.  
8     Q. And now I want to know if you can  
9 point to me, to any specific document in the  
10 record from anyone you worked on, give me with  
11 any specificity a document that tells you that  
12 in the period between November 2006 and March  
13 of 2007 let's say Signal was working on the  
14 problem of the false promises of Green Cards,  
15 to correct those false promises with it's  
16 recruiters and lawyer or the bar association?  
17     MR. ROUX: Objection as to the  
18 form.  
19     A. In three months Signal was not yet  
20 fully aware of the promise of Green Cards.  
21     Q. So tell me when did they become  
22 fully aware of the promise of Green Cards?  
23     A. After the problems in March 2007  
24 there was greater awareness of Signal of the  
25 promises that had been made.

| Page 48 | Page 49 |
|---|---|

**Page 48**

Shelley

1  
2     Q. That is your understanding that  
3 they didn't have full awareness that false  
4 promises of Green Cards were being made before  
5 March of 2007?  
6     A. There were issues --  
7     MR. ROUX: Objection to the  
8 form.  
9     A. There were points made by the  
10 workers, but the full documentary evidence on  
11 this such as you are talking about was  
12 certainly something they were not fully aware  
13 of.  
14     Q. What documentary evidence did  
15 Signal need to be in a position to be fully  
16 informed?  
17     A. I think the documents that you  
18 were referring to, advertisements, of  
19 statements by the recruiters to the workers.  
20     Q. And it is your understanding that  
21 Signal didn't see those advertisements or see  
22 the contract with Sachin Dewan which says that  
23 they would get sponsored for Green Cards until  
24 March of 2007?  
25     A. I am not sure how far up the

**Page 49**

Shelley

1  
2 management chain is, but this was not  
3 something that was immediately -- that they  
4 were immediately aware of with the arrival of  
5 the workers.  
6     MR. HOWARD: Would you mark this  
7 as Shelley Exhibit 2, E-mail dated March  
8 13, 2008.  
9     (Shelley Exhibit 2, E-mail dated  
10 March 13, 2008, SIGE 0163151 to 153,  
11 marked for identification, as of this  
12 date.)  
13     Q. Professor Shelley, I am showing  
14 you what has been marked as Shelley Exhibit 2,  
15 it is a multipage document page, Bates SIGE  
16 0163151 through 153. There is an E-mail chain  
17 and I am going to focussed on an E-mail on the  
18 second page of the document dated March 10,  
19 2008 from Richard Marler to Jennifer Ludden, a  
20 reporter with NPR.  
21     My first question is have you seen  
22 this before?  
23     A. Yes.  
24     Q. Was this a document provided to  
25 you before you wrote your expert report?

TSG Reporting - Worldwide - 877-702-9580

| Page 50 | Page 51 |
|---|---|

**Page 50**

```
                 Shelley
 1        A.    Yes.
 2              MS. HANGARTNER:  Alan I am just
 3        going to ask before you start to ask
 4        specific questions you allow
 5        Professor Shelley to fully review the
 6        E-mail?
 7              MR. HOWARD:  Absolutely.
 8        Q.    Have you had an opportunity to
 9   review it?
10        A.    Yes.
11        Q.    Do you have an understanding of
12   the context of this E-mail when you reviewed
13   it for your report?
14        A.    I understood that it was a
15   response from the senior management to an
16   inquiry from a journalist.
17        Q.    This is after the lawsuit had been
18   filed; is that correct?
19        A.    Correct.
20        Q.    And the CEO, Richard Marler,
21   suggested that a press release provided by
22   Signal should be the subject of a positive
23   press story on the H-2B program; correct?
24        A.    That is what he says here.
```

**Page 51**

```
                 Shelley
 1        Q.    Did you actually review the press
 2   release as well?
 3        A.    Yes.
 4        Q.    He says in the middle, the third
 5   paragraph:  The core issue regarding the
 6   problem confronting the initial inflow of
 7   Indian guest workers occurred in India without
 8   Signal involvement or knowledge.  Stated
 9   simply the workers paid Indian U.S. middlemen
10   and U.S. lawyers too much money to get work
11   visas and jobs at Signal.  In addition several
12   workers misrepresented their skills.  These
13   workers were also sold a bill of goods
14   regarding obtaining Green Cards and ultimately
15   perhaps citizenship.
16        So this is consistent with your
17   understanding of the duplicitous practices
18   that caused the problem as Mr. Marler
19   describes it here; is that correct?
20              MR. ROUX:  Objection as to the
21        form.
22        Q.    Let me say it another way.
23              He is describing as the problem
24   being that the workers paid too much money and
```

| Page 52 | Page 53 |
|---|---|

**Page 52**

```
                 Shelley
 1   they were sold a bill of goods about getting
 2   Green Cards; is that correct?
 3              MR. ROUX:  Objection as to the
 4        form.
 5        A.    It states that they paid too much,
 6   yes, and they were lied to about their Green
 7   Cards, yes.  It also states that the workers
 8   misrepresented their skills to Signal, so that
 9   there is a problem on both sides.
10        Q.    So you agree with me the too much
11   money and being sold a bill of goods about a
12   Green Card was a problem?
13        A.    Everybody agrees it was a problem.
14        Q.    And Signal became aware of this
15   problem shortly after the arrival of the
16   initial Indian work force in late 2006, early
17   2007; is that correct?
18              MR. ROUX:  Objection as to the
19        form.
20        Q.    That is what he says?
21        A.    That is what he says, yes.
22        Q.    So he is saying when the initial
23   workers came to Signal, and I think you and I
24   reached agreement that that happened in
```

**Page 53**

```
                 Shelley
 1   November 1, 2006, Signal became aware of the
 2   problem, at least according to CEO Dick
 3   Marler; correct?
 4        A.    Yes.  As I said I didn't know what
 5   level it reached after Signal became aware of
 6   it, but people at Signal became aware of it.
 7   I said that earlier.
 8        Q.    Did you interview Dick Marler for
 9   purposes of your report?
10        A.    Yes.
11        Q.    Did you ask him about this
12   document?
13        A.    I asked him about his knowledge of
14   the situation.  I did not particularly ask him
15   about one particular document over another.
16        Q.    Did Mr. Marler tell you like he
17   told Ms. Ludden that Signal became aware of
18   the problem of too much fees and the workers
19   being sold a bill of goods about Green Cards
20   shortly after the arrival of the initial
21   Indian work force?
22              MR. ROUX:  Objection as to the
23        form.
24        A.    I did not ask him the exact dates
```

TSG Reporting - Worldwide - 877-702-9580

Case 2:15-cv-02296-SM-DEK Document 78-2 Filed 01/15/15 Page 16 of 85
Case 1:13-cv-00499-MAC-ZJH Document 92-3 Filed 01/15/15 Page 16 of 85 PageID #:
1681

## Page 54

```
                  Shelley
 1
 2   of the chain, but I knew that he was aware of
 3   a problem.
 4        Q.   Did you ask Mr. Marler or any of
 5   senior management at Signal, guys, did you
 6   know that the workers were paying too much in
 7   fees or had been lied to about Green Cards
 8   while they were still workers over in India;
 9   did you ask him that question?
10        MR. ROUX:  Objection as to the
11   form.
12        A.   I was told by management that
13   there was a constant flow of workers after,
14   you know, that came over this period.  I did
15   not need to ask them that question because
16   they told me the chronology of this process.
17        Q.   Aside from telling you that
18   workers came over a period of months, did you
19   ask them whether for any of those workers who
20   came after the initial workers, guys, did you
21   know before those workers came that they had
22   been paying too much money and been sold a
23   bill of goods about Green Cards; did you ask
24   them that?
25        A.   I talked to them about all of
```

## Page 55

```
                  Shelley
 1
 2   these issues, so I didn't need to particularly
 3   ask them because they talked to me about the
 4   whole problem and laid it out for me.
 5        Q.   As part of telling you the problem
 6   and laying it out for you, did they tell you
 7   yes, we made a decision to bring in workers
 8   even though we knew they paid too much money
 9   and that they had been sold a bill of goods
10   about Green Cards; did they tell you that?
11        A.   No.
12        Q.   If that were in fact the case
13   would you have a problem with that?
14        MR. ROUX:  Objection as to the
15   form.
16        Q.   Would you think that would be
17   inappropriate?
18        A.   It depends on the context -- what
19   is appropriate -- the question comes of what
20   do we do with these workers that have paid and
21   put themselves in debt already.
22        Q.   Who are still in India?
23        A.   Yes.
24        Q.   So is it your testimony and your
25   opinion that because you assumed these
```

## Page 56

```
                  Shelley
 1
 2   workers, and I take it this is an assumption
 3   that they have paid this money and put
 4   themselves in debt in India; is that correct?
 5        A.   This is an assumption?
 6        Q.   Correct.  For the workers who are
 7   still in India what knowledge does Signal have
 8   that they are actually in debt, have put
 9   themselves in debt in India?
10        MR. ROUX:  Objection as to the
11   form.
12        A.   Signal would have to extrapolate
13   from what it has heard previously.
14        Q.   Professor Shelley, as an expert in
15   human trafficking and forced labor and issues
16   such as the ones you teach about and study,
17   can you identify for the jury in this case
18   circumstances in which it would be appropriate
19   for an employer in the United States to learn
20   that a group of individuals in another country
21   have been charged excessive recruiting fees by
22   recruiters and a lawyer hired by that company
23   to get them workers, and had been lied to
24   about the fact that when they come to the
25   United States they are going to get Green
```

## Page 57

```
                  Shelley
 1
 2   Cards for those workers, where it would still
 3   be appropriate for that employer to bring the
 4   workers in to the country to the U.S. to work
 5   for them?
 6        MR. ROUX:  Objection as to the
 7   form.
 8        A.   That is not a clear question.
 9        Q.   What is unclear about it?
10        A.   You have compounded too many
11   elements in the question.
12        Q.   Let me try to say it again simply.
13        Take a hypothetical, you have an
14   employer who has hired recruiters and a lawyer
15   to get them workers from India, with me so
16   far?
17        A.   Yes.
18        Q.   They learn that these recruiters
19   and lawyer have paid what the employer
20   considers to be excessive recruiting fees,
21   okay, are you with me?
22        A.   Yes.
23        Q.   They also learn that the
24   recruiters and the lawyer have lied to these
25   workers to get them to pay those fees by
```

15 (Pages 54 to 57)

Page 58

```
 1              Shelley
 2    saying they are going to get Green Cards when
 3    they come to work for the employer.  The
 4    employer knows these things and makes the
 5    decision anyway to have those workers come to
 6    the United States to work for that employer.
 7          I am asking you to give me a set
 8    of circumstances in your professional opinion
 9    where that would be an appropriate and
10    acceptable decision for the employer to make?
11          MR. ROUX:  Objection as to the
12       form.
13       A.   The analogy that you have just
14    given is not consistent with the situation in
15    this case.
16       Q.   If the jury were to find based on
17    the record it is consistent with the situation
18    in this case, then would you agree that there
19    are no circumstances under which it would be
20    appropriate for the employer to make that
21    decision?
22          MR. ROUX:  Objection as to the
23       form.
24       A.   There are many other facts in this
25    case, and there are many other things that
```

Page 59

```
 1              Shelley
 2    happened in this case other than the
 3    hypothetical that you just posed to me.
 4       Q.   Tell me what facts you believe are
 5    present in this case that are not in my
 6    hypothetical that would make it appropriate
 7    for Signal to have made the decision to
 8    continue to bring workers to work at Signal
 9    despite knowing that they had paid excessive
10    fees to the recruiters and lawyer hired by
11    Signal, and that they had been promised
12    falsely that they would get Green Cards at
13    Signal?
14          MR. ROUX:  Objection as to the
15       form.
16       A.   This is not my job to come up with
17    the terms of a case.  I can comment on
18    specific provisions, I am not coming up with
19    an alternative scenario.
20       Q.   With all due respect Professor I
21    am entitled to know if you believe that
22    Signal's actions in this case were appropriate
23    with respect to the decision they made to
24    bring workers from India to work at Signal
25    even though they knew those workers had paid
```

Page 60

```
 1              Shelley
 2    excessive fees and had been lied to about
 3    Green Cards, I am entitled to know why?
 4          MR. ROUX:  Objection as to the
 5       form.
 6       A.   As Mr. Marler says in his
 7    statement, we have refused to do additional
 8    business with the original recruiters and
 9    lawyers.  They have been replaced with what we
10    believe to be more reliable personnel.
11       Q.   Well he actually says we
12    immediately terminated those persons in India
13    and the United States that were involved in
14    the initial recruitment.
15       A.   Yes, I said that earlier.
16       Q.   Is that an accurate reflection of
17    the record?
18       A.   As far as I know.
19       Q.   You told me you saw the agreements
20    with for example the lawyer, Mr. Burnett;
21    correct?
22       A.   Yes.
23       Q.   They hired him again in September
24    of 2007, didn't they?
25       A.   They tried to -- they fired Mr.
```

Page 61

```
 1              Shelley
 2    Pol, but not Mr. Burnett.
 3       Q.   Or Mr. Dewan, they didn't fire him
 4    either?
 5       A.   They had serious problems with Mr.
 6    Dewan and Mr. Dewan's -- let me say.  In the
 7    Indian court decision on this case the Indian
 8    court referred to this as a conspiracy of
 9    Dewan, Pol and Burnett.
10       Q.   With all due respect I don't care
11    about the Indian court right now.  My question
12    to you was did Signal or did Signal not as Mr.
13    Marler says in his E-mail to Jennifer Ludden,
14    the reporter at NPR, immediately terminate Mr.
15    Dewan when it found out from the initial
16    workers that they paid too much money and had
17    been sold a bill of goods about Green Cards?
18          MR. ROUX:  Objection as to the
19       form.
20       A.   It terminated its recruitment
21    contract, yes.
22       Q.   Your understanding is that it
23    immediately terminated it's contract with Mr.
24    Dewan?
25       A.   I don't know immediately because I
```

16 (Pages 58 to 61)

Case 2:15-cv-02296-SM-DEK Document 72-2 Filed 01/15/15 Page 18 of 85
Case 1:13-cv-00499-MAC-ZJH Document 291-3 Filed 01/15/15 Page 18 of 85 PageID #:
1683

| Page 62 | Page 63 |
|---|---|
| Shelley | Shelley |

**Page 62**

Shelley

1 told you I don't know -- I have memos like
2 this, I don't know exactly when Mr. Marler
3 learned this and felt that what his will lower
4 level staff were telling him was credible and
5 he terminated this contract.
6     Q.   Did you ask him?
7     A.   I asked him about his concerns and
8 he talked to me about his complex problems of
9 disengaging from Pol, Burnett and Sachin
10 Dewan.
11     Q.   Professor Shelley coming back to
12 my question that I do believe I am entitled to
13 understand your opinion.  If Signal made the
14 decision to bring workers to work at Signal
15 from India despite knowing those specific
16 workers had paid excessive recruiting fees and
17 been lied to about Green Cards, I want to know
18 the facts in your opinion that make that
19 decision acceptable and appropriate.  I
20 understand you have given me one now, your
21 view, your understanding of the record that
22 Signal immediately terminated those they
23 viewed responsible for the fees and the lies,
24 that is Dewan, Pol and Burnett.  Anything

**Page 63**

Shelley

1 else?
2     MR. ROUX:  Objection as to the
3 form.
4     A.   They tried to work on the process
5 to get workers' fees refunded.  They tried to
6 work with the workers to provide them, when
7 they learned about this debt, to provide them
8 employment so that they could pay back the
9 debt for the workers that they had there.
10     Q.   You mentioned this a couple of
11 times and I want to know, I want to understand
12 your opinion in this regard.  If in fact -- by
13 the way have you read any of the deposition
14 testimony of any of the executives of Signal
15 in this case?
16     A.   Yes.
17     Q.   Whose?
18     A.   I have read one or two of them.
19 They have not all been transcribed yet.
20     Q.   How about the ones from the class
21 certification phase of the case?
22     A.   That case I have read through,
23 yes.
24     Q.   All of them?

**Page 64**

Shelley

1     A.   Not all of them, but I read
2 through some of them.
3     Q.   Which ones?
4     A.   I think I have read through -- I
5 am going to have to check in my files.
6     Q.   And were these ones that you
7 specifically asked for from counsel or did
8 they voluntarily select ones for you?
9     A.   They gave me some of the senior
10 people to read.
11     Q.   Did they give you Ron Schnoor's
12 deposition?
13     A.   I have read some of Ron Schnoor.
14 I can't tell you if I read his deposition for
15 that, I have to look in my files.
16     Q.   Do you recall what Mr. Schnoor
17 answered when I asked him why he made the
18 decision to bring workers from India whom
19 he known had paid too much money and been lied
20 to about Green Cards?
21     A.   No, I cannot tell you right now.
22     Q.   Do you recall the response when he
23 said we needed the workers?
24     A.   Yes, I know that.

**Page 65**

Shelley

1     Q.   Did you see what he said when I
2 asked him the follow up whether he gave any
3 consideration to the Indian workers
4 themselves; do you recall what he said?
5     A.   He was concerned about the
6 employment, but there were plenty of people at
7 Signal who were concerned about the workers.
8 That I have interviewed and determined in many
9 different cases.
10     Q.   But Mr. Schnoor was not one of
11 them; correct?
12     MR. ROUX:  Objection as to the
13 form.
14     A.   I am not making a character
15 judgment on Mr. Schnoor.  I am confirming what
16 you have read in that statement.  But I have
17 said that in interviewing many of the top
18 management of Signal I have seen a great
19 concern for the Indian workers.
20     Q.   And those are interviews that you
21 have done in 2014 six years after this lawsuit
22 was filed; is that correct?
23     A.   That is correct.
24     Q.   And you give more credibility to

Case 2:15-cv-02296-SM-DEK Document 78-2 Filed 01/15/15 Page 18 of 85
Case 1:13-cv-00499-MAC-ZJH Document 92-3 Filed 03/15/15 Page 19 of 85 PageID #:
1684

Page 66

```
 1              Shelley
 2    those interviews you conducted than the sworn
 3    testimony of the number 2 man at Signal as to
 4    precisely why he made the decision to bring in
 5    the workers, and whether he gave any
 6    consideration to the Indian workers at all?
 7         MR. ROUX:  Objection as to the
 8    form.
 9         A.   I believe in doing a diverse
10    complex analysis of the subject and not to
11    focus always on one line or two lines in the
12    deposition in which somebody under pressure
13    may not be giving the best representation of
14    what they are saying.
15         Q.   And that is what you felt about
16    Mr. Schnoor's testimony when you read it, so
17    you discounted that?
18         MR. ROUX:  Objection as to the
19    form.
20         A.   I do not say that I discounted it,
21    it is all part of what goes into my analysis.
22         Q.   Did you talk with Mr. Schnoor, did
23    you interview him?
24         A.   Yes.
25         Q.   Did you ask him what he meant by
```

Page 67

```
 1              Shelley
 2    that testimony?
 3         A.   I have talked to him about his
 4    testimony, yes.
 5         Q.   Have you talked to him about the
 6    testimony I just referred to?
 7         A.   Yes.
 8         Q.   And did he stand by it?
 9         A.   I would say --
10         MR. ROUX:  Objection as to the
11    form.
12         A.   I would say that when I talked to
13    Mr. Schnoor I have an analysis of his
14    financial views on this, but also his approach
15    and concern that I registered for the workers
16    who arrived and had this bum deal.
17         Q.   Is it your view, let's take at
18    face value what you learned in these
19    interviews, that Signal was concerned about
20    the workers in India because they knew they
21    were deep in debt and the only way they could
22    get to pay off that debt was to actually come
23    to work at Signal.  Is that your understanding
24    of what they were thinking?
25         MR. ROUX:  Objection as to the
```

Page 68

```
 1              Shelley
 2    form.
 3         A.   I cannot get entirely inside their
 4    heads, but this is one thing that some people
 5    have expressed.
 6         Q.   And do you think that that is an
 7    appropriate decision for an employer to make,
 8    that is to say look, we know you have paid
 9    these excessive fees and have these debts that
10    you paid to our agents, and we know you were
11    lied to about Green Cards, and you are not
12    going to get the Green Cards, but we will make
13    the decision for you to bring you to the
14    United States to have you work in our camps
15    and on our facilities so you can make back the
16    money to repay the debts you had to take out
17    to pay the fees to our recruiters in the first
18    place, that is a decision we will make for
19    you, and it is not necessary for us to tell
20    you in advance by the way guys you are only
21    coming here temporarily and you are not
22    getting Green Cards.
23         In your view as an expert witness
24    is that an appropriate decision for Signal to
25    make?
```

Page 69

```
 1              Shelley
 2         MR. ROUX:  Objection as to the
 3    form.
 4         A.   I do not concur that there was
 5    such conscious deception as you are
 6    suggesting.
 7         Q.   Was there subconscious deception?
 8         MR. ROUX:  Objection as to the
 9    form.
10         A.   No.
11         I would like to go to the
12    bathroom.
13         MR. HOWARD:  We can take a break.
14    Off the record.
15         (Recess taken.)
16         Q.   Professor Shelley, looking at
17    Exhibit 1, your report, page 41, paragraph 57?
18         A.   Yes.
19         Q.   You say:  Signal did not charge
20    the workers any employment fee, and when they
21    learned of the situation with the recruiter
22    they broke off their relationship with Pol.
23         What situation are you referring
24    to there, the excessive fees?
25         A.   Yes.
```

18  (Pages 66 to 69)

Case 2:15-cv-02296-SM-DEK Document 72-3 Filed 01/15/15 Page 20 of 85
Case 1:13-cv-00499-MAC-ZJH Document 239-3 Filed 05/15/15 Page 20 of 85 PageID #:
1685

## Page 70

Shelley

1
2       Q.   They broke off their relationship
3   with Pol, but they did not break off their
4   relationship with Dewan and Burnett at that
5   time; correct?
6       A.   Yes.
7       Q.   Why not?
8           MR. ROUX:  Objection as to the
9   form.
10      A.   Burnett was their lawyer, they
11  were trying to work with him, and eventually
12  filed a complaint with the Louisiana Bar about
13  him.
14      Q.   Thirteen months after they fired
15  Pol; right?
16      A.   I don't know what happened in the
17  interim process between the time that they
18  fired Pol and worked with Burnett.
19      Q.   Did you believe it was an
20  appropriate step for Signal to fire Pol?
21      A.   Yes.
22      Q.   And why wouldn't it have been
23  appropriate too to fire Burnett and Dewan?
24          MR. ROUX:  Objection as to the
25  form.

## Page 71

Shelley

1
2       A.   I cannot get inside the minds of
3   the Signal management, but from what I
4   understand in my discussions with them they
5   were trying to work with Dewan and work with
6   Burnett to try to find some accommodation.
7       Q.   How many of the 500 workers that
8   came from India in this H-2B program had
9   arrived by the time they fired Michael Pol?
10      A.   I cannot give you an exact number,
11  but over a hundred at least.
12      Q.   And isn't it a fact that Signal
13  needed Burnett and needed Dewan to get those
14  other hundreds of workers to come to Signal
15  who were still in India?
16          MR. ROUX:  Objection as to the
17  form.
18      Q.   And like Mr. Schnoor said, they
19  needed the workers?
20          MR. ROUX:  Objection as to the
21  form.
22      A.   I am not sure that the reason they
23  did not fire them was that they needed the
24  workers.
25      Q.   Could have been though; right?

## Page 72

Shelley

1
2           MR. ROUX:  Objection as to the
3   form.
4       A.   I don't know.  I do know that
5   there were communications with both of them
6   expressing their concerns and their trying to
7   get them to do better.
8       Q.   Including to refund money;
9   correct?
10      A.   Yes.
11      Q.   And they got a letter from Dewan
12  on behalf of himself and Burnett saying no, we
13  are not refunding the money; correct?
14      A.   Yes.
15      Q.   They still kept working with them;
16  correct?
17      A.   They still kept working with them
18  to try and get them to behave better too.
19      Q.   And also to get more workers from
20  India through them; is that correct?
21          MR. ROUX:  Objection as to the
22  form.
23      A.   I am not saying that this was
24  just -- you are insinuating that the
25  relationship was kept solely for the purpose

## Page 73

Shelley

1
2   of obtaining workers.
3       Q.   Was it at least part of it?
4       A.   It may be, but much of this is
5   also an attempt to try and understand the
6   extent of the problem and work and rectify it
7   as they understand it.  And then at this point
8   where there is a point of no return as you
9   pointed out the relationship is broken.
10      Q.   We have been talking about things
11  that Signal learned after the first workers
12  came to Signal.  Have you seen any evidence to
13  suggest that Signal knew about the promise of
14  the Green Cards before the first worker came
15  to Signal?
16      A.   No.
17          MR. HOWARD:  Would you mark this
18  document as Shelley Exhibit 3, E-mail
19  dated August 24, 2006, numbered SIGE
20  0329048 through 50.
21          (Shelley Exhibit 3, E-mail dated
22  August 24, 2006, numbered SIGE 0329048
23  through 50, marked for identification, as
24  of this date.)
25      Q.   Professor Shelley, I am showing

19 (Pages 70 to 73)

## Page 74

```
 1              Shelley
 2  you what has been marked as Exhibit 3 to your
 3  deposition, it is a document Bates stamped
 4  SIGE 0329048 through 9050.  It is an E-mail
 5  from Global Resources, it is Michael Pol to
 6  John Sanders at Signal dated August 24, 2006.
 7         I ask whether you have ever seen
 8  this before?
 9      A.  I have to read it and let you
10  know.
11      Q.  Thank you.
12         Have you had an opportunity to
13  review the document?
14      A.  Yes.
15      Q.  Did you ever see this before?
16      A.  I have not seen this document.  I
17  have seen other documents that address some
18  pieces of this.
19      Q.  Do you know who Mr. Sanders is?
20      A.  Yes.
21      Q.  Have you ever spoken with
22  Mr. Sanders?
23      A.  No.
24      Q.  Have you read his deposition?
25      A.  I have read some things that
```

## Page 75

```
 1              Shelley
 2  Mr. Sanders has written.
 3      Q.  I asked about his deposition?
 4      A.  I don't think I read his
 5  deposition.  I have read many things of
 6  Mr. Sanders.
 7      Q.  Did you also read things he wrote
 8  in his private journal that was kept on the
 9  Signal server?
10      A.  Yes, absolutely.
11      Q.  So in August of 2006, this is
12  before any worker has arrived at Signal; is
13  that correct?
14      A.  Correct.
15      Q.  And there is a discussion in here
16  about the process in which the workers who are
17  going to come to work at Signal on a H-2B visa
18  have to go get interviewed by the consulate in
19  India; is that correct?
20      A.  Yes.
21      Q.  I think you have stated you seen
22  issues with respect to problems about the
23  workers being coached on what answers to give
24  the consulate; correct?
25      A.  That is correct.
```

## Page 76

```
 1              Shelley
 2      Q.  Does this document indicate to you
 3  the fact that the workers had to be coached
 4  before going into their interview was
 5  communicated to someone at Signal before those
 6  interviews took place?
 7         MR. ROUX:  Objection as to the
 8      form.
 9      A.  Someone at Signal knew that people
10  were being prepared for interview at the
11  consulate, yes.
12      Q.  And that they were going to be
13  coached on the proper way to interview; is
14  that correct?
15         MR. ROUX:  Objection as to the
16      form.
17      A.  I would say that people going in
18  for interviews at U.S. consulates are
19  routinely talked to about how to handle an
20  interview.
21      Q.  But the coaching that Mr. Pol is
22  telling Mr. Sanders about specifically
23  includes the fact that they should not tell
24  the consulate that Signal is sponsoring them
25  for permanent residence, a Green Card, because
```

## Page 77

```
 1              Shelley
 2  if they say that they are not going to get
 3  their H-2B visa, they will be a goner; is that
 4  correct?
 5         MR. ROUX:  Objection as to the
 6      form.
 7      A.  What he is saying is that these
 8  people should say they are going on H-2B
 9  visas, yes.
10      Q.  And be coached not to tell the
11  fact that we are going to process them for a
12  Green Card, correct; that is what it says?
13      A.  Wait.  It says that the workers
14  have to explain that they are going on H-2B
15  visas.
16      Q.  Are you specifically ignoring the
17  words that say:  More importantly there is
18  some things that should not be known to the
19  consulate personnel such as the fact that we
20  are going to process them for a Green Card.
21  If one of these guys says he is going to the
22  U.S. for immigration and Signal is sponsoring
23  him for permanent residency, Green Card, he is
24  a goner.
25         What do those words mean to you in
```

Case 2:15-cv-02296-SM-DEK Document 78-2 Filed 01/15/15 Page 22 of 85
Case 1:13-cv-00499-MAC-ZJH Document 92-1 Filed 01/15/15 Page 22 of 85 PageID #:
1687

| Page 78 | Page 79 |
|---|---|

**Page 78**

Shelley

1  this communication between Mr. Pol and
2  Mr. Sanders of Signal?
3      A.   It means that Mr. Pol is saying
4  that when the workers go in they are to say
5  that they are applying exclusively for a H-2B
6  visa.  It does not say that Signal is going to
7  sponsor them for a permanent residence or that
8  the workers understand that they will be
9  sponsored for a permanent residence.
10      Q.   Just so I am clear Professor
11  Shelley, by the words I just read to you you
12  do not infer that Mr. Pol's understanding when
13  he wrote this E-mail was the fact that we are
14  going to process them for a Green Card and
15  that Signal is sponsoring them for permanent
16  residence?
17      MR. ROUX:  Objection as to the
18  form.
19      Q.   Did Mr. Pol just make that up?
20      A.   Mr. Pol --
21      MR. ROUX:  Objection as to the
22  form.
23      A.   Wait.  It does not say that Mr.
24  Pol -- that we are processing them for a Green
25

**Page 79**

Shelley

1  Card at Signal.
2      Q.   If one of those guys says he is
3  going to the U.S. for immigration and that
4  Signal is sponsoring him for permanent
5  residence, Green Card, he is a goner, why
6  would a worker tell the consulate that Signal
7  is sponsoring them for a Green Card unless
8  that is what he has been told by the
9  recruiters and the lawyer?
10      MR. ROUX:  Objection as to the
11  form.
12      A.   I would say I have seen the
13  advertisements that were then later that
14  advertised for a Green Card.  Having read a
15  lot of what the workers have written, many of
16  them did not understand that only the
17  government can give them a Green Card.
18      Q.   My question has nothing to do with
19  the government --
20      A.   But that is who can issue a Green
21  Card, and that is a very important part of
22  this.
23      MR. ROUX:  Objection.
24      Q.   Signal has control over the
25

**Page 80**

Shelley

1  decision as to which workers, if any, it would
2  sponsor for a Green Card; is that correct?
3      A.   That is correct, that after they
4  stayed for a while eventually they might be
5  able to sponsor them for a Green Card, and
6  they have done that.
7      Q.   Well we will talk about that in a
8  bit.  But at least as of November of 2006 when
9  the first workers came right through March of
10  2007 when the last workers were there, Signal
11  had made no decision and had no intent at that
12  time to sponsor all of these H-2B workers for
13  Green Cards, isn't that a correct statement;
14  that is what their testimony is; is that
15  correct?
16      MR. ROUX:  Objection as to the
17  form.
18      A.   They had made a commitment to the
19  H-2B visa program to sponsor them for initial
20  visa of nine months.
21      Q.   And my question was they had also
22  did not have the intent at that time to
23  sponsor all of the employees for Green Cards;
24  is that correct?
25

**Page 81**

Shelley

1      MR. ROUX:  Objection as to the
2  form.
3      Q.   You have read the testimony of Ron
4  Schnoor?
5      A.   Yes, and some of them you want to
6  see if there are workers that are qualified
7  under the conditions of the program to qualify
8  for a Green Card.
9      Q.   And --
10      A.   That is important.
11      Q.   And as Mr. Schnoor said to the
12  extent that the workers were promised that
13  Signal would sponsor each and every one of
14  them for a Green Card, that was a false
15  promise; is that correct?
16      MR. ROUX:  Objection as to the
17  form.
18      A.   There is not a promise that Signal
19  delivered in it's contract of employment that
20  it would give them a Green Card.
21      Q.   But there was a promise delivered
22  by the agents of Signal to these workers that
23  Signal would sponsor them all for Green Cards;
24  yes or no?
25

---

**Page 82**

Shelley

1
2        MR. ROUX:  Objection as to the
3    form.
4        A.    The recruiter engaged in
5    duplicitous practice unaware as I have said
6    before before they came to the United States
7    of what Signal would do.
8        Q.    So is it your testimony that this
9    August 24, 2006 E-mail to Mr. Sanders of
10   Signal which was written months before any
11   worker came to Signal would have given Signal
12   no clue that its recruiters like Mr. Pol were
13   telling the workers that Signal is going to
14   sponsor them for permanent residence and a
15   Green Card?
16       A.    Correct.
17       MR. ROUX:  Objection as to the
18   form.
19       A.    Mr. Sanders is not a lawyer, he is
20   not somebody who understands the implications
21   of all of this.
22       Q.    So is the answer to my question
23   yes, at least as far as the E-mail that Mr.
24   Sanders is concerned would have communicated
25   to him that Signal's recruiter was telling the

---

**Page 83**

Shelley

1
2    workers that Signal was going to sponsor them
3    for Green Cards, but your position is he might
4    not have appreciated that because he is not a
5    lawyer?
6        MR. ROUX:  Objection to form.
7        A.    Exactly, yes.
8        MR. HOWARD:  Would you mark this
9    in as Shelley Exhibit 4, handwritten note
10   Bates numbered SIGP 0053101.
11       (Shelley Exhibit 4, handwritten
12   note Bates numbered SIGP 0053101, marked
13   for identification, as of this date.)
14       Q.    Professor Shelley, I am showing
15   you now a one-page document, SIGP 0053101,
16   identified as Exhibit 4 to your deposition.
17   It is a page from notes and I will represent
18   to you these are notes from Mr. Sanders.  Do
19   you recognize this handwriting from materials
20   that he wrote that you have reviewed?
21       A.    I mostly reviewed typed forms of
22   his comments.
23       Q.    Have you seen any of his
24   handwritten notes in conjunction with a
25   meeting that was going to be held with Mr. Pol

---

**Page 84**

Shelley

1
2    on November 20, 2006?
3        A.    I have not seen his handwritten
4    notes for that.
5        Q.    He states in these notes from his
6    discussion with a worker that they paid
7    $15,800, and that assurance of Green Card is
8    why they came.  You have no knowledge of these
9    notes or the context of these notes?
10       A.    That is a very different question.
11   I have knowledge of the contents, but I have
12   not seen the handwritten notes.
13       Q.    Context is what I asked, I was not
14   asking contents, I'm sorry.
15       Do you have knowledge of the
16   context in which these notes were prepared?
17       A.    I have knowledge that Mr. Sanders
18   was one of the first people to be informed and
19   to be concerned about the fact that these
20   payments were made.
21       Q.    And that assurances of Green Cards
22   were given; is that correct?
23       A.    He was the first person that I am
24   aware of that knew of this.
25       Q.    And he might have even known it as

---

**Page 85**

Shelley

1
2    far back as August of 2006, but he didn't
3    recognize -- appreciate the issue; is that
4    correct?
5        MR. ROUX:  Objection as to the
6    form.
7        A.    I don't know what is in Mr.
8    Sanders' mind, but this is the first time when
9    I heard of this that I learned that he knew
10   about these Green Cards.
11       Q.    Do you know with whom Mr. Sanders
12   shared the information in these notes on or
13   about November 17, 2006 at Signal?
14       A.    I am not sure who directly he
15   shared these notes with.  I do know that Mr.
16   Sanders eventually expressed his concerns of
17   what was going on.
18       Q.    To whom did Mr. Sanders report at
19   Signal?
20       A.    Mr. Sanders reported to higher
21   levels of management.
22       Q.    How high?
23       A.    I am not sure exactly the
24   executive chain in Signal, but I know that
25   they were aware -- some of the management was

---

## Page 86

```
 1            Shelley
 2   aware of these things that Mr. Sanders was
 3   finding out.
 4       Q.   Including Mr. Schnoor, the number
 5   2 guy and the head at Mississippi; is that
 6   correct?
 7           MR. ROUX:  Objection as to the
 8       form.
 9       A.   I believe that Mr. Schnoor
10   eventually learned of this.  I don't know the
11   exact date that Mr. Schnoor learned of this.
12       Q.   Well three days later was the
13   meeting with Mr. Pol in which he fired
14   Mr. Pol.  Would it be safe to say that he
15   learned it in or about this time period?
16       A.   I would say that that is likely,
17   yes.
18           MR. HOWARD:  Would you mark this
19       document as Shelley Exhibit 5, letter
20       dated December 1, 2006, Bates numbered
21       HRT_SIB 000368444.
22           (Shelley Exhibit 5, letter dated
23       December 1, 2006, Bates numbered HRT_SIB
24       000368444, marked for identification, as
25       of this date.)
```

## Page 87

```
 1            Shelley
 2       Q.   Professor Shelley I am showing you
 3   Exhibit 5, a one-page document dated December
 4   1, 2006, engagement letter from Signal
 5   International to Malvern Burnett, Bates number
 6   HRT_SIB 000368444.  Have you ever seen this
 7   letter before.
 8       A.   Let me read it and I will let you
 9   know.
10       Q.   Thank you.
11           Have you had an opportunity to
12   read the letter?
13       A.   Yes.
14       Q.   Have you seen it before?
15       A.   I am not sure.  I have seen
16   correspondence between Signal and Burnett, I
17   am not sure if I saw this letter.
18       Q.   Here Ron Schnoor, the person I
19   think that we just established learned of
20   these issues regarding the recruiting fees and
21   the assurances of Green Cards in November of
22   2006, is now engaging Mr. Burnett on December
23   1, 2006; is that right?
24       A.   That is what appears to be.
25       Q.   And in the second paragraph he
```

## Page 88

```
 1            Shelley
 2   says:  We further confirm that your fees and
 3   costs incurred in representing Signal in this
 4   matter will be billed to and paid by the
 5   skilled foreign workers.  Signal will have no
 6   responsibility for your fees and expenses.
 7           Do you see that?
 8       A.   Yes.
 9       Q.   So here is a man who knows that
10   the workers who are still in India are being
11   charged excessive recruiting fees, and he
12   writes a letter to the lawyer saying go ahead,
13   you are working for us, but you are going to
14   get all your fees from the workers themselves,
15   we don't have to pay you a penny.  That is
16   what this says; right?
17           MR. ROUX:  Objection as to the
18       form.
19       A.   It does not say that Mr. Schnoor
20   is aware that they are paying excessive fees.
21   He is saying that he has hired a recruiter to
22   obtain the workers and they are responsible
23   for the recruitment process.
24       Q.   He has hired a lawyer here who is
25   going to get all his fees for working for
```

## Page 89

```
 1            Shelley
 2   Signal from the workers; is that correct?
 3       A.   They are a contractual agreement,
 4   yes, that the recruiters, Pol, Burnett and
 5   Sachin Dewan are the recruiters that are
 6   handling all of this, yes.
 7       Q.   If the record is that Mr. Schnoor
 8   was well aware and of the opinion that the
 9   fees being charged by the recruiters and
10   Mr. Burnett the lawyer were excessive and
11   unreasonable before December 1, 2006, would
12   you have a problem with him on behalf of
13   Signal engaging Mr. Burnett with the specific
14   provision that he can go ahead and collect
15   those fees without any limit from the workers?
16           MR. ROUX:  Objection as to the
17       form.
18       A.   This document is on November 17th,
19   right?
20       Q.   You are talking about Exhibit 4?
21       A.   Exhibit 4, exactly.
22       Q.   Right.
23       A.   In which Mr. Sanders has had a
24   discussion with a worker, right?
25       Q.   Well --
```

---

Page 90

Shelley

```
 1              Shelley
 2        A.   I am answering your question.
 3        Q.   I understand, but let me cut to
 4   the chase because I want to give you one other
 5   fact that you need to keep in mind.
 6             On November 20th, twelve days
 7   before Mr. Schnoor signs this letter with
 8   Mr. Burnett, Signal and Mr. Schnoor meet with
 9   Michael Pol, tell him we are going to fire you
10   because of the excessive fees.  That happened
11   twelve days before they write this letter.  So
12   I am just not relying on Mr. Sanders' note, I
13   am relying on a meeting in which Mr. Schnoor
14   himself fired Mr. Pol because of the excessive
15   fees.
16             Now I am asking you is it
17   appropriate twelve days later for
18   Mr. Schnoor -- eleven days later, only 30 days
19   in November -- eleven days later for
20   Mr. Schnoor to write an engagement letter
21   authorizing Mr. Burnett to charge all of his
22   fees to the workers?
23        MR. ROUX:  Objection as to the
24   form.
25        A.   I am not a party to this
```

---

Page 91

Shelley

```
 1              Shelley
 2   relationship between Pol and Burnett, but if
 3   you fired one part of this relationship for
 4   charging excessive fees, then if you want to
 5   keep your job you may not do the same.
 6             It is not assuring, this is not
 7   evidence that Mr. Burnett is going to keep
 8   doing the same behavior.  You might think if
 9   you were a corporation engaging with somebody
10   that after you fired somebody for certain
11   behavior that the rest of the people will not
12   behave the same way afterwards.
13        Q.   Mr. Schnoor could have included
14   language in the engagement letter that he
15   wrote to Malvern Burnett, we can confirm that
16   your fees and costs incurred in representing
17   Signal in this matter at a cap of $1,000 per
18   worker will be billed and paid by the skilled
19   foreign workers.  He could have put in a cap,
20   couldn't he have?
21        MR. ROUX:  Objection as to the
22   form.
23        A.   He could have put in anything,
24   yes.
25        Q.   Right, so he is responsible for
```

---

Page 92

Shelley

```
 1              Shelley
 2   what he did put in and what he didn't put in,
 3   is he not?
 4        MR. ROUX:  Objection as to the
 5   form.
 6        A.   Legally he is responsible.
 7   Whether this is advisable, that is another
 8   question.
 9        Q.   Well that is a question I am
10   asking you.  You are here as an expert witness
11   who wrote a 40 some odd page report basically
12   saying that Signal did nothing wrong here.  So
13   I want to know in your opinion now having seen
14   that Signal knew of the excessive fees and yet
15   went ahead and re-engaged Mr. Burnett to go
16   ahead and continue collecting all the fees for
17   his work for Signal from the workers
18   themselves was appropriate?
19        MR. ROUX:  Objection as to the
20   form.
21        A.   I in my statement have not said
22   that everything was good at Signal, right.
23   This is not a categorical blanket defense of
24   this.  I had said, as I stand by my statement,
25   that there was duplicitous behavior that they
```

---

Page 93

Shelley

```
 1              Shelley
 2   were not aware of.  The fact of -- and I am
 3   not a lawyer who reviews contract letters of
 4   employment.  I am a specialist on the process
 5   of human trafficking, and you are asking me to
 6   answer about what would be the best procedure
 7   to answer in a contractual letter, and whether
 8   a lawyer should have had him list a cap on
 9   this.  That is not what I do for a living,
10   that is what you do for a living, is advise on
11   contractual relationships.
12        Q.   Putting aside the engagement
13   letter with Mr. Burnett, if Signal was going
14   to make the decision to keep working with him
15   to bring in hundreds more workers, and they
16   knew he was party to charging excessive fees,
17   do you think it would have been appropriate
18   and advisable for Signal to tell him if you
19   are going to keep working for us and keep
20   bringing workers for us, you have to cap your
21   fees.  We are not going to let you charge what
22   we believe to be excessive and unreasonable
23   fees.  Would that have been an appropriate
24   step for Signal to have taken?
25        MR. ROUX:  Objection as to the
```

TSG Reporting - Worldwide - 877-702-9580

Page 94

```
          Shelley
1    form.
2       A.  I am not party to all of these
3    discussions that Signal had with Burnett.  But
4    the fact that these -- that there were
5    discussions between Signal and Burnett I know
6    about.  The fact that this is not a well drawn
7    letter is not what I comment on.
8       Q.   In your view in connection with
9    Signal's decisions that they made after
10   learning about the problem being defined by
11   you as these duplicitous practices, did Signal
12   do anything wrong?
13       MR. ROUX:  Objection as to the
14   form.
15       A.  Do anything wrong; what do you
16   mean?
17       Q.   Well you said you are not here to
18   say that they did everything right.  I am
19   asking you specifically with the decisions
20   that they made that we have been talking about
21   for two hours now, in your view did they do
22   anything else?
23       MR. ROUX:  Objection as to the
24   form.
25
```

Page 95

```
          Shelley
1       A.  I think there are things that they
2    could have done better.  I am not ready to say
3    they did everything wrong.
4       Q.   Not everything wrong, did they do
5    anything wrong in your view?
6       A.   There are certainly things that
7    they could have done much better.
8       Q.   What?
9       A.   For example when the workers
10   arrived at Signal they could have had staff
11   training on, you know -- they could have had
12   more staff to welcome the workers.  They did
13   not have enough processing staff.  That is one
14   example.
15       Q.   Anything else?
16       A.   I can give examples also of when
17   they got more -- they needed to buy more
18   trailers and they went out and ordered more
19   trailers.  But they didn't have as many
20   trailers in place when the first workers
21   arrived that they thought were desirable.  I
22   mean this is not as if Signal did everything
23   right, and they will be the first ones as I
24   have talked to them to admit that they did not
25
```

Page 96

```
          Shelley
1    do everything right.  Nobody does everything
2    right and it is a complex situation.  But to
3    say and ask me are they wrong, I am explaining
4    and analyzing the situation, all right.
5       Q.   I want to focus now specifically
6    on the topic we have been talking about today,
7    and that is decisions Signal made and choices
8    it made what it did and what it didn't do in
9    terms of correcting the problem being the
10   excessive fees and the false promises of Green
11   Cards before continuing to bring in hundreds
12   of more workers to Signal after it learned
13   about that problem.  I want to know
14   specifically with respect to Signal's conduct
15   in that regard is it your opinion that they
16   did everything right or could they have done
17   that better too?
18       MR. ROUX:  Objection as to the
19   form.
20       A.  Nobody does everything right.
21       Q.   What could they have done better
22   in that process?
23       MR. ROUX:  Objection as to the
24   form.
25
```

Page 97

```
          Shelley
1       A.   I think that they could have
2    worked much better with the recruiters.  I
3    think as you suggested maybe there could have
4    been a more informed procedure to work with
5    these workers in India.  But as I have said in
6    this statement there was so little available
7    for anybody who was involved in the
8    recruitment process of workers at that time.
9       Q.   So little what available?
10       A.   Information as you have today on
11   the web, on reports, on analyses of what you
12   need to do to properly recruit workers.
13       Q.   What information in your view as
14   the expert was unavailable to Signal in the
15   fall of 2006 that is available today that
16   would have better informed their decision
17   making process in what to do about the workers
18   that they knew to have paid excessive fees and
19   been lied to about Green Cards?
20       A.   As I have said here that I have
21   done a really careful review of the
22   literature.  So as I said at the present
23   time --
24       Q.   Where are you reading?
25
```

25  (Pages 94 to 97)

| Page 98 | Page 99 |
|---|---|

**Page 98**

Shelley

1
2  A.  Point 62.
3  Q.  Okay.
4  A.  At the present time a perspective
5  employer of H-2B workers could go to the
6  web-site of Veriti, a non-profit that advises
7  employers on supply chains and labor practices
8  overseas.
9      I have been through extensive
10  material of problems of recruitment both in
11  the United States and in Europe.  I have gone
12  through the footnotes of the publications that
13  were available which advised employers on what
14  problems there were.  What problems there are
15  with recruitment.  What you need to be careful
16  of.  None of them or maybe one of them, but it
17  has an early date saying there is a problem,
18  was there information available prior to 2006
19  and hardly anything available even in 2008.
20  Q.  My question to you is this
21  universe of information that you say was not
22  available in 2006 that is currently available,
23  what specific information had it been
24  available to Signal in the fall of 2006 would
25  have factored into or changed how Signal acted

**Page 99**

Shelley

1
2  in 2006?
3  A.  It is not just information, it is
4  services that are available to corporations
5  that want to do the right thing.  So that
6  there are people that can advise them to vet
7  the recruitment process, to work on it that
8  did not exist at that time.
9  Q.  So again my question though is
10  those resources that are available now that
11  were not available then, in your opinion what
12  specific impact would that have had on what
13  Signal did; how would their actions have
14  changed had they had access to that
15  information?
16      MR. ROUX:  Objection as to the
17  form.
18  A.  If you had access to information
19  on problems with recruitment they might have
20  asked much more pointed questions of Mr. Pol
21  before they retained him, before it came to
22  the point of dismissing him.  There would be
23  much more knowledge and many more questions
24  one could ask on recruitments, on
25  misstatements.  Like you are saying that Mr.

| Page 100 | Page 101 |
|---|---|

**Page 100**

Shelley

1
2  Sanders did -- I mean he may have known, but I
3  don't think he appreciated all of this.  These
4  are now, you know, there are now materials
5  that go A, B, C, D, that did not exist.
6  Q.  What specific information
7  concerning the duplicitous practices is it
8  your opinion that Signal did not have during
9  the period 2006 to 2007 that it could have had
10  and would have had had it had access to these
11  web-sites and resources that are available
12  today?
13      MR. ROUX:  Objection as to the
14  form.
15  A.  It is not just a question of
16  information, it is a question of how to handle
17  the situation which it did not have.
18  Q.  And because it lacked the
19  information is it your opinion that they did
20  not handle the situation as they should have?
21      MR. ROUX:  Objection as to the
22  form.
23  A.  I think that they could have
24  handled the situation better.  I think Signal
25  would agree with you that they could have

**Page 101**

Shelley

1
2  handled the situation better.  I don't think
3  anyone would disagree.  But this does not mean
4  that they are engaged in human trafficking
5  because they are not handling a situation as
6  well as could be desired.
7  Q.  In fact would you agree with me
8  that they handled the situation pretty poorly?
9      MR. ROUX:  Objection as to the
10  form.
11  A.  I will say that they could handle
12  it better.  I will not say they handled it
13  poorly.  Compared to other work I have seen,
14  studied, read, I would not say that they, you
15  know, they handled it poorly.  There are many
16  worse examples.
17  Q.  I want to turn to another issue,
18  and if you look at your report at page 33,
19  paragraph 38?
20  A.  Yes.
21  Q.  Paragraph that begins:
22  Mr. Kadakkarappally and Sabulal Vijayan are
23  being mentioned as being subject to
24  deportation according to Ms. Burke because
25  they objected to the conditions at the man

26 (Pages 98 to 101)

---

**Page 102**

Shelley

1 camp. Signal did not seek to dismiss these
2 two men for their comments, but for the fact
3 that their comments agitated the workers
4 undermining their work performance.
5          What is your source for that
6 statement that you make?
7     A.   I interviewed many of the managers
8 at Signal.
9     Q.   Whom did you interview
10 specifically with respect to the termination
11 of those two individuals?
12    A.   I spoke to much of senior
13 management.  I had a meeting with them in July
14 and asked for them to explain about these two
15 individuals, Mr. Kadakkarappally and Vijayan
16 and, you know, what happened with their
17 termination.  Subsequently I went through
18 their financial records to see what was their
19 payment, their qualifications.
20         So I did not just take the word of
21 the interviews, I looked for other things on
22 the records of these two individuals.
23    Q.   And you are aware that they were
24 terminated on March 9, 2007; is that correct?

---

**Page 103**

Shelley

1     A.   Yes.
2     Q.   What records in the period leading
3 up to the termination on March 9, 2007
4 relating to that termination decision did you
5 review?
6     A.   I have read -- that is too narrow.
7 I have read much more than relating to their
8 termination decision.  I have read material
9 related to their employment record, their
10 payments, the hours that they received.  I
11 have read also their T visa statements.  I
12 have interviewed -- and I have interviewed the
13 staff.
14    Q.   Did you read any deposition
15 testimony concerning the events of March 9,
16 2007?
17    A.   I have read some deposition, I
18 also read the medical records, the hospital
19 records after Mr. Vijayan's what I would call
20 self mutilation.  I have looked at the witness
21 reports.  I interviewed somebody that was at
22 the hospital with him.
23    Q.   The hospital records refer to
24 Mr. Vijayan's admission as a suicide attempt,

---

**Page 104**

Shelley

1 do they not?
2          MR. ROUX:  Objection as to the
3     form.
4     A.   They referred to him as trying to
5 cut his wrists.
6     Q.   Do they not use the word suicide
7 attempt in some of those hospital records?
8     A.   They may.
9     Q.   Do you have some problem with
10 calling it a suicide attempt and why you want
11 to use this term self mutilation?
12    A.   Yes.
13    Q.   Why is that?
14    A.   I find that Mr. Vijayan's behavior
15 after he cut his wrists, I mean if someone
16 intends to commit suicide they don't come
17 running out, you know, displaying themselves.
18 This is not the way one commits suicide.
19    Q.   Are you an expert on suicide
20 attemptees; people who attempt suicide?
21         MR. ROUX:  Objection as to the
22    form.
23    A.   I am not a specialist from a
24 psychological point of view, but I have in my

---

**Page 105**

Shelley

1 past taught deviant behavior.  So I am not a
2 psychologist, but it is something that I do
3 happen to know something about from earlier
4 stages in my career.
5     Q.   You are aware of the Forbes
6 article in which CEO of Signal Richard Marler
7 referred to Mr. Vijayan's suicide attempt as a
8 bunch of nonsense, theatrics; correct?
9     A.   I have seen that.  I have read
10 many articles on this.
11    Q.   I take it that you are in
12 agreement with his view of that act?
13    A.   Not entirely.
14    Q.   But you don't consider it in your
15 view to be -- well do you consider it to have
16 been a serious act, let me ask you that;
17 serious in the sense of reflecting true
18 psychological distress?
19         MR. ROUX:  Objection as to the
20    form.
21    A.   I am not a specialist on
22 psychology.  I have not interviewed Mr.
23 Vijayan.
24    Q.   By calling it self-mutilation as

---

27  (Pages 102 to 105)

Page 106

```
 1            Shelley
 2    opposed to a suicide attempt are you
 3    expressing your opinion that it was a less
 4    significant event than it might be portrayed?
 5        A.   Yes.
 6        Q.   And of what relevance to your
 7    opinions is that conclusion?
 8        A.   It is relevant in understanding
 9    the overall circumstances of this case.
10        Q.   And in particular the events of
11    March 9th; correct?
12        A.   Not only the events of March 9th.
13        Q.   Have you read the testimony of the
14    security guard, Mr. Beaufort, from Swetman
15    Security, who was brought in as part of the
16    effort by Signal to terminate and deport Mr.
17    Vijayan and seven other workers?
18            MR. ROUX:  Objection to the form.
19        A.   No, I have not.
20        Q.   Have you read his statement that
21    Signal obtained within a day of the event?
22        A.   No.
23        Q.   Have you read any of the Signal
24    employee witness statements as to that event?
25        A.   I have read some materials on this
```

Page 107

```
 1            Shelley
 2    event, and I have interviewed the workers on
 3    this event.
 4        Q.   Which --
 5        A.   Some of the management.
 6        Q.   You interviewed Mr. Snyder?
 7        A.   Yes.
 8        Q.   Did you review his deposition on
 9    this issue?
10        A.   I have looked at some parts of his
11    deposition, not read the whole thing from
12    start to finish.
13        Q.   The whole thing was made available
14    to you but you chose not to read the whole
15    thing?
16            MR. ROUX:  Objection as to the
17        form.
18        A.   I have had everything that I have
19    let's say requested, nothing has been held
20    back from me.
21        Q.   My question then is you chose then
22    what portions of Mr. Snyder's deposition to
23    read and which not to read?
24        A.   No.  In the interest of time and
25    limitations of time from the time I was hired
```

Page 108

```
 1            Shelley
 2    to the time I presented my report, I had
 3    limited time and therefore I chose to focus on
 4    what I could focus on.
 5        Q.   Is it your intent between now and
 6    trial to go back and do a more thorough review
 7    of the record and the deposition transcripts
 8    in this case to further inform your opinions?
 9        A.   Absolutely.
10        Q.   How much more time would you
11    anticipate spending?
12        A.   I am going to have to make a
13    determination with the lawyers, with the
14    company of how much more time I am going to
15    spend.  But many things that I wanted are just
16    becoming available as well.
17        Q.   What things are just becoming
18    available that were not available to you when
19    you were engaged in May?
20        A.   Many of the depositions that are
21    going on today.
22        Q.   How about the depositions that
23    occurred in June, were those made available to
24    you?
25        A.   The depositions in June only very,
```

Page 109

```
 1            Shelley
 2    very little of it, mostly discussions of
 3    those.
 4        Q.   We have a correspondence that
 5    suggests you would be submitting an update to
 6    your expert report in advance of your
 7    deposition.  Have you done an update to
 8    Exhibit 1?
 9        A.   No.  I just finished this one.  I
10    finished one in the Texas case and I finished
11    this.  There has been no update.
12        Q.   Now what impact if any do the
13    circumstances surrounding the termination of
14    Mr. Kadakkarappally and Vijayan have on your
15    opinions?
16        A.   It is one piece of information
17    that I have factored into my overall opinions.
18        Q.   And based on the records you have
19    reviewed did Signal do anything wrong with
20    respect to the termination, the decision to
21    terminate those individuals and how they
22    carried out that decision?
23            MR. ROUX:  Objection as to the
24        form.
25        A.   Put it this way, I have had
```

Page 110

```
 1            Shelley
 2    explained to me why Signal terminated the
 3    workers, which I have expressed here.  And I
 4    think that the handling of this and the way
 5    that the dismissal was handled could have been
 6    handled better.
 7       Q.   Is it your opinion that the way it
 8    was handled contributed to a perception among
 9    the workers in the Mississippi camp that if
10    they complained, if they acted improperly
11    toward Signal they were at risk of the same
12    treatment, that is being rounded up by
13    security guards for forced deportation?
14            MR. ROUX:  Objection as to the
15    form.
16       A.   They have alleged this in their T
17    visa applications.  That is all I can say on
18    that.
19       Q.   Having read everything that you
20    have read about what transpired that day could
21    you see why they would perceive based on
22    Signal's not handling it as well as they
23    could, why they would perceive that threat?
24            MR. ROUX:  Objection as to the
25    form.
```

Page 111

```
 1            Shelley
 2       A.   I have problems with the way the
 3    workers and their T visa's have described
 4    their perception of this problem.
 5       Q.   What do you think would have been
 6    an appropriate perception of the workers in
 7    the Mississippi camp when they see their
 8    colleagues being rounded up by 300 pound
 9    security guards and put in a trailer to be
10    forcibly deported to India?
11            MR. ROUX:  Objection as to the
12    form.
13       A.   For people to allege that they
14    have been trafficked based on something that
15    they have not seen, something that they have
16    not heard, and have not explained well is
17    extremely problematic to me.
18       Q.   Can you answer my question though?
19       A.   That is my answer to your
20    question.
21       Q.   What about the Mississippi workers
22    in the Mississippi camp who saw everything
23    that happened that day, would you have a
24    problem with their perception?
25            MR. ROUX:  Objection as to the
```

Page 112

```
 1            Shelley
 2    form.
 3       A.   I would say that things were
 4    mishandled, but I don't -- I also think that
 5    there was -- I wouldn't call it theatrics, but
 6    I would say that there are serious problems in
 7    the orchestration of this event.
 8       Q.   The orchestration of the March 9th
 9    event?
10       A.   Yes.
11       Q.   Who orchestrated the March 9th
12    event; that was Signal, wasn't it?
13            MR. ROUX:  Objection as to the
14    form.
15       A.   Not entirely.
16       Q.   What was Signal's role in
17    orchestrating the March 9th event?
18       A.   You said that Signal orchestrated
19    this.  I didn't say that.
20       Q.   You just said not entirely, so I
21    assumed from your answer you meant at least in
22    part they orchestrated the event?
23       A.   No.
24       Q.   Signal made the decision to
25    terminate the workers; is that correct?
```

Page 113

```
 1            Shelley
 2       A.   Yes.
 3       Q.   They also made the decision that
 4    they were not going to just quietly go to the
 5    workers one by one and escort them to the
 6    office to fill out paperwork and then have
 7    them leave the premises, correct, they didn't
 8    do that?
 9            MR. ROUX:  Objection as to the
10    form.
11       A.   I am not sure that the workers
12    would willingly go to the office.
13       Q.   That wasn't my question.  They
14    didn't attempt that, did they?
15       A.   They did not do that.
16       Q.   They made the decision the day
17    before the termination was going to be
18    executed to bring in security guards from the
19    Swetman firm, they made that decision first;
20    correct?
21       A.   Yes.  And they were advised on
22    that.  They were advised on how to proceed.
23       Q.   The Swetman guards took their
24    instructions from Signal management including
25    Mr. Snyder; is that correct?
```

29 (Pages 110 to 113)

| Page 114 | Page 115 |
|---|---|
| Shelley | Shelley |

**Page 114**

Shelley

2   MR. ROUX: Objection as to the
3 form.
4   A.  I am not sure who gave the
5 instructions, but Signal did hire the Swetman
6 guards.
7   Q.  They were told to show up the next
8 morning at 5 a.m.; is that correct?
9   A.  I do not know what time they were
10 told to show up.  I know they appeared.
11   Q.  And at 5 a.m. to 6 a.m. was when
12 the camp was going to be full because you had
13 the night shift coming back from work and the
14 day shift not quite yet going to work;
15 correct?
16   MR. ROUX: Objection as to the
17 form.
18   A.  There was certainly a changing of
19 the guard at that time, or the changing of the
20 staffing I should say.
21   Q.  Did you read the witness statement
22 or see the deposition of Pat Stoepher in this
23 case?
24   A.  I read probably -- I probably did.
25   Q.  Do you recall in her statement

**Page 115**

Shelley

2 where she said that the decision was made to
3 use the guards at this time in front of the
4 whole camp to round up the workers to be
5 terminated in order to make an example of them
6 to the other workers?
7   MR. ROUX: Objection as to the
8 form.
9   A.  I have read or understood that
10 this was, you know, Pat's interpretation.
11   Q.  Do you just assume she is not
12 telling the truth or not accurate, or do you
13 assume she is accurate about that?
14   MR. ROUX: Objection as to the
15 form.
16   A.  Considering that Signal consulted
17 with the immigration service before the
18 workers were terminated, I think there are
19 other issues involved that everybody who
20 worked for Signal might not be party to.
21   Q.  But Ms. Stoepher said that she
22 participated in a meeting in which it was
23 clear that this was going to be done the way
24 it was done in order to make an example in
25 front of the other workers.  Do you have a

**Page 116**

Shelley

2 basis to rebut what she says?
3   MR. ROUX: Objection as to the
4 form.
5   A.  I am not rebutting what she says.
6 This is not my job to rebut what she says.
7   Q.  Do you take it into account at all
8 if your opinion is based in part on the
9 allegations of the perception of the workers?
10   A.  I take everything into account
11 that I read.
12   Q.  So if in fact the jury believes
13 the evidence in this case that Signal made the
14 decision to terminate the workers in the way
15 they did in order to make an example to the
16 rest of the Indian workers in the Mississippi
17 camp that were watching this unfold, would
18 that be relevant to the opinion as to what the
19 perception of those workers to that event
20 would be?
21   MR. ROUX: Objection as to the
22 form.
23   A.  It is one interpretation of it.
24   Q.  Do you have a different
25 interpretation of what happened that day?

**Page 117**

Shelley

2   A.  Yes, and I am still trying to
3 understand it all.
4   Q.  So you don't have a clear picture
5 in your mind as to what happened that day?
6   A.  I have a picture of part of it,
7 but not all of it.
8   Q.  And would it be fair to say that a
9 full robust picture of what happened on that
10 day, March 9, 2007, is important in this case?
11   A.  Yes, it is important.
12   Q.  Because it is a true reflection of
13 Signal's actions; correct?
14   A.  No.
15   MR. ROUX: Objection as to the
16 form.
17   A.  No, that is not what I said.
18   Q.  What Signal chose to do in it's
19 termination of these workers and how it went
20 about terminating these workers, would that be
21 a reflection of Signal's actions; its just a
22 statement of fact, isn't it?
23   MR. ROUX: Objection to the form.
24   A.  It is an action that Signal took.
25 To say that it is a reflection of Signal is a

## Page 118

Shelley

1  value judgment that I am not making. I am
2  just saying that it is an action that Signal
3  took.
4  Q. So you are saying that they took
5  it, but that really isn't who Signal is; I
6  don't understand that. If Signal took the
7  action why isn't it a reflection of Signal?
8  MR. ROUX: Objection as to the
9  form.
10  A. Because there are other factors
11  that preceded this action such as discussing
12  things with the immigration service that gave
13  Signal advice, and there are other forces at
14  work surrounding this event that need to be
15  understood.
16  Q. Let's try to unpack some of that
17  and understand some of the forces at work
18  surrounding the event --
19  MR. ROUX: Before we go any
20  further, when are we going to break for
21  lunch?
22  MR. HOWARD: I was going to say
23  12:30, we started at 9:30.
24  Would you mark this document as

## Page 119

Shelley

1  Shelley Exhibit 6, E-mail dated March 5,
2  2007, numbered SIGE 0011482 and 483, and
3  SIGE 0055312 and 313.
4  (Shelley Exhibit 6, E-mail dated
5  March 5, 2007, Bates numbered SIGE
6  0011482 and 483, and SIGE 0055312 and
7  313, marked for identification, as of
8  this date.)
9  Q. Professor Shelley, I have given
10  you what is marked as Exhibit 6. Please take
11  your time and take a look at it and let me
12  know if you have seen these E-mails before?
13  A. Okay.
14  Q. Professor Shelley, have you seen
15  these E-mails before as part of your review
16  for your report?
17  A. No, but I have had many of these
18  facts discussed with me.
19  Q. Just so you understand the workers
20  whose badge numbers are identified in the
21  first paragraph of the March 5, 2007 E-mail
22  from Mr. Snyder are in fact
23  Mr. Kadakkarappally and Mr. Vijayan?
24  A. Yes, I am aware of that.

## Page 120

Shelley

1  Q. So you are aware of the fact Mr.
2  Snyder was aware that the workers were going
3  bunkhouse to bunkhouse to recruit other
4  workers to meet with a lawyer; correct?
5  A. Yes.
6  Q. Do you see anything wrong with
7  that from the workers' perspective, should
8  they have the right to among themselves talk
9  about meeting with a lawyer to exercise their
10  legal rights?
11  MR. ROUX: Objection as to the
12  form.
13  A. I am not taking an objection to
14  that.
15  Q. Now are you aware that Mr. Schnoor
16  did take an objection to that by saying that
17  this does not need to go unchecked. We have a
18  unionizing effort underway.
19  Do you see the E-mail from him on
20  March 6th to Darrell Snyder in response to
21  learning about the workers meeting with
22  lawyers?
23  A. Yes.
24  Q. Do you know whether the unionizing

## Page 121

Shelley

1  effort as Mr. Schnoor describes it had
2  anything to do with the decision to terminate
3  those two workers?
4  MR. ROUX: Objection as to the
5  form.
6  A. I asked questions on that.
7  Q. What were you told?
8  A. What I wrote here, that in their
9  organizing the workers were getting very
10  agitated, and they had extreme concerns about
11  ensuring safety of the work force.
12  Q. Because if the workers were so
13  agitated they would not do their job safely,
14  is that your understanding?
15  A. Yes.
16  Q. This is your understanding. That
17  is what the Signal management told you in your
18  interviews is why they terminated these
19  workers?
20  MR. ROUX: Objection as to the
21  form.
22  A. I asked them pointedly about these
23  questions that you are raising.
24  Q. And that is their answer?

Page 122

```
 1              Shelley
 2        A.   That was part of their answer,
 3   yes.
 4        Q.   What else was part of their
 5   answer?
 6        A.   That they were not terminating
 7   them for union organizing or activism.
 8        Q.   How about for meeting with
 9   lawyers?
10        MR. ROUX:  Objection as to the
11   form.
12        A.   They told me that was not why they
13   dismissed them.
14        Q.   And you believed them?
15        A.   I have -- I found them credible
16   when they talked to me about this.
17        Q.   Did you ask to see any other
18   records, for example what Signal stated as
19   their reasons for terminating these employees
20   in their submission to the EEOC when charges
21   were brought to the EEOC?
22        A.   I have looked at some of the EEOC
23   documents, yes.
24        Q.   Specifically the documents where
25   Signal told the EEOC in responses to charges
```

Page 123

```
 1              Shelley
 2   of retaliation what Signal's reasons were for
 3   terminating these workers, have you looked at
 4   that?
 5        A.   I have not looked at that.
 6        Q.   Would that be something that as
 7   part of your fuller more comprehensive review
 8   you think you should look at in order to test
 9   whether Signal's management explanation to you
10   in 2014 is accurate or not?
11        MR. ROUX:  Objection as to the
12   form.
13        A.   I am ready to read and be as fully
14   prepared as a witness as I can be.
15        Q.   And would you agree with me that
16   what Signal tells the government in response
17   to a formal investigation is relevant to its
18   true reasons for terminating workers?
19        MR. ROUX:  Objection as to the
20   form.
21        A.   I have read and am planning to
22   read some more on the EEOC.  I am not a
23   specialist on the EEOC, I am a specialist on
24   human trafficking issues.
25        Q.   Well are you a specialist on the
```

Page 124

```
 1              Shelley
 2   DOJ?
 3        MR. ROUX:  Objection.
 4        A.   I don't think anyone is a
 5   specialist on the DOJ.
 6        Q.   Well I note that several times in
 7   your report you rely on the DOJ's March 14,
 8   2008 letter to Signal; correct?
 9        A.   Yes.  That is not saying I am a
10   specialist on the DOJ.
11        Q.   Well what examination did you do
12   about the investigation conducted by the DOJ
13   that gave rise to that letter?
14        A.   I asked for some documents.  I
15   asked questions about the DOJ investigation.
16        Q.   And you rely on the fact that, and
17   we will get to this a little bit later, that
18   the DOJ made a conclusion from it's
19   investigation in 2008 not to charge Signal
20   with discrimination; is that correct?
21        A.   Correct.
22        Q.   You know that the EEOC in 2012
23   with the benefit of all the evidence that came
24   about in this case between 2008 and 2012 has
25   charged Signal with discrimination; right?
```

Page 125

```
 1              Shelley
 2        A.   Absolutely.
 3        Q.   You don't mention that in your
 4   report at all.  Did you place any weight on
 5   that at all?
 6        A.   There has not been a finding in
 7   this, and I am not as I said a specialist on
 8   the EEOC.  So I have read some of the
 9   documents, but that is not a trafficking case.
10        Q.   So neither was the charge that the
11   DOJ was referring to, that was discrimination;
12   right?
13        A.   I have read that, but I am not
14   commenting on -- I am not an expert on
15   discrimination, I am an expert on trafficking.
16   I stick to what I know.
17        Q.   We are jumping ahead, but as long
18   as we are talking about it I just want to
19   clear this up.
20            At paragraph 16 of your report you
21   state:  The element of coercion under the TVPA
22   definition is also not present as evidenced by
23   the finding of the Department of Justice.
24            That is the March 2008 finding,
25   the letter that you are referring to; correct?
```

| Page 126 | Page 127 |
|---|---|

**Page 126**

Shelley

1 
2    A.   Yes.
3    Q.   And that is the letter that
4  investigated whether there was a charge under
5  section 1324b 1, 8 U.S.C.; correct?
6    A.   Yes.
7    Q.   And that is a discrimination
8  statute; right?
9    A.   Yes.
10    Q.   What element of coercion was
11  relevant to the finding there at all?
12    A.   I can go back and read the
13  document.
14    Q.   Well we will do that later.  But
15  as you sit here, and I know you say you are
16  not an expert on DOJ, you understand that to
17  be a discrimination statute; right?
18    A.   Yes.
19    Q.   Not a trafficking statute?
20    A.   Correct.  But there is an element,
21  a question of coercion in this case and that
22  is why I was commenting on that here.
23    Q.   But as you sit here you don't know
24  of a connection between coercion and what the
25  DOJ was looking at when it issued it's letter

**Page 127**

Shelley

1 
2  in March of 2008; correct?
3    MR. ROUX:  Objection as to the
4  form.
5    A.   I stated here that Signal has been
6  cleared of alleged violations of unfair
7  immigration related employment practices.  And
8  here under prohibition or intimidation or
9  retaliation under Department of Justice
10  provision 5 of 8 U.S. Code 1324b, it is also
11  an unfair immigration related employment
12  practice for a person or other entity to
13  intimidate, threaten, coerce or retaliate
14  against any individual for the purpose of
15  interfering with any right or privilege
16  secured under this section, or because the
17  individual intends to file or has filed a
18  charge or a complaint, testified, assisted or
19  participated in any manner in an
20  investigation, proceeding or hearing under
21  this section.
22    So as you can see, and you know
23  better than I do, the word coercion is here,
24  or coerce.  This is why I emphasized in this
25  statement that if you have not been found

| Page 128 | Page 129 |
|---|---|

**Page 128**

Shelley

1 
2  guilty under this or found responsible, then
3  you are not being cited there for coercion.
4    Q.   But you tied it to coercion of the
5  TVPA, but I will put that aside.  My question
6  to you was you rely several times in your
7  report in support of your opinions as to what
8  the DOJ Civil Rights Division finding was with
9  respect to a discrimination charge in 2008;
10  correct?
11    A.   I have relied on that, yes.
12    Q.   And you think that that supports
13  your opinions in this case that Signal was not
14  involved in trafficking or discrimination;
15  right?
16    A.   Correct.
17    Q.   You agree with me that in 2008 the
18  DOJ didn't have available to them all of the
19  documents and deposition transcripts and
20  evidence that we have gotten in this case
21  since 2008; correct?
22    MR. ROUX:  Objection as to the
23  form.
24    A.   I don't know what DOJ had at that
25  time, I am not party to it, but if you ask me

**Page 129**

Shelley

1 
2  I do know about DOJ and the Civil Rights
3  Division and human trafficking.  But I don't
4  know about what information they had.
5    Q.   Do you know enough about the EEOC
6  to know that for them to file a lawsuit the
7  commission itself has to make a finding that
8  there is grounds for making that charge for
9  liability?
10    MR. ROUX:  Objection as to the
11  form.
12    A.   I am not -- as I said to you I am
13  a specialist on trafficking and not on the
14  EEOC.
15    Q.   I am just trying to understand why
16  if one government agency issues a letter in
17  2008 saying that they are not going to charge
18  discrimination, and another government agency
19  four years later with all this other evidence
20  says we are going to charge for
21  discrimination, you find the 2008 finding
22  relevant and appropriate and rely upon it, and
23  you don't even mention in your report the 2012
24  EEOC charge?
25    MR. ROUX:  Objection as to the

33 (Pages 126 to 129)

Page 130

```
 1            Shelley
 2    form.
 3        Q.   That is what I am trying to
 4    understand.
 5        A.   Well then because I am much more
 6    familiar with the work of the Department of
 7    Justice.
 8        Q.   So it is just lack of familiarity
 9    with the EEOC that you can't opine on any
10    significance to the fact that they have seen
11    fit based on the evidence they have reviewed
12    to sue Signal?
13            MR. ROUX:  Objection as to the
14    form.
15        A.   I am not commenting on their suit,
16    I am not party to it, and that is not my
17    specialization.
18        Q.   Let's go back to what was
19    available in March of 2007 that led to the
20    termination of Mr. Kadakkarappally and Mr.
21    Vijayan.
22            Would you mark this as Shelley
23    Exhibit 7, letter dated February 26, 2007,
24    numbered HRT_SIB 000506100.
25            (Shelley Exhibit 7, letter dated
```

Page 131

```
 1            Shelley
 2    February 26, 2007, numbered HRT_SIB
 3    000506100, marked for identification, as
 4    of this date.)
 5        Q.   Showing you now Professor Shelley
 6    what has been marked as Exhibit 7, it is a
 7    one-page letter from the Southern Poverty Law
 8    Center Immigration Justice Project, to Signal
 9    International, dated February 26, 2007.  My
10    first question will be whether you have ever
11    seen this before?
12        A.   No, I have not seen this.
13        Q.   Take a moment and review it?
14        A.   Okay.
15        Q.   Having looked at this letter do
16    you recognize now that Signal did receive a
17    letter from lawyers on behalf of some of the
18    Indian H-2B workers on February 26, 2007?
19            MR. ROUX:  Objection as to the
20    form.
21        A.   I see that a letter was sent, yes.
22        Q.   So now at the time the workers
23    were terminated which would have been the week
24    after Exhibit 7 was sent from SPLC, the
25    lawyers, to Signal International, Signal has
```

Page 132

```
 1            Shelley
 2    received a letter from lawyers and learned
 3    from it's sources within the camp that Jacob
 4    Joseph and Sabulal were organizing efforts
 5    among the workers to meet with lawyers;
 6    correct?
 7            MR. ROUX:  Objection as to the
 8    form.
 9        A.   Can you clarify this?
10        Q.   Sure.  We are just trying to set
11    the stage here because as I understand it you
12    want to get a fuller picture of what happened
13    surrounding the events of March 9, 2007.  So
14    to set the stage I have shown you one document
15    which you said you have not seen, but were
16    aware of the facts, that is Exhibit 6, which
17    was Signal being aware that Sabulal and Jacob
18    Joseph were getting other workers in the camp
19    to meet with lawyers; correct?
20        A.   Was I aware --
21        Q.   That was one of the facts that
22    was -- that was part of the picture that week;
23    correct?
24        A.   Yes.
25        Q.   So now I am trying to establish
```

Page 133

```
 1            Shelley
 2    with Exhibit 7 that another part of the
 3    picture was the receipt by Signal of a letter
 4    from lawyers from the SPLC on behalf of the
 5    Indian workers, correct, that is what it
 6    appears to be?
 7        A.   That is what it appears to be.
 8    That is the letter that you have given me.
 9            MR. ROUX:  Objection as to the
10    form.
11        Q.   Now I will show you the internal
12    response to that letter.  Shelley Exhibit 8,
13    E-mail dated March 6, 2007, numbered HRT_SIB
14    000527725.
15            (Shelley Exhibit 8, E-mail dated
16    March 6, 2007, numbered HRT_SIB
17    000527725, marked for identification, as
18    of this date.)
19        Q.   Showing you now what has been
20    marked as Exhibit 8 to your deposition.  An
21    E-mail string from March of 2007 with the
22    subject matter letter from Southern Poverty
23    Law Center, and I ask you if you would review
24    these E-mails and tell me first whether you
25    have ever seen them before?
```

Page 134

Shelley

1          Shelley
2          A.   I have not seen these letters, but
3    I have discussed some parts of this.
4          Q.   What parts of this have you
5    discussed and with whom?
6          A.   I have had discussions with Tracey
7    and Ron.  I have discussed the question of
8    what the workers were doing, of the question
9    of labor organizing.  You know, whether they
10   thought that was going on in the camps, in the
11   residential areas where they were living.
12         Q.   In your discussions with Tracey
13   Binion and Ronald Schnoor did they tell you
14   that after receiving the Southern Poverty Law
15   Center letter that is Exhibit 7, which was
16   asking to have a discussion and a good faith
17   dialogue about the issues with Indian workers
18   with Signal, that there was internal
19   discussion as to how to respond to that
20   letter; did that come up at all in your
21   discussions?
22         MR. ROUX:  Objection as to the
23      form.
24         A.   We did not discuss the response to
25   this letter.

Page 135

1          Shelley
2          Q.   Did they even tell you about the
3    letter from the SPLC?
4          A.   They did not tell me about the
5    letter.  They told me that there were concerns
6    expressed about labor conditions.  Labor
7    conditions let's say.
8          Q.   They told you what you said in
9    your report that these guys were terminated
10   because they were agitating the other workers
11   and it would be of concern from a safety
12   perspective; is that correct?
13         MR. ROUX:  Objection as to the
14      form.
15         A.   I talked to them because I was
16   concerned as -- how do I say it -- as a
17   specialist on human trafficking my job is not
18   to be considering issues of union organizing.
19   This is not human trafficking, this is another
20   agenda, another issue.  I am concerned when I
21   talk about trafficking about what is going on
22   in the work environment, the payment, whether
23   there is elements of force.  If there is
24   elements of taking passports away.  I am
25   not -- I have never seen that union organizing

Page 136

1          Shelley
2    is part of any discussion of human
3    trafficking.
4          Q.   Coercion is a discussion involved
5    with human trafficking; is that correct?
6          A.   Yes, if there is extreme force,
7    yes.
8          Q.   Abuse of power is an element; is
9    that correct?
10         A.   Not under --
11         MR. ROUX:  Objection as to the
12      form.
13         A.   Let's read the TVPA.
14         Q.   We will get to that definition in
15   a moment, or after lunch.  But I think you
16   even refer to the UN abuse of power or
17   exploitation of vulnerability, those are
18   hallmarks of potential trafficking; correct?
19         MR. ROUX:  Objection as to the
20      form.
21         A.   I am looking at statutes on human
22   trafficking and there is no defined, legally
23   defined hallmarks of human trafficking.  There
24   are statutes and people who have established
25   provisions on human trafficking.

Page 137

1          Shelley
2          Q.   There is also the UN protocol
3    which you quote which says abusive power of a
4    position of vulnerability.  Do you agree with
5    that?
6          A.   It is one definition, it is not
7    the American definition of that.
8          Q.   Abuse of legal process is part
9    of -- is a definition of forced labor under
10   the TVPA, is it not?
11         MR. ROUX:  Objection as to the
12      form.
13         A.   I am not talking about -- let me
14   just think for a minute.  In forced labor
15   there are precedents on what abuse of power
16   consist of, and Judge Zainey in his decision
17   on denying class did not see these
18   preconditions of force against the workers and
19   that they had mobility, they had the ability
20   to come and go and were not subject to
21   coercion.
22         Q.   The question is under the TVPA the
23   elements for forced labor, does it include
24   coercing work based on abuse of legal process?
25         MR. ROUX:  Objection as to the

TSG Reporting - Worldwide - 877-702-9580

| Page 138 | Page 139 |
|---|---|

**Page 138**

1      Shelley
2      form.
3      A.    And what would you define as abuse
4  of legal process.
5      Q.    I was going to ask you, you are
6  the expert?
7          MR. ROUX:  Objection as to the
8      form.
9      Q.    Is it an element, yes or no, do
10  you know?
11         MR. ROUX:  Objection as to the
12      form.
13      A.    In how you prove abuse of legal
14  process --
15      Q.    I will let you go through it at
16  lunch.  Can you tell me without going through
17  it; do you have a definition of abuse of legal
18  process that you use?
19      A.    No.
20      Q.    If you were to threaten a group of
21  employees if any one of you sues this company
22  all of you will be terminated, is that an
23  abuse of legal process?
24         MR. ROUX:  Objection as to the
25      form.

**Page 139**

1      Shelley
2      Q.    Not only terminated, but deported
3  back to India?
4      A.    I would want to see any legal
5  precedent on this.  I am not aware of a case
6  of that.
7      Q.    Putting aside a case a legal
8  precedent, just as an expert on trafficking,
9  would it concern you if you saw evidence that
10  a company was telling it's employees who were
11  in the country on temporary visas, guys, if a
12  single one of you brings a lawsuit against
13  this company all of you will be terminated and
14  sent back to your home country; would that
15  bother you?
16         MR. ROUX:  Objection as to the
17      form.
18      A.    I am not -- it might bother me.
19      Q.    Now let's look at Exhibit 8,
20  Ronald Schnoor tells Tracey Binion in response
21  to the letter from the Southern Poverty Law
22  Center:  Tracey, remember, the best defense is
23  a strong offense.  When we do not respond to
24  threats like this it only fuels the fire.
25  Ignoring threats and not responding only helps

| Page 140 | Page 141 |
|---|---|

**Page 140**

1      Shelley
2  sponsor more trouble like we have now with all
3  the Indians meeting with the lawyers this past
4  weekend.  Like the Department of Labor folks
5  learned we are almost perfect.  The next time
6  some disgruntled employee barks he will think
7  twice about wasting their time again.  Before
8  the week is over the Indians will know we are
9  not afraid to fight and so should their
10  liberal lawyers.  They do not have a claim so
11  I let them think they do.
12         Did I read that correctly?
13      A.    Well you read this.
14      Q.    Is there any reference in there to
15  by the way we really have to deal with this
16  issue of agitation because it is a safety
17  concern?
18         MR. ROUX:  Objection as to the
19      form.
20      A.    I inquired to them --
21      Q.    That is not my question.  My
22  question is does this E-mail refer to anything
23  having to do with agitation and a safety
24  concern?
25      A.    This E-mail does not.

**Page 141**

1      Shelley
2      Q.    Do you agree with me that this
3  E-mail discusses coming up with a response by
4  Signal to the threat it perceives from the
5  Indian workers meeting with lawyers and having
6  their lawyer, the SPLC, write a letter to
7  Signal.  That is what he is talking about;
8  right?
9      A.    When I read this it is quite vague
10  and agitated.
11      Q.    Well it is not too vague.  He says
12  before the week is over the Indians will know
13  we are not afraid to fight and so should their
14  liberal lawyers.  That is Tuesday March 6th;
15  right?
16         MR. ROUX:  Objection as to the
17      form.
18      Q.    That is when he wrote that?
19      A.    Yes.
20      Q.    And what happened on Friday, March
21  9th, before the week was over?
22      A.    There was this, how would I say,
23  this event where the workers were deported.
24      Q.    And as an expert who is supposed
25  to be objectively looking at the evidence in

| Page 142 | Page 143 |
|---|---|

**Page 142**

Shelley

1
2  this case, as you see this E-mail for the
3  first time, this was not shared with you by
4  anyone at Signal before now, was it?
5      MR. ROUX:  Objection as to the
6  form.
7      A.   No, there were other things that
8  were shared with me that I asked them about of
9  their personal response, their level of
10 agitation, their internal communications.  So
11 I am not surprised by this E-mail, it is not
12 inconsistent with what was told to me.
13     Q.   Professor Shelley, as an expert
14 witness who told me a half hour ago you wanted
15 to get a fuller picture of what happened
16 regarding the events of March 9th, now seeing
17 this E-mail for the first time, Exhibit 8, do
18 you have any concern that perhaps Mr. Schnoor
19 followed through on his E-mail to teach the
20 workers and their liberal lawyers a lesson
21 before the week was out that the way it would
22 respond to his perceived threat from their
23 meeting with lawyers was by forcibly
24 terminating and deporting the workers who were
25 organizing those efforts?

**Page 143**

Shelley

1
2      MR. ROUX:  Objection as to the
3  form.
4      A.   I think that you are drawing
5  conclusions from something that is more than I
6  am reading here.
7      Q.   We will let the jury draw its own
8  conclusions.  Let's go to lunch.
9          (Luncheon recess:  12:38 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

| Page 144 | Page 145 |
|---|---|

**Page 144**

Shelley

1
2      A F T E R N O O N   S E S S I O N
3          (Time noted:  1:46 p.m.)
4  L O U I S E   I.   S H E L L E Y, Ph.D.,
5      resumed and testified as follows:
6  EXAMINATION BY (Cont'd.)
7  MR. HOWARD:
8      Q.   Professor Shelley, before the
9  lunch break we were reviewing Shelley Exhibit
10 8 and the statement made on March 6th by Ron
11 Schnoor that before the week is over the
12 Indians will know that we are not afraid to
13 fight and so should their liberal lawyers.  Do
14 you remember that?
15     A.   Yes.
16     Q.   You agree with me that March 9th
17 was an event that occurred within that week;
18 is that correct?
19     A.   Yes.
20     Q.   Are you aware also of a meeting
21 that Mr. Schnoor convened with the entire
22 Mississippi camp of workers on March 12th?
23     A.   I knew that he convened a meeting,
24 I didn't recall the date.
25     Q.   Did you ever listen to an audio

**Page 145**

Shelley

1
2  tape of what he said at that meeting?
3      A.   No, I did not listen.
4      Q.   Did you ever review a transcript
5  from the audio tape of what he said at that
6  meeting?
7      A.   No.  I talked to him about the
8  meeting, but I didn't review an audio tape.
9      Q.   Why not?
10     A.   I have a limited number of hours
11 and I am prioritizing what I am working on.
12     Q.   Would you agree with me that in a
13 case in which there are allegations of forced
14 labor and coercion and abuse of legal process,
15 what Mr. Schnoor told the entire camp of
16 Mississippi workers on the heels of the
17 termination of eight of the workers and after
18 receiving letters from lawyers and learning
19 about meetings from lawyers might have
20 relevance to this case?
21     A.   Everything that went on at Signal
22 has relevance to this case.
23     Q.   Let me show you a transcript which
24 you say you have not seen before.  Shelley
25 Exhibit 9, rough transcription of audio tape,

TSG Reporting - Worldwide - 877-702-9580

| Page 146 | Page 147 |
|---|---|

**Page 146**

Shelley

1  3/12/07.
2  (Shelley Exhibit 9, rough
3  transcription of audio tape, 3/12/07,
4  marked for identification, as of this
5  date.)
6  Q.  Showing you what has been marked
7  as Exhibit 9 which I will represent to you is
8  a transcript of the speech Mr. Schnoor gave on
9  March 12, 2007 to the camp of Mississippi
10  workers.  I want to direct your attention to
11  the fourth page?
12  A.  Okay.
13  Q.  Read the paragraph please that is
14  under the timeframe 1939 to 2232.
15  A.  Okay.
16  Q.  Have you read that?
17  A.  I would like to read the rest of
18  it.
19  Q.  I will give you time on a break,
20  we are before trial, I think my questions are
21  going to go specifically to the words in this
22  paragraph?
23  A.  All right.
24  Q.  In the middle of the paragraph
25

**Page 147**

Shelley

1  after the first third he says:  So I want you
2  to think very, very carefully about suing
3  Signal and about suing us for things that I
4  know are let's just say are not called for,
5  what I call a frivolous suit because I know we
6  are fully compliant.  We have good lawyers
7  too, very good lawyers, we will fight this
8  like we do in Signal's interest, okay.  That
9  won't be good for this program, that won't be
10  good for this program.  If we have to spend a
11  lot of energy and effort fighting frivolous
12  lawsuits then the process will impact all of
13  you.  We won't be doing any visa extensions or
14  anything with Signal.  This program is
15  terminated and ended when the visas are
16  complete and that is July 31st.  That is not
17  very far away.
18  Now would you agree with me that
19  by March 12, 2007 Mr. Schnoor understood that
20  these workers had incurred debts to pay what
21  he viewed as excessive recruiting fees?
22  MR. ROUX:  Objection as to the
23  form.
24  A.  I am not sure that its March 12th
25

**Page 148**

Shelley

1  is the day that he understood that, no.
2  Q.  If he understood that at the time
3  he is making these statements, and he is
4  telling these workers who he knows have
5  incurred these debts and need to stay at
6  Signal to make wages to pay off those debts,
7  that the program would be terminated if anyone
8  of you files a lawsuit, would you agree that
9  that could be perceived by the workers hearing
10  these words as a threat?
11  MR. ROUX:  Objection as to the
12  form.
13  A.  I am not sure that I do.
14  Q.  Do you see anything in this
15  language of concern to you that this could be
16  perceived as a threat to the workers?
17  A.  I see this language as someone who
18  is hot headed and angry.  But I see language
19  in the rest of the paragraph that is quite
20  different from this.
21  Q.  Would you agree with me though
22  that a worker listening to this from the head
23  of the Mississippi facility at Signal could
24  perceive this as a threat that if I go and
25

**Page 149**

Shelley

1  meet with a lawyer and bring a lawsuit,
2  exercise my legal rights against Signal, my
3  visa is going to be terminated and I will be
4  sent home to India in financial ruin; is that
5  possible?
6  MR. ROUX:  Objection as to the
7  form.
8  A.  It doesn't say that his visa will
9  be terminated.  It says the program will be
10  terminated once they serve their period.
11  Q.  Three more months; correct?
12  A.  Yes.
13  Q.  Would it be perceived as a threat
14  to the workers or of concern to the workers
15  that if I go and file a lawsuit the program is
16  going to end and I and all of my colleagues
17  here are going to have to go back to India?
18  MR. ROUX:  Objection as to the
19  form.
20  A.  I think that any employer is not
21  guaranteed unless they have a contract with
22  their worker to keep them on past their dated
23  period of employment.
24  Q.  Is it okay in that circumstance
25

| Page 150 | Page 151 |
|---|---|

**Page 150**

Shelley

1  for an employer to tell workers if you
2  exercise your legal rights to bring a lawsuit
3  against us you will be terminated, all of you
4  will be terminated and returned to India?
5      MR. ROUX:  Objection as to the
6  form.
7      Q.   Is that appropriate in your view?
8      A.   I don't think it is a smart thing
9  to do as a manager, as a person running a
10  business.  But he is also telling the workers
11  that he wants to make this work.  And so I
12  think that you are taking several lines out of
13  context that are distorting Mr. Schnoor's
14  overall intentions, because I think he is a
15  man who has a temper, but who also tries to
16  make things work for the different actors
17  involved, including the workers.
18      Q.   And you have talked to Mr. Schnoor
19  about what his intentions were in making this
20  speech; is that correct?
21      A.   I talked to Mr. Schnoor about what
22  he went through, not his intentions just, but
23  what he went through as a person while this is
24  going on in his watch at Signal.

**Page 151**

Shelley

1      Q.   Did you ask Mr. Schnoor was it his
2  intent to actually end the program and not
3  extend a single visa for any worker if any
4  worker filed a lawsuit against Signal?
5      MR. ROUX:  Objection as to the
6  form.
7      A.   That is not what I asked him, but
8  I asked him about the program and how he
9  perceived it and responded to it.
10     Q.   So you didn't ask him the question
11 that I just asked you?
12     A.   No because I don't think that is
13 the right question as a witness to elicit the
14 information that I want in response to it.  It
15 is a loaded question and it will not get you
16 the kind of answer that you need to make a
17 reasoned judgment.
18     Q.   Did you read any of the
19 transcripts of the plaintiffs' testimony
20 concerning their reaction to Mr. Schnoor's
21 speech?
22     A.   Yes I have.
23     Q.   Your report said that you read one
24 plaintiff deposition; is that correct?

**Page 152**

Shelley

1      A.   Yes, and I also have talked to
2  some of the workers who are still at Signal.
3      Q.   You talked to the ones that are
4  still at Signal in 2014; is that correct?
5      A.   Yes.
6      Q.   Did you talk to any of the workers
7  that are plaintiffs in this case?
8      A.   No.
9      Q.   Whose deposition did you read?
10     A.   Well --
11     Q.   I think --
12     A.   I don't remember, I have to check.
13     Q.   How did you make the decision to
14 choose which one plaintiff's deposition to
15 read?
16     A.   I think that I scanned some of
17 them and decided to look at one that seemed to
18 cover some of the issues that I wanted to look
19 at.
20     Q.   Do you recall any testimony in
21 that one deposition that you read about the
22 reaction to Mr. Schnoor's speech?
23     A.   I have read a lot on the workers
24 reaction to Mr. Schnoor and to the conditions

**Page 153**

Shelley

1  in early March, yes.
2      Q.   And to his speech in particular
3  and the words that we just read?
4      A.   Not to those words in particular,
5  no.
6      Q.   Now at paragraph 17 on page 13 of
7  your report, do you have that in front of you?
8      A.   Yes.
9      Q.   The last line in paragraph 17 is:
10 Nor did Signal abuse or threaten to abuse the
11 legal process.
12         Those are your words; right?
13     A.   Yes.
14     Q.   I think before lunch we were
15 trying to come up with whether you had a
16 definition for that, and you used the word, so
17 I want to know what definition you have in
18 mind when you made that statement in your
19 report?
20     A.   When I think about abusing the
21 legal process I think about legal intimidation
22 in accusing people of false charges, that is
23 what I often think of of abuse of the legal
24 process, particularly with respect to use of

Page 154

```
 1            Shelley
 2   the criminal law.
 3        Q.   Do you know what the definition
 4   that is incorporated within the TVPA speaks
 5   about abuse of legal process; are you familiar
 6   with that?
 7        A.   I have read it.
 8        Q.   Can you recall it offhand?
 9        A.   No.
10        Q.   Do you know whether it includes
11   for example abuse of administrative processes,
12   the threatened use of a law or legal process
13   whether administrative, civil or criminal in
14   order to exert pressure on another person to
15   cause that person to take some action or
16   refrain from taking some action.  Is that a
17   definition familiar to you?
18        A.   Yes.
19        Q.   If workers listening to
20   Mr. Schnoor give his speech on March 12th
21   interpreted his words that I read to you as
22   saying if you file a lawsuit against Signal we
23   are going to use the H-2B process to terminate
24   your legal stay in the United States and you
25   are going to have to go back to India, would
```

Page 155

```
 1            Shelley
 2   that in your mind potentially constitute abuse
 3   of legal process as it is defined for the
 4   TVPA?
 5        MR. ROUX:  Objection as to the
 6   form.
 7        A.   He has not threatened to remove
 8   workers prior to the expiration of their visa.
 9        Q.   Signal was telling the workers
10   that they were going to extend the visa at
11   this time; correct?
12        A.   It had been up until these events,
13   yes.
14        Q.   And now he is telling them if you
15   do something, that is file a lawsuit, we are
16   not going to extend your visas.  That is what
17   he is telling them here; correct?
18        A.   This is what he said here, but he
19   is also saying other things to that.
20        Q.   Yes, he doesn't want it to happen,
21   he wants the program to work?
22        A.   And he wants to make -- he
23   understands their financial situation, he
24   understands the bind that they are in.  It is
25   a part of a whole complex situation.  If he
```

Page 156

```
 1            Shelley
 2   were terminating them or trying to terminate
 3   them before their visa was up and their
 4   contract with Signal, that is a very different
 5   process than letting them stay through the
 6   whole contractual period.
 7        Q.   So if Mr. Schnoor actually took
 8   steps to terminate workers before their visa
 9   expired because of steps they took to assert
10   their legal rights, that would be a problem
11   for you; is that correct?
12        MR. ROUX:  Objection as to the
13   form.
14        A.   I did not say exertion of their
15   legal rights.
16        Q.   Well if he terminated them because
17   they did something to in Signal's view
18   threaten them legally, like have a lawyer
19   write a letter and terminated them because of
20   that, that would be in your words an entirely
21   different matter; right?
22        MR. ROUX:  Objection as to the
23   form.
24        A.   Can you please rephrase your
25   question.
```

Page 157

```
 1            Shelley
 2        Q.   Sure.  Let's go back to the
 3   workers that were listening to the speech on
 4   March 12th.  They were aware that their
 5   friends, Mr. Kadakkarappally and Mr. Vijayan,
 6   had been terminated three days earlier; is
 7   that correct?
 8        A.   Many of them were, yes.
 9        Q.   And many of them were actually
10   physically present in the camp when their
11   friends were rounded up by security guards,
12   put in a trailer to be forcibly deported to
13   India; is that correct?
14        MR. ROUX:  Objection as to the
15   form.
16        A.   Some of them saw this movement of
17   these workers and their leaving the camp.
18        Q.   And these other workers were aware
19   that Mr. Kadakkarappally and Mr. Vijayan had
20   been organizing efforts to meet with lawyers;
21   right?
22        A.   Some of them were aware, not all
23   of them were aware.
24        Q.   And now they are being told by the
25   head of the Mississippi facility that if
```

40 (Pages 154 to 157)

Case 2:15-cv-02296-SM-DEK Document 78-2 Filed 01/15/15 Page 42 of 85
Case 1:13-cv-00499-MAC-ZJH Document 92-3 Filed 01/15/15 Page 42 of 85 PageID #:
1707

| Page 158 | Page 159 |
|---|---|

**Page 158**

Shelley

1 Shelley
2 anyone brings a lawsuit against Signal then we
3 are going to let your visa's expire and this
4 program is going to be over. Is it your
5 testimony that that would not be perceived by
6 those workers as a threat in any way?
7 MR. ROUX: Objection as to the
8 form.
9 A. In understanding how Indian
10 workers think, since many of them have spent
11 much of their lives in the Middle East, in
12 Saudi Arabia, in UAE and elsewhere, I am not
13 sure that they would perceive this in the way
14 that you are talking about.
15 Q. But they might have?
16 A. I would say it is highly unlikely
17 because they have lived in a world in which
18 they have had no rights for seven or ten
19 years, not even the right to go to church.
20 Q. So having their rights taken away
21 in Mississippi would be okay with them?
22 MR. ROUX: Objection as to the
23 form.
24 A. We are not talking about having
25 their rights taken away. You asked me how

**Page 159**

1 Shelley
2 they would perceive such a statement. That is
3 a very different question than saying having
4 their rights taken away. You asked me about
5 their perception.
6 Q. I want to come back to your
7 statement that drawing a distinction between
8 letting a visa expire that otherwise would be
9 extended, and terminating a worker before the
10 expiration of their original visa term, okay.
11 And I want to know whether if Mr. Schnoor had
12 said if someone sues Signal we are going to
13 terminate the program immediately and send you
14 all back to India immediately, that would be a
15 problem for you, but just telling them that we
16 are going to let the program expire, we are
17 not going to extend your visas is okay; are
18 you drawing that distinction?
19 A. I am certainly drawing a
20 distinction between those two.
21 Q. So in your mind at least the first
22 scenario, if he told them if any of you file a
23 lawsuit we are going to terminate the program
24 immediately and send you back to India
25 immediately, that would be a problem?

| Page 160 | Page 161 |
|---|---|

**Page 160**

1 Shelley
2 MR. ROUX: Objection as to the
3 form.
4 A. I am not getting into the minds of
5 the Indian workers, and I think that is a very
6 important think to understand, is how what
7 they know about their labor rights, what they
8 understand about the right to organize in the
9 State of Mississippi and the State of
10 Louisiana, they may not be what you think of
11 as ideal, but there are certain laws of which
12 I think most of them are not aware of unless
13 there is someone explaining this to them.
14 Q. Well what Mr. Schnoor is
15 explaining to them is if you file a lawsuit
16 against Signal you will all be going back to
17 India. That is what he explains to them;
18 right.
19 MR. ROUX: Objection as to the
20 form.
21 A. He says that this program will be
22 terminated when the visas are complete.
23 Q. You understand, don't you, that
24 these workers who had taken out debts to pay
25 their recruiting fees for the opportunity to

**Page 161**

1 Shelley
2 come to Signal and have been give promises --
3 A. They did not take out their debts
4 to come to Signal. Many of them took out
5 debts way before Signal ever entered into this
6 picture.
7 Q. And some of them took out debts
8 specifically to come to Signal; is that
9 correct?
10 A. Some of them did.
11 Q. Which of the plaintiffs going to
12 trial in January were recruited in 2006
13 specifically for Signal and took out their
14 debts to come to work at Signal?
15 A. I have to review my files, but
16 some of them did and some of them had presided
17 this.
18 Q. And do you draw a distinction
19 between the two groups?
20 A. I think it is very important to
21 understand when you talk about the complicity
22 of Signal, that there is a very important
23 distinction that Signal was not involved in
24 the recruiting process, and this started way
25 before Signal ever got into the picture.

TSG Reporting - Worldwide - 877-702-9580

Page 162

Shelley

1
2      Q.   When in your mind, if ever, did
3   Signal become complicit in the recruiting
4   process?
5      MR. ROUX:  Objection as to the
6   form.
7      A.   I would not say that Signal is
8   complicit in the recruiting process, but
9   Signal hired recruiters who had workers that
10  they had to place since 2003.
11     Q.   For the ones in 2006 Signal was
12  involved in the recruiting process for those
13  workers; is that correct?
14     A.   All that Signal did in that
15  recruiting process was test some of the
16  workers.  They were not actively involved in
17  the recruiting process.
18     Q.   Have you studied any of the
19  testimony about whether or not the Signal
20  representatives who went to India to test the
21  workers were physically in the room with
22  Sachin Dewan and Michael Pol and Malvern
23  Burnett when they spoke to the workers?
24     A.   I read some of their statements
25  and I have asked them questions about what was

Page 163

Shelley

1
2   going on and what they observed.
3      Q.   Who specifically did you ask about
4   what they heard going on and what they
5   observed in India at Signal?
6      A.   When I talked to the recruiters,
7   to Darrell and others who were there, they
8   explained to me that they could not understand
9   much of what was going on because it was not
10  conducted in English.
11     Q.   Is Darrell Snyder the one Signal
12  representative that you spoke to and
13  interviewed who went to India as part of the
14  recruiting process or were there others?
15     A.   There were others.
16     Q.   Who else?
17     A.   I will have to review my notes.
18     Q.   You know of course that Darrell
19  Snyder was not in India in 2006, he went in
20  2007; is that correct?
21     A.   Yes.
22     Q.   So I want to know if you can
23  recall the name of any Signal person that you
24  interviewed who actually went to India in
25  2006?

Page 164

Shelley

1
2      A.   I interviewed one of the testers,
3   I will have to go into my notes, but I don't
4   have total recall at the moment.  I have not
5   been on this case for six years like you, but
6   I have met these people and I have notes that
7   I have taken.
8      Q.   In paragraph 17 you state:  There
9   is strong indications that some individuals
10  engaged in fraud in India by having other
11  persons take the skills test for them as
12  indicated by the fact that the Signal skills
13  tester did not recognize them on their arrival
14  in the U.S., and their failure to be able to
15  perform the needed skills.
16     Was that statement that you made
17  based on your conversation with the one Signal
18  representative who went to test workers in
19  India in 2006?
20     A.   Not only.  It is also based on
21  some of the tests that I have seen of the
22  welding tests that have been taken.  It has
23  also been taken on some of the T visa
24  applications that I have read in which
25  individuals, at least one of them has admitted

Page 165

Shelley

1
2   to not having worked as a welder before, but
3   being a farmer.  And it is also unfortunately
4   a practice in India all the time of having
5   other people take tests for you and
6   misrepresent your credentials, and that goes
7   up to the highest levels in India.
8      Q.   And what is your basis for that
9   statement?
10     A.   Because I am a researcher on
11  corruption and I can give you examples from
12  outside this case that I know of.
13     Q.   Can you?
14     A.   Certainly.  For example I have one
15  scholar applying for a Fulbright at the
16  university, and he gave me a list of his
17  credentials which seemed very strange to me
18  for a person at such a low level Indian
19  institution.  I therefore sent a request to
20  somebody that I am acquainted with to ask the
21  vice rector, former vice rector of Calcutta
22  University to check on these credentials, and
23  they were fraudulent.
24     I can go into other experiences,
25  but it is a major problem not only in the hard

| Page 166 | Page 167 |
|---|---|

**Page 166**

Shelley

1
2  sciences, but in applications to universities,
3  in applications to research fellowships, in
4  applications it is for any kind of work that
5  people overstayed or misrepresent their job
6  credentials.
7      Q.  Specific to India you are talking
8  about?
9      A.  Yes.
10     Q.  Specific to skilled workers in
11 India?
12     A.  Yes.  It is across the board in
13 India.
14     Q.  Have you done before this case any
15 specific work with skilled workers in India?
16     A.  No.
17     Q.  Which plaintiff to your
18 recollection was a farmer and never had done
19 any welding or pipe fitting?
20     A.  I have all the annotated T visa's
21 here.
22     Q.  What do you have?
23     A.  I have annotated them with
24 comments.
25     Q.  Annotated your report with

**Page 167**

Shelley

1
2  comments?
3      A.  No, I took the T visa's -- wait a
4  second.  I will have to check in here.  But he
5  was recently deposed I know.  I am going to
6  have to check.
7      Q.  Let's move on then.
8          By the way you are not an expert
9  on welding, are you?
10     A.  No, but I have learned something
11 on it recently.
12     Q.  Well you testify in your -- or you
13 put forth in your report that you could tell
14 that Mr. Khuttan, one of the plaintiffs, was
15 not a very good welder because you were shown
16 a picture of his welding test in India; is
17 that correct?
18     A.  No, I was shown pictures of Mr.
19 Khuttan's welding and I was shown pictures of
20 what a good weld looks like, so I could make a
21 comparison between what a bad weld looks like
22 and a good weld looks like.
23     Q.  And you were explained that by
24 someone who is an expert in welding; correct?
25     A.  Yes.

**Page 168**

Shelley

1
2      Q.  Is that someone from Signal?
3      A.  Yes.  But I have in my life done a
4  lot of house renovation, I know something
5  about what work you need to do to fix
6  properties.
7      Q.  And you are holding yourself out
8  in this case as an expert in welding to the
9  jury?
10     A.  No, but I think that if somebody
11 is making an explanation to me that is faulty
12 I could tell if they were lying to me, that
13 much I can tell you.  But I am not going to
14 tell you that I am not an expert on welding.
15 But you can tell when somebody is lying to
16 you.
17     Q.  Yes I can.
18         MR. ROUX:  Objection as to the
19 form.
20     Q.  Let's take a look at page 6,
21 paragraph 8 of your report:  Trafficking is a
22 legally defined concept and is not subject to
23 shifting definitions to suit the occasion.
24         You are critical of reports by the
25 Southern Poverty Law Center because in your

**Page 169**

Shelley

1
2  view they have used, to use your words,
3  shifting definitions of trafficking; is that
4  fair to say?
5      A.  Yes.
6      Q.  And the trafficking definition
7  that you use in your report is quote:  The
8  recruitment, harboring, transportation,
9  provision or obtaining of a person for labor
10 or services through the use of force, fraud or
11 coercion for the purpose of subjection to
12 involuntary servitude, peonage, debt bondage
13 or slavery.  Am I correct?
14     A.  Yes.
15     Q.  That is the definition that you
16 don't want to shift from, is that fair to say?
17     A.  This is the TVPA definition.
18     Q.  Okay.
19     A.  I can't shift from a legal
20 definition.  What I can say is that when I
21 read the reports, because I have a book on
22 human trafficking, and I read the reports that
23 Southern Poverty Law Center prepared on what
24 was human trafficking in New Orleans, it was a
25 total different phenomenon from the Signal

Page 170

```
 1              Shelley
 2    case.
 3         Q.   My question to you is the
 4    definition of trafficking that you use for
 5    your report that you say comes from the TVPA,
 6    specifically what statute provides that
 7    definition; let me ask it this.
 8              That comes from 22 U.S. Code
 9    Section 7102, does it not?
10         A.   Yes.
11         Q.   And that is the definition of
12    severe forms of trafficking in persons;
13    correct?
14         A.   Yes.
15         Q.   And then it is quoted right from
16    there; is that correct?
17         A.   Yes.
18         Q.   Is that the definition that you
19    understand is applicable to private rights of
20    action for forced labor under the TVPA; is
21    that the applicable definition?
22              MR. ROUX:  Objection as to the
23         form.  That is a legal conclusion, I
24         don't think she has to answer that.
25              MR. HOWARD:  Well she has given
```

Page 171

```
 1              Shelley
 2    lots of legal conclusions in her report,
 3    so I think I am free to ask her.
 4         A.   I am not providing -- I am not
 5    going into a contextual analysis.  The point
 6    that I was making here is that the Southern
 7    Poverty Law Center in explaining to the world
 8    what human trafficking was like described a
 9    totally different phenomenon than what you
10    have in the Signal case.
11         Q.   But in your paragraph 8 I want to
12    know for purposes of drawing your conclusions
13    in this case, and it is your opinion, we
14    talked about it this morning, that Signal was
15    not involved in human trafficking in any way;
16    correct?
17         A.   No.
18         Q.   That is your opinion?
19         A.   Right.
20         Q.   And I want to know whether the
21    definition you were using to reach that
22    conclusion is the definition that we have just
23    read that comes from 22 U.S. Code Section 7102
24    that you use and quote in your report?
25              MR. ROUX:  Objection as to the
```

Page 172

```
 1              Shelley
 2    form.
 3         A.   I am using this definition which
 4    is also being used by your expert witness on
 5    your side on -- because I am addressing the
 6    comments that you have presented on what the
 7    definition of human trafficking is.
 8         Q.   My question again, Professor
 9    Shelley, is when you give the opinion in this
10    case that Signal was not involved in human
11    trafficking, is the definition that you are
12    using the one that you quote at paragraph 8 of
13    your report?
14              MR. ROUX:  Objection as to the
15         form.
16         A.   I am using, and because this case
17    is also, and I should have put this in, a case
18    on forced labor, I used provision Section 1589
19    and Section 1590.
20         Q.   Where do you have those in your
21    report?
22         A.   I said I should have, and we sent
23    a statement last week to you saying that I of
24    course considered these provisions and that
25    should be added to my statement.  That was
```

Page 173

```
 1              Shelley
 2    provided last week.
 3              MR. ROUX:  Can we go off the
 4         record briefly?
 5         Q.   We are on the record.
 6              I never got that statement.  Are
 7    you now amending your report to say that you
 8    are considering not 22 U.S.C. 7102, but 18
 9    U.S. Code 1589?
10         A.   I didn't say but.  I also reviewed
11    provision 1589 and 1590.
12         Q.   You reviewed them.  Are you saying
13    that you also applied the definitions of 1589
14    and 1590 in reaching your conclusions in this
15    case?
16         A.   Yes.
17              MS. HANGARTNER:  Just for the
18         record the TVPA provisions that you are
19         citing from right now, what year are
20         those?
21              MR. HOWARD:  The current.
22              MS. HANGARTNER:  The current TVPA?
23              MR. HOWARD:  Yes, but I think they
24         were in effect in --
25              MS. HANGARTNER:  The TVPA has been
```

---

Page 174

Shelley

1  amended since then.
2      MR. HOWARD: I know. But I am
3  talking about the definitional phrases
4  provisions. We can have this argument
5  later.
6      Q. So in connection with 1589 you are
7  aware that someone is guilty of trafficking
8  through forced labor whoever knowingly
9  provides or obtains the labor or services of a
10  person by any one of the following means. One
11  of which is by means of serious harm or
12  threats of serious harm to that person or
13  another person. Are you aware of that?
14      MR. ROUX: Objection as to the
15  form.
16      A. Yes.
17      Q. Or by means of the abuse or
18  threatened abuse of law or legal process;
19  correct?
20      A. Yes.
21      MR. ROUX: Objection as to the
22  form.
23      Q. And do you agree with me that
24  serious harm as it is defined for purposes of

---

Page 175

Shelley

1  establishing a claim for trafficking and
2  forced labor under the TVPA can be
3  psychological harm, it doesn't have to be
4  physical harm?
5      MR. ROUX: Objection as to the
6  form.
7      MS. HANGARTNER: This is not the
8  TVPA that applies to this matter.
9      MR. HOWARD: Okay.
10      MR. RAMSEY: I don't think that is
11  correct for the record. For the record
12  the definitions were taken directly from
13  case law and then put into the TVPA. So
14  I think you are wrong. I think that the
15  objection is inappropriate. Let's move
16  on.
17      MS. HANGARTNER: I disagree.
18      Q. And I want to be clear too. I do
19  not want to elicit legal conclusions from you.
20  I want to know when you make conclusions as a
21  trafficking expert and when you conclude from
22  all the records you have seen and review you
23  have done and the facts in this case, which I
24  also understand are ongoing, so I definitely

---

Page 176

Shelley

1  want to give you the opportunity to amend your
2  opinions. But at least the opinions that you
3  express in your report as of August 29, 2014
4  that Signal was not engaged in human
5  trafficking, I want to know what you had in
6  mind as is meant by human trafficking?
7      A. I have relied heavily on the
8  publications of Southern Poverty Law Center in
9  examining and defining what I think of as
10  human trafficking. I have also written a 350
11  page book which was written as a scholarly
12  book and is now the standard textbook on human
13  trafficking that is used at Harvard and the
14  Kennedy School and almost every other top
15  university in the United States.
16      So when I discuss what I think
17  about human trafficking, it is not just a
18  one-page conclusion. I have spent 20 years of
19  my life or more by now studying human
20  trafficking.
21      Q. And with all that time studying
22  and your textbook can you tell me what it
23  means to you, that is human trafficking, that
24  you can then compare the conduct of a company

---

Page 177

Shelley

1  like Signal in a case like this?
2      A. In most cases just like what is
3  written in the Southern Poverty Law Center the
4  companies and in the precedent cases like
5  Pickle pay the workers not less than the
6  minimum wage. They do not provide the workers
7  health benefits. They treat the workers as
8  disposable people. They hold their passports.
9  They deny them mobility, which Judge Zainey in
10  his decision said did not happen.
11      Furthermore they often have as you
12  asked me trauma, so that they hide their
13  identities permanently. They are not all over
14  Facebook as these defendants or plaintiffs are
15  who have not hidden their identities at all.
16  That is about the psychological side of it.
17      But the circumstances of this in
18  which a company pays it's workers $18 an hour,
19  50 percent overtime, health benefits, and
20  gives people vacation time, I have never seen
21  a trafficking case in my life that conforms to
22  those conditions.
23      Q. Is it your opinion that a company
24  cannot be engaged in trafficking if it pays

---

---

Page 178

Shelley

1    it's workers $18 an hour plus overtime and
2    gives vacation?
3        A.   Those are not the only conditions
4    of trafficking, but they are an important
5    prerequisite that they are paying and treating
6    workers at an appropriate -- with a very high
7    rate of pay.  Most of trafficking consists of
8    people being abused in their form of payment.
9        Q.   I am just confused by your use of
10   the word prerequisite.  Is it your opinion
11   that it is a prescription for finding
12   trafficking that workers be paid less than
13   minimum wage, or a poor wage?
14       A.   It is certainly one of the key
15   elements, but not the only element of human
16   trafficking.
17       Q.   I understand it is not the only
18   element of human trafficking, but is it a
19   necessary element in your view?
20       A.   If someone is being paid under the
21   minimum wage that is in violation of the law,
22   that is an important element of human
23   trafficking.  Not the only one, but an
24   important element of it.

---

Page 179

Shelley

1        Q.   And the flip side, if a worker is
2    being paid above minimum wage, is that to your
3    mind dispositive of the question of their
4    being trafficked, meaning if they are being
5    paid above minimum wage they cannot be victims
6    of trafficking; is that your opinion?
7            MR. ROUX:  Objection as to the
8        form.
9        A.   I did not say that it is the only
10   condition.  I gave you multiple conditions
11   that exist in this case.  But wage is a very
12   important consideration.
13       Q.   I understand that.  I am
14   questioning now about wage.  Is it your
15   opinion that if a worker is paid a good wage
16   above minimum wage that worker cannot be a
17   victim of trafficking?
18           MR. ROUX:  Objection as to the
19       form.
20       A.   You have sex trafficking victims
21   who are paid money by their traffickers and
22   are violently abused, and yet you have a
23   person that can be trafficked.  So money is
24   not the only variable, but it is an important

---

Page 180

Shelley

1    variable.
2        Q.   Fair enough.  How about a skilled
3    worker, is it possible for a skilled worker to
4    be a victim of forced labor as opposed to sex
5    trafficking, even if that worker is getting
6    paid above minimum wage?
7            MR. ROUX:  Objection as to the
8        form.
9        A.   As I mentioned just now there are
10   numerous conditions that apply, and as I have
11   said before and I will say again, wage is just
12   one of them.  How many times do I have to say
13   it?
14       Q.   Well when you use words such as
15   prerequisite or necessary, I understand that
16   it is one of the factors, I am just asking you
17   whether you agree that a skilled worker could
18   be paid above minimum wage and still be a
19   victim of trafficking; is possible?
20       A.   Its possible, that is what I said.
21       Q.   Now in your report you talk about
22   there being an absence of captivity, that they
23   had mobility?
24       A.   Yes.

---

Page 181

Shelley

1        Q.   Is that again a factor as opposed
2    to a prerequisite for trafficking?
3        A.   If an individual is confined to a
4    facility, literally I have seen cases where
5    women are chained to the walls or workers
6    held, that is absolutely a condition of human
7    trafficking.  But the fact that the workers
8    had mobility is a very important factor in
9    denying the presence of human trafficking, as
10   Judge Zainey also said that.
11       Q.   Is it your opinion that if workers
12   are entitled to hold their own passports they
13   cannot be victims of human trafficking or
14   forced labor?
15           MR. ROUX:  Objection as to the
16       form.
17       A.   As I have said to you there are
18   multiple factors that come into a decision of
19   human trafficking.  If your passport is held,
20   that is a very strong condition in favor of
21   there being human trafficking.  If you hold
22   your own passport it is a favorable condition
23   for the denial of human trafficking.
24       Q.   Because by having your own

---

TSG Reporting - Worldwide - 877-702-9580

Page 182

Shelley

1    passport you are free to leave the country; is
2    that correct?
3        A.   You are free to move, you have
4    your identity papers that you need for your
5    existence.
6        Q.   We talk about mobility.  You are
7    talking about mobility in the sense of the
8    workers could come and go from the Signal
9    facility; correct?
10       A.   Yes, but I am talking about
11   mobility way beyond the Signal facility.
12       Q.   In what sense?
13       A.   That people traveled all over the
14   United States to visit relatives.
15       Q.   Do you have an understanding in
16   this case, for each of the workers who were at
17   Signal on H-2B visas, one of their options was
18   to stay working for Signal; correct?
19       A.   Yes, because under an H-2B visa
20   you need to stay with the employer for whom
21   your visa is issued.  So they don't have many
22   options under an H-2B visa.
23       Q.   That is my point.  I want to know
24   what other options these workers had?
25

Page 183

Shelley

1        MR. ROUX:  Objection as to the
2    form.
3        A.   I understand that there were
4    efforts by the recruiters to get some of the
5    workers transferred to other employers.  But
6    in terms of the structure of the H-2B visa
7    program the workers who have visas for Signal
8    are required to work with Signal.  That is a
9    U.S. Government regulation and this was in
10   force and complied with.
11       Q.   So these workers had two other
12   options though, correct, in that they could
13   leave Signal, stay in the U.S. and be
14   undocumented, that is one other option;
15   correct?
16       A.   It is not a legal option.
17       Q.   The other legal option was to go
18   back to India; correct?
19       A.   Also there was a third option, is
20   that if you have another employer that will do
21   the paperwork you can get a transfer of your
22   H-2B visa from one employer to another
23   employer, and that happened with some of the
24   Signal employees.  In fact many of them.
25

Page 184

Shelley

1        Q.   How many of them?
2        A.   I don't know, but there are --
3    that have moved and have legal status, they
4    did not all stay illegally.  They were leaving
5    to some other employers when the paperwork
6    that had been started earlier came through.
7        Q.   Who did that paperwork?
8        A.   The recruiters, because they had
9    been recruited originally for some other
10   companies.
11       Q.   That is your understanding of the
12   record?
13       A.   I understand that some of them
14   transferred to other employers and had their
15   H2-B visas transferred.
16       Q.   Where did you get that
17   understanding?
18       A.   From some of the documents that I
19   read.
20       Q.   Can you remember any one
21   specifically?
22       A.   I can't remember a particular
23   document that I read, but I know that some of
24   them did move.
25

Page 185

Shelley

1        Q.   Would you agree or disagree with
2    the following statement, that the high
3    recruitment fees and deceptive recruitment
4    practices directed at plaintiffs made them
5    vulnerable to forced labor and trafficking?
6        MR. ROUX:  Objection as to the
7    form.
8        MR. SHAPIRO:  Objection to the
9    form.
10       A.   There is a question of whether
11   there is a vulnerability, and there could be a
12   vulnerability, but I do not determine that
13   there are the conditions of forced labor at
14   Signal.
15       Q.   So you agree with me there is
16   vulnerability from those conditions?
17       A.   There is --
18       MR. ROUX:  Objection as to the
19   form.
20       A.   In the process of being a migrant
21   worker anywhere there is always a condition of
22   vulnerability, and some of these other
23   conditions compound one's vulnerability.
24       Q.   And would you agree that the high
25

47 (Pages 182 to 185)

Shelley

1    recruitment fees and deceptive recruitment
2    practices directed at these migrant plaintiffs
3    compounded their vulnerability to forced labor
4    and trafficking?
5         MR. ROUX:  Objection as to the
6    form.
7    A.    No.
8    Q.    Why not?
9    A.    Because I view the process of
10   recruitment differently from the work
11   conditions to which they were exposed.
12   Q.    How so?
13   A.    Because I believe that there is a
14   process of recruitment, and then there is a
15   process of employment.  I don't know if I am
16   that clear.
17   Q.    Well they are recruited to then
18   become employed.  If the recruitment process
19   made them vulnerable to forced labor, what
20   changes when they start getting employed?
21        MR. ROUX:  Objection as to the
22   form.
23   A.    Because it depends on the
24   conditions of their employment.  So that in
25

Shelley

1    the Pickle case -- no, the Pickle case does
2    not deal with an H2-B visa.  But in the
3    process of coming as a worker, if you go into
4    a situation in which you have an intentionally
5    exploited worker situation, then you are
6    increased vulnerability to forced labor.
7    Q.    With the high recruitment fees and
8    deceptive recruitment practices as you have
9    described them and mention them in your own
10   report that were directed at the plaintiffs in
11   this case, did that make them during the
12   recruitment process vulnerable to forced labor
13   and human trafficking?
14        MR. ROUX:  Objection as to the
15   form.
16   A.    We are not discussing what
17   happened to them during the recruitment
18   process because I am discussing what is going
19   on with Signal, and Signal was not involved
20   except as a tester in this recruitment
21   process.
22   Q.    So you are expressing no opinions
23   one way or the other as to whether what
24   happened to these workers in the recruitment
25

Shelley

1    process made them vulnerable to forced labor
2    and human trafficking or not?
3         MR. ROUX:  Objection as to the
4    form.
5    A.    I would say in India everybody
6    pays recruiters to go overseas, and every
7    Indian worker that goes overseas has a
8    possibility of being vulnerable to bonded and
9    forced labor.  That is the problem of the
10   situation in India as it exist today for
11   everyone.
12   Q.    Well you held yourself out as
13   knowledgeable about the foreign worker
14   phenomenon with Indian workers going to the
15   UAE and Saudi Arabia and other places.  How
16   did the amount of the recruitment fees paid by
17   the workers, the plaintiffs in this case,
18   compare to the standard recruiting fees that
19   those workers would pay to go to those other
20   job opportunities?
21        MR. ROUX:  Objection as to the
22   form.
23   A.    The workers paid less to go to the
24   Middle East and received much less to go to
25

Shelley

1    the Middle East.
2    Q.    So the recruitment fees were
3    higher here than you have seen before?
4    A.    They were high, I will not say
5    than I have seen before, they are high
6    recruitment fees, that is clear.
7    Q.    So did that make them particularly
8    vulnerable for forced labor?
9    A.    I wouldn't say that the payment of
10   the fees to come to the United States makes
11   them particularly vulnerable.  I will say to
12   you that the environment in which the workers
13   go in the Middle East makes them particularly
14   vulnerable.  It is the environment in which
15   you go to, the conditions of the work, the
16   conditions of the pay, and many other
17   conditions that exist in the country that
18   establish vulnerability, it is not just the
19   payment of recruitment fees.
20   Q.    What were the conditions at Signal
21   through the employment that in your mind,
22   maybe I am mis-hearing you, alleviated any
23   vulnerability these workers had to forced
24   labor or trafficking?
25

Page 190

Shelley
1
2       MR. ROUX:  Objection as to the
3   form.
4       A.   The workers at Signal were hired
5   as workers at Signal, as employees of Signal.
6   This is extremely unusual in the case of
7   migrant workers to be hired under the same
8   payroll conditions as domestic employees.
9       Q.   Well not all the conditions that
10  were applied to the India H-2B workers were
11  the same as Signal applied to their domestic
12  employees, were they?
13      MR. ROUX:  Objection as to the
14  form.
15      A.   They were hired as workers and I
16  would like you to clarify your question some
17  more.
18      Q.   The Indian H-2B workers when they
19  were hired were required to live in Signal's
20  man camps; is that correct?
21      A.   Yes.
22      Q.   And that was not a requirement of
23  any other worker employed by Signal; is that
24  correct?
25      A.   Yes.

Page 191

Shelley
1
2       Q.   In fact Signal forbid any other
3   workers other than the Indian workers from
4   living in the man camps; is that correct?
5       MR. ROUX:  Objection as to the
6   form.
7       A.   I don't know if any other workers
8   sought to live in the man camps.
9       Q.   Well you are aware and you talked
10  about it in your expert report about this
11  being the post Katrina era in the Gulf coast
12  where there was a shortage of housing;
13  correct?
14      A.   That is correct.
15      Q.   And there was a shortage of
16  workers because American workers were
17  displaced from their housing; correct?
18      A.   Absolutely.
19      Q.   Signal could have made their man
20  camps available to American workers who wanted
21  to keep their jobs working with Signal, they
22  could have done that; right?
23      MR. ROUX:  Objection as to the
24  form.
25      A.   Also American workers at this time

Page 192

Shelley
1
2   went up to other places in the United States
3   where fracking was starting and where there
4   was an enormous demand for American workers at
5   high pay.  So there are other factors going on
6   that reduced the pool of American workers and
7   the conditions in this environment were not
8   desirable for keeping workers there.
9       Q.   Do you know if there were American
10  workers or contract workers other than the
11  Indian workers available to Signal at the time
12  they recruited the Indian H-2B workers?
13      MR. ROUX:  Objection as to the
14  form.
15      A.   I know that at Signal there were
16  American workers, there were some contractual
17  workers from other countries, but they were
18  not direct Signal employees.
19      Q.   The American workers and the
20  contract workers were not required by Signal
21  to live in the man camps; is that correct?
22      A.   The American workers had their own
23  housing and the contractual workers did not
24  directly work for Signal.
25      Q.   Were any of them required by

Page 193

Shelley
1
2   Signal to live in the man camps?
3       A.   They were not Signal employees.
4       Q.   Were any of them required by
5   Signal to live in the man camps, anyone other
6   than the Indian H-2B workers?
7       A.   No.
8       Q.   By the way you are familiar with
9   the term that Signal used to describe the man
10  camps as the reservation?
11      A.   I would not say that everybody at
12  Signal referred to them as the reservation.
13      Q.   How many of them did?
14      A.   I don't know, but I know that it
15  is not a universal comment because I have
16  questioned the staff on this.
17      Q.   So you questioned them in 2014.
18  Did you ever call the Indian worker man camps
19  the reservation and they told you no?
20      A.   No, I am not that stupid.
21      Q.   So how did you come to the
22  determination that it was not a universal term
23  used to describe the man camps?
24      A.   Because when you ask questions of
25  people you try and elicit an answer that will

TSG Reporting - Worldwide - 877-702-9580

| Page 194 | Page 195 |
|---|---|
| 1          Shelley | 1          Shelley |
| 2   give you a view of how they viewed this camp, | 2    Q.   Does it make it -- I mean at what |
| 3   how they referred to it, and an open ended | 3   level of use at a company does a derogatory |
| 4   question is often a much better way of | 4   term like the reservation for the man camp |
| 5   soliciting information than a direct question. | 5   that only the Indian workers are required to |
| 6    Q.   So what was the open ended | 6   live in become a problem for you as a |
| 7   question you asked of the Signal workers to | 7   trafficking expert? |
| 8   make the determination that the term | 8      MR. ROUX:   Objection as to the |
| 9   reservation was not universally used by Signal | 9    form. |
| 10   workers? | 10    A.   The question for me is not the |
| 11    A.   I asked them what they considered | 11   name of it, the question comes to what are the |
| 12   of this housing and some people would say to | 12   circumstances that resulted in the creation of |
| 13   me, oh that person referred to it as a | 13   these facilities and why the Indian workers |
| 14   reservation, and I would never think of it in | 14   lived there.   It is not what they are called, |
| 15   those terms. | 15   it is what they were. |
| 16    Q.   Who told you that? | 16    Q.   So the fact that some Signal |
| 17    A.   I am not sure, but there were at | 17   employees referred to this man camp as the |
| 18   least a couple of people who said that to me. | 18   reservation is of no significance to you at |
| 19    Q.   And how many documents did you | 19   all? |
| 20   review where they actually used the term the | 20      MR. ROUX:   Objection as to the |
| 21   reservation? | 21    form. |
| 22    A.   I cannot tell you how many | 22    A.   It may affect other aspects of |
| 23   documents I reviewed that referred to this.   I | 23   this process, but it is not something that is |
| 24   have seen the term, I know that it was not a | 24   necessarily part of a trafficking case.   What |
| 25   universal term. | 25   is part of a trafficking case is what we are |

| Page 196 | Page 197 |
|---|---|
| 1          Shelley | 1          Shelley |
| 2   looking at of the conditions in which people | 2   are kind of used to having derogatory phrases |
| 3   were living, or the facilities that existed, | 3   ascribed to their housing conditions? |
| 4   what people were charged for them, and not | 4      MR. ROUX:   Objection as to the |
| 5   what somebody in this organization may call | 5    form. |
| 6   this. | 6    A.   I am not sure that these workers |
| 7    Q.   Well for an Indian worker who | 7   are knowing that this is referred to as the |
| 8   hears the term reservation ascribed by his | 8   reservation, or that they understand what this |
| 9   employer to the place where he is required to | 9   means or what you are interpreting this to |
| 10   live, would that have any psychological impact | 10   mean to an Indian who is not fluent in |
| 11   on him in your opinion? | 11   English. |
| 12      MR. ROUX:   Objection as to the | 12    Q.   I ask you to turn back to page 28 |
| 13    form. | 13   of your report please? |
| 14    A.   I doubt it, and I can explain to | 14    A.   Can we take a bathroom break? |
| 15   you why I doubt it.   One of them is that most | 15      MR. HOWARD:   Sure.   Off the |
| 16   of these Indians have been doing their | 16    record. |
| 17   depositions through translations, so the | 17      (Recess taken.) |
| 18   subtleties that you are referring to are not | 18    Q.   Professor Shelley, if you look at |
| 19   something that somebody who is not very fluent | 19   page 28, I think we saw this sentence before |
| 20   in English, of which many of these workers | 20   when Bob Marler, you actually meant Dick |
| 21   were not in 2006, be aware of. | 21   Marler, the CEO, saw the occupancy density |
| 22      Secondly many of these workers | 22   when the camps were first set up he ordered |
| 23   have lived in restricted housing for most of | 23   more trailers to reduce crowding. |
| 24   their lives working overseas. | 24      He told you that; right? |
| 25    Q.   So does that tell you that they | 25    A.   Yes. |

Case 2:15-cv-02296-SM-DEK Document 72-2 Filed 01/15/15 Page 52 of 85
Case 1:13-cv-00499-MAC-ZJH Document 92-3 Filed 01/15/15 Page 52 of 85 PageID #:
1717

| Page 198 | Page 199 |
|---|---|
| Shelley | Shelley |

**Page 198**

```
1              Shelley
2        Q.    And did he tell you that he made
3   the decision that the camps would be too
4   crowded before the first worker even arrived
5   at Signal in November of 2006?
6        A.    I wouldn't say that he made a
7   decision that they would be too crowded.  He
8   made a decision based on his analysis that
9   this is what he would order, and when he saw
10  the way it looked he said that he ordered more
11  trailers.
12       Q.    And he ordered more trailers
13  because when he saw the ones that were
14  originally ordered it would be overcrowded,
15  right, not enough?
16             MR. ROUX:  Objection as to the
17  form.
18       A.    He looked at the trailers and
19  wanted more space for the workers.
20       Q.    To reduce crowding, that is the
21  words that you used?
22       A.    Yes, but it is not that he
23  intentionally ordered a certain number of
24  facilities originally to crowd the workers.
25       Q.    No, but he realized whatever he
```

**Page 199**

```
1              Shelley
2   did order was going to crowd the workers and
3   they needed more; is that correct?
4        A.    Yes, so that when he saw what
5   was -- what he thought was a problem he wanted
6   more, he wanted better things for his workers,
7   yes.
8        Q.    That was in October of 2006; is
9   that correct?
10       A.    Yes.
11       Q.    When did Signal order more
12  trailers?
13       A.    After that.  I don't know exactly
14  when they ordered them.
15             MR. HOWARD:  Would you mark this
16  as Shelley Exhibit 10, document numbered
17  SIGE 0556816.
18             (Shelley Exhibit 10, one-page
19  excerpt from Mr. Sanders diary dated
20  Friday, January 19, 2007, numbered SIGE
21  0556816, marked for identification, as of
22  this date.)
23       Q.    Showing you now what has been
24  marked as Exhibit 10 to your deposition,
25  one-page excerpt from Mr. Sanders diary dated
```

**Page 200**

```
1              Shelley
2   Friday, January 19, 2007, SIGE 0556816.  I
3   will ask if you have ever seen this before?
4        A.    No I have not seen this.
5        Q.    Take a moment and review it
6   please?
7        A.    Okay.
8              MR. HOWARD:  Would you mark this
9   as Shelley Exhibit 11, E-mail dated June
10  14, 2007, numbered SIGE 0048939.
11             (Shelley Exhibit 11, E-mail dated
12  June 14, 2007, numbered SIGE 0048939,
13  marked for identification, as of this
14  date.)
15       A.    This thing that is blacked out --
16       Q.    Maybe you can read it better on my
17  version.
18       A.    I can't, if you can read it to me.
19       Q.    I will read it to you.  You see
20  the part where Mr. Sanders is talking about
21  wanting to put in a purchase order with
22  Ameritech for the additional trailers;
23  correct?
24       A.    Yes.
25       Q.    And that before you could get Ron
```

**Page 201**

```
1              Shelley
2   and Chris, and that is Ron Schnoor and the CFO
3   Chris Cunningham, to sign off on the
4   expenditure I had to tabulate the actual cost
5   we incurred to date.
6              You see that; right?
7        A.    Yes.
8        Q.    What he also says in the portion
9   that you have difficulty reading:  This
10  information coupled with Ron's information
11  today that the Indians are not as physically
12  strong as red neck south Mississippi boys and
13  simply do not work fast had him questioning
14  the whole deal of the Indians being here.  And
15  then we realized, or more accurately he
16  realized, that we were not adding in the $35 a
17  day boarding charge we were collecting.  That
18  totals $3 million a year which changed the
19  complexion entirely.  Ron was on board.
20             Did you learn through your
21  investigation or discussions with Mr. Marler
22  that his determination in October of 2006 that
23  there needed to be more trailers ordered to
24  reduce the crowding in the Mississippi man
25  camp actually did not turn into a purchase
```

TSG Reporting - Worldwide - 877-702-9580

## Page 202

```
 1              Shelley
 2   order for trailers until late January 2007?
 3        A.   I knew there was some delay, I
 4   could not tell you exactly what the delay was,
 5   what the timeframe was.
 6        Q.   And you probably couldn't tell me
 7   then what the reason for the delay was either;
 8   correct?
 9            MR. ROUX:  Objection as to the
10   form.
11        A.   I can't say, no.
12        Q.   And does it appear to you the
13   reason for the delay is Signal wanted to make
14   sure it had it's cost set and was not going to
15   pay for new trailers until it could make sure
16   that it could collect the money from the
17   Indian workers themselves to pay for them?
18            MR. ROUX:  Objection as to the
19   form.
20        A.   There were many things that I
21   learned about the operation of these man
22   camps, and to make a simple statement like
23   that is simplifying the problem.
24        Q.   You understood that the $35 a day
25   charge for the man camps included a portion to
```

## Page 203

```
 1              Shelley
 2   reimburse Signal for the cost of operating the
 3   camp, plus a portion that went back into
 4   Signal's pockets that was more than the cost
 5   of running the camp themselves; is that
 6   correct?
 7            MR. ROUX:  Objection as to the
 8   form.
 9        A.   I examined the financial data
10   concerning the construction of the camp or the
11   purchase of the camp, the running of the camp,
12   the food of the camps.  I think it is normal
13   business operations when you provide a
14   facility that you pay for the expenses of the
15   facility and over time you pay for the costs
16   of the facility.  That is like in a rental
17   apartment.  So yes, it seemed this policy was
18   consistent with building something and renting
19   it.
20        Q.   This was a capital cost investment
21   made by Signal, right, to build the camps?
22            MR. ROUX:  Objection as to the
23   form.
24        A.   They invested capital to build
25   this, yes.
```

## Page 204

```
 1              Shelley
 2        Q.   Was there accounting treatment of
 3   it as a capital cost?
 4            MR. ROUX:  Objection as to the
 5   form.
 6        A.   I am not looking at how they
 7   categorized this operation other than to know
 8   that they put considerable amount of money
 9   into building these, in purchasing these
10   facilities.
11        Q.   Did you look at any of the
12   financial records on the accounting treatment
13   by Signal for the cost of the man camps?
14            MR. ROUX:  Objection as to the
15   form.
16        A.   I looked at many financial records
17   concerning the man camps, yes.
18        Q.   Did that include their accounting
19   treatment of the man camps?
20        A.   If you call it the accounting
21   treatment, I looked at the accounting records.
22   How the accountant chose to classify them is
23   not a question of accounting treatment, I
24   looked at the financials concerning the man
25   camps.
```

## Page 205

```
 1              Shelley
 2        Q.   You know enough as you have told
 3   me you reviewed financial records and all your
 4   experience that if a company treats something
 5   in a certain way as an accounting matter there
 6   are tax ramifications.  So that the net costs
 7   to the company after tax considerations like
 8   depreciation and things like that is different
 9   than their gross outlay for the capital costs.
10   Do you know or don't you?
11            MR. ROUX:  Objection as to the
12   form.
13        A.   I know that there are complex tax
14   implications of all of this.  I did not go
15   through all the tax implications, but I
16   reviewed financial records.
17        Q.   Is it fair to say that you learned
18   enough about the man camps issue to determine
19   that costs to Signal was at least one of the
20   factors they made to determine whether and
21   when to purchase more trailers for the man
22   camps?
23            MR. ROUX:  Objection as to the
24   form.
25        A.   That I can't say.  I can say that
```

Page 206

```
 1           Shelley
 2   I know that costs to Signal was a factor
 3   affecting the operation of the man camps.
 4        Q.   Was it also a factor affecting
 5   Signal's decision making with respect to the
 6   man camps?
 7           MR. ROUX:  Objection as to the
 8   form.
 9        A.   After a capital investment like
10   any business any decision affects this.  But
11   the idea as someone had written about that
12   this was a profit center for Signal is not the
13   case.
14        Q.   I don't want to argue about how
15   you define profits, but let's take a
16   hypothetical.  If a landlord buys a building
17   and he charges his tenants $1,000 a month for
18   each apartment in the building, and the costs
19   of the upkeep of the building and the taxes
20   for the building and everything else run about
21   $500 a month, would you call that $500
22   additional rental payment paid by each
23   apartment tenant profits?
24           MR. ROUX:  Objection as to the
25   form.
```

Page 207

```
 1           Shelley
 2        Q.   And I am adding to the
 3   hypothetical that the landlord put in a
 4   capital investment to buy the property, but
 5   would you or would you not characterize the
 6   rental above operating costs as profit?
 7        A.   You would look at it as net
 8   revenue flow.  But whether it is a profit
 9   depends on depreciation scale, depreciation,
10   investment, rate of borrowing costs.
11        Q.   Did you look at that in connection
12   with Signal's accounting for the man camps to
13   determine if in fact they made a profit or
14   stood to make a profit if the man camps
15   remained full for a three year period as they
16   projected?
17           MR. ROUX:  Objection as to the
18   form.
19        A.   I looked at the period in which
20   they were in residence there, and they were
21   not making a profit.
22        Q.   Do you know what their projections
23   were for the three year period they projected
24   the man camps to be full?
25        A.   I saw some figures on this, but
```

Page 208

```
 1           Shelley
 2   this was a hypothetical and not a question of
 3   what actually happened.
 4        Q.   How long after the extra trailers
 5   were actually ordered did they arrive?
 6        A.   It took a period for them because
 7   there was a lot of pressure on trailers at
 8   that time with post Hurricane Katrina.  So I
 9   am not exactly sure, but it was not
10   immediately.
11        Q.   So for how many months were the
12   workers in the Mississippi camp living in
13   conditions that Signal's CEO Richard Marler in
14   October of 2006 had determined was
15   insufficient?
16           MR. ROUX:  Objection as to the
17   form.
18        A.   You are mixing two points.  He
19   didn't say that they were insufficient.  He
20   said that he wanted to do better by his
21   workers.  He didn't say that they were
22   insufficient.
23        Q.   Have you read his transcript of
24   his deposition?
25        A.   I have read some of it.
```

Page 209

```
 1           Shelley
 2        Q.   Did you read the questions I asked
 3   him about this exact document?
 4        A.   No, I have not read that.
 5        Q.   You didn't read about how upset he
 6   was when he found out that the trailers had
 7   not been ordered?
 8           MR. ROUX:  Objection as to the
 9   form.
10        A.   I learned from him that he was
11   upset that there was not faster that the
12   trailers arrived and that there was not better
13   housing for the workers.  That much I know.
14   Whether I read it in a deposition, whether I
15   spoke to him, but what you are telling me I am
16   aware of.
17        Q.   Now you testified that you visited
18   the camps and that informed your views of the
19   adequacy of the housing, the trailers in the
20   Mississippi camp, am I correct about that?
21        A.   That is one of the factors that I
22   used.
23        Q.   When did you visit the camp?
24        A.   I visited there in July, but I
25   also saw videos from the period of residence.
```

| | |
|---|---|
| Page 210 | Page 211 |

**Page 210**

Shelley

1       Shelley
2    Q.  I will get to the videos in a
3 moment. But just to be clear your physical
4 visit to the trailers was in July of 2014;
5 correct?
6    A.  Yes.
7    Q.  And they had all been refurbished
8 to become two-man apartments; I think each
9 trailer had been refurbished to be two two-man
10 apartments?
11    A.  No.
12    Q.  They had not in July?
13    A.  No.
14    Q.  So if Mr. Marler, or I am sorry
15 Mr. Bingle testified that that was the case,
16 he was wrong about that?
17       MR. ROUX:  Objection as to the
18   form.
19    A.  I don't know what he testified,
20 but not all the trailers were in use.
21    Q.  Did you visit trailers that had 12
22 bunk beds, 24 beds in them?
23    A.  I visited trailers that had at one
24 time had held 24 beds.
25    Q.  What did they look like when you

**Page 211**

Shelley

1       Shelley
2 visited them?
3    A.  They were disassembled.
4    Q.  Empty?
5    A.  No.
6    Q.  What was in them?
7    A.  Wood, pieces of equipment.  There
8 were things in them.
9    Q.  Now when you say you saw videos of
10 camps in residence, you mentioned a Texas
11 video in 2008?
12    A.  Yes.
13    Q.  Was that when the camp was in use
14 by the Indian H-2B workers?
15    A.  No, it was shortly after.  I also
16 saw videos when the facilities still had the
17 bunk beds.
18    Q.  Where did you see those videos?
19    A.  I was provided them.  I also saw
20 videos of people on the upper tier of the bunk
21 beds.
22       MR. HOWARD:  Would you mark this
23   as Shelley Exhibit 12, photographs.
24      (Shelley Exhibit 12, photographs,
25   marked for identification, as of this

**Page 212**

Shelley

1       Shelley
2 date.)
3    Q.  Before you take a look at that I
4 just want clarification as to precisely which
5 videos you saw, because you mentioned only the
6 Texas camp video from 2008 in your report.  So
7 what other videos did you see and from what
8 source concerning the man camps when they were
9 occupied by the Indian H2-B workers?
10    A.  I had videos that I downloaded
11 here, that I was given copies of.  No, I have
12 them on -- I don't have them here, I have them
13 on a CD.  I can't tell you.
14    Q.  Do you know who took them?
15    A.  Signal had them photographed after
16 2007 after the case was initiated.
17    Q.  So have you seen any video footage
18 of the camp from before the case was initiated
19 when it was fully occupied by the plaintiffs?
20    A.  No, I have not seen the video for
21 that.  I have seen pictures, but not video.
22    Q.  I am showing you now what has been
23 marked as Exhibit 12 which are photos of the
24 man camp, two aerial photos of the Mississippi
25 man camp.  Do those look familiar to you as to

**Page 213**

Shelley

1       Shelley
2 the facilities you toured?
3    A.  Yes.
4    Q.  Then showing you some still
5 pictures from the camps, the inside of a
6 trailer.  Are these like the pictures that you
7 saw?
8    A.  Yes.
9    Q.  But you have not seen the videos
10 when there were 24 guys in the trailer, is
11 that fair to say?
12    A.  No, I have not seen that.
13    Q.  And how do the pictures here
14 compare to the physical pictures after the
15 Indian H2-B workers were gone from the
16 facility that you saw those videos, or the
17 tour you did of the Mississippi camp in 2014?
18       MR. ROUX:  Objection as to the
19   form.
20    A.  The 2014 camp as I said to you was
21 disassembled in some of them.  So you have
22 some elements of this.  The photos that I have
23 seen were not in color, so I don't have the
24 spreads or things like that.  But they are not
25 that different.

TSG Reporting - Worldwide - 877-702-9580

## Page 214

```
 1              Shelley
 2      Q.   Now you have testified a lot about
 3  the workers who went to the Middle East, Saudi
 4  Arabia, also to UAE.  Have you ever personally
 5  yourself toured housing facilities for foreign
 6  skilled workers such as welders and pipe
 7  fitters in those countries?
 8      A.   I have not toured them.  I have
 9  read descriptions of them.  I have worked with
10  colleagues who have done this.  I have seen
11  them like I have seen this, you know.
12      Q.   To your understanding based on
13  these secondary sources how do these living
14  conditions compare to the living conditions in
15  Saudi Arabia and the UAE?
16      A.   The conditions in Saudi Arabia are
17  abysmal.  In other parts of the Gulf they are
18  absolutely awful.  I know diplomats who had to
19  do reporting on this issue who have had
20  servants who have previously -- people who
21  worked with them who previously lived in these
22  facilities.  They are massive and go on
23  forever and are awful.
24      Q.   Does that in any way inform your
25  opinions in this case that the housing
```

## Page 215

```
 1              Shelley
 2  provided in the man camps by Signal for the
 3  Indian H2-B workers for $1,065 per month per
 4  man were sufficient and adequate?
 5      MR. ROUX:  Objection as to the
 6  form.
 7      A.   First of all the workers were not
 8  paying 1,050 a month just for housing, it
 9  included food and transport.  The fact that
10  workers have said that they never lived worse
11  than at Signal very much affects my judgment
12  having known these incredible experts that
13  worked on this issue in the Middle East.
14      Q.   So based on your understanding of
15  what these other experts have done you doubt
16  the truthfulness of the plaintiffs in this
17  case when they say that they lived in
18  apartments in Singapore or UAE or Saudi Arabia
19  that were three or four guys to an apartment
20  and were a lot nicer than living in 24 guys to
21  a trailer in this man camp?
22      MR. ROUX:  Objection as to the
23  form.
24      A.   I have -- how do I say it.  I also
25  have seen some of these camps in Russia where
```

## Page 216

```
 1              Shelley
 2  they have been, you didn't ask me about that.
 3  And the conditions are not what they are
 4  describing.  These are not -- they are not
 5  providing you an accurate description of how
 6  they are living in these countries.
 7      Q.   That is your opinion?
 8      A.   Yes.
 9      Q.   Now is it also your opinion based
10  on what you have seen, the video of the camp
11  from 2008 in Texas, your tour of the camp in
12  2014, and some pictures that were shown to you
13  in black and white, that the housing
14  facilities in the man camps when they had 24
15  Indian workers living in each trailer were
16  perfectly fine?
17      A.   I am not saying that they are
18  perfectly fine, but they meet standards that
19  are -- they meet let's say -- they are
20  facilities that are used by other people in
21  other situations, both in the United States
22  and overseas.
23      Q.   When you say in the United States
24  who are you referring to?
25      A.   Some of these neighboring
```

## Page 217

```
 1              Shelley
 2  facilities in which there were workers that
 3  came from elsewhere were using much lower
 4  grade, what do you call these, trailers, than
 5  what was being used at Signal.
 6      Q.   Do you agree or disagree that the
 7  housing that Signal provided to the Indian
 8  H2-B workers should have been up to standards
 9  that any American worker would have been happy
10  to live in as opposed to choosing a standard
11  based on what living conditions are in India
12  or in other countries abroad?
13      MR. ROUX:  Objection as to the
14  form.
15      A.   Let us look at the conditions of
16  what post Katrina Louisiana was like.
17      Q.   Well it is Mississippi we are
18  talking about.
19      A.   I mean Mississippi, Louisiana and
20  the Gulf coast, and this is the reason that
21  the workers were able to get H-2B visas, is
22  because the conditions were acute in that
23  region.  Therefore American workers were not
24  having conditions that were what they would
25  like to live in at that time.  In fact most of
```

---

**Page 218**

Shelley
1
2    the people I have interviewed at Signal
3    lost their homes and were living in miserable
4    temporary housing.  So nobody had good
5    housing.
6         This was a trauma, it was a trauma
7    for all these people that they lost their
8    homes and there was not good housing for them.
9    And the FEMA facilities that Americans were
10   living in have been shown to be very
11   dangerous.  So we are not talking about some
12   ideal conditions of American life for anybody
13   in this region.
14        Q.   But we are talking about
15   conditions in which workers who had to pay two
16   years of salary and go into incredible debt
17   and were promised they would get Green Cards
18   were transported to Signal and placed in, that
19   is what we are talking about; right?
20        A.   This is the housing that was
21   available.  There was not good housing
22   available for anyone in this region.
23        Q.   Signal could have made the
24   decision to let these workers try and find
25   housing outside of Signal's facility if they

---

**Page 219**

Shelley
1
2    could; they could have made that decision,
3    couldn't they have?
4         MR. ROUX:  Objection as to the
5    form.
6         A.   In order to live in off facility
7    in an environment in which as I cite in my
8    report there was almost no housing available
9    for Americans, how is somebody with a nine
10   month visa to stay in the United States, with
11   no record of payment history, no transport,
12   they did not have cars, they don't have
13   driver's licenses, how are they going to get
14   to work?
15        Q.   Signal could have said all those
16   things to the workers and said but go, you are
17   free if you want and can find a place to work,
18   go ahead.  And you don't have to live in the
19   camps and you don't have to pay us the $1,050
20   a month.  Signal could have said that and
21   maybe the workers would have said you know you
22   are right, we will stay here.  They didn't
23   give them that option, did they?
24        MR. ROUX:  Objection as to the
25   form.

---

**Page 220**

Shelley
1
2         A.   They didn't have that option, but
3    if they had that option and were spending
4    their time looking for housing, which would
5    have been so hard to find, they would not have
6    been able to accumulate the hours and the
7    overtime that they so needed to pay off their
8    debt.  So, you know, you are talking to me at
9    one time of their enormous debt and how they
10   need to pay this off, and at the second time
11   you have a question of people having housing
12   that is close to their work site so when there
13   is work available they can be making time and
14   a half on overtime and paying off their debt.
15        Q.   If one of the Signal Indian H-2B
16   workers is working on a crew with an American
17   worker and they become friendly and the
18   American worker says I have a two bedroom
19   apartment, my roommate moved out, it is $300 a
20   month, why don't you move in with me, we will
21   drive to work together.  In that event, and
22   that worker goes to Signal and says I am
23   moving out of the camp and moving in with my
24   buddy John, and they say fine, but you are
25   still going to pay the 1,050 a month to us.

---

**Page 221**

Shelley
1
2    You have to pay it and John doesn't; is that
3    right?
4         MR. ROUX:  Objection as to the
5    form.
6         A.   That is not the conditions of
7    trafficking.  That may be something that is a
8    question of equal treatment, but that is not a
9    provision of trafficking of whether somebody
10   chooses to move into housing.  But there was
11   almost no housing to move into.
12        Q.   What study have you done of the
13   housing that was available in Pascagoula,
14   including right across the street from Signal,
15   in the period of November 2006 through March
16   of 2007?
17        A.   I have read the comprehensive Rand
18   report done for the Gulf coast region,
19   including Pascagoula.  I have been to downtown
20   Pascagoula which was decimated, and I have
21   looked at the -- because today's Pascagoula is
22   different from what Pascagoula was like six
23   years ago.  And if you look at what we are
24   finding about, and looking at the UCR
25   statistics for Pascagoula and Moss Point, you

---

| Page 222 | Page 223 |
|---|---|

**Page 222**

Shelley

1 are dealing with highly criminalized regions
2 in which there are rates of victimization for
3 both property and violent crime that are a
4 multiple of the national average.
5 Q. And you reference that in your
6 opinions, and I am trying to understand why
7 that is relevant to your opinions. You are
8 saying that that is a justification for Signal
9 telling these workers from India you have to
10 live on our facility in these trailers?
11 MR. ROUX: Objection as to the
12 form.
13 A. If you are bringing people to a
14 very dangerous environment, and that is what
15 Pascagoula and Moss Point were after Katrina,
16 then I think that it is important to consider
17 the welfare of your workers. And to have
18 people who do not understand the environment
19 and do not understand the threats that they
20 face and say that this is a coercive response
21 is not appropriate.
22 Q. I understand your opinion. You
23 also give the opinion based on among other
24 things going to a restaurant. Do I understand

**Page 223**

Shelley

1 the restaurant in New Orleans was run by the
2 same caterer who --
3 A. Anjay, yes. A-N-J-A-Y.
4 Q. And you concluded that the food
5 was adequate in quantity and was nutritional
6 with fresh fruit and needed food groups
7 represented according to the menu. Did you
8 look at any of the records of what Signal
9 employees internally were saying about the
10 kitchen and dining facilities in the Texas and
11 Mississippi man camps at the time the Indian
12 H2-B workers were there?
13 A. Certainly.
14 Q. I will show you what was marked as
15 Exhibit 11. I want to know is this one of the
16 documents that you have seen.
17 For the record it is E-mails from
18 June of 2007, Bates SIGE 0048939 to 40. Have
19 you seen these E-mails before?
20 A. I have not seen these, I have seen
21 others concerning the food situation.
22 Q. June 14, 2007, Lewis Harky writes
23 to Lisa Spears: I pray that the Texas health
24 department doesn't show up. They will shut

| Page 224 | Page 225 |
|---|---|

**Page 224**

Shelley

1 this place down immediately.
2 On June 13, 2007 Lisa Spears
3 writes to Rodney Meisetschlaeger: Rodney,
4 several months back I toured the man camps to
5 find disgusting cooking facilities. I brought
6 this to the attention of Tom -- and I will
7 represent that is Tom Rigalo, the head of the
8 Texas facility -- who indicated he would take
9 care of it. When Colline was out there last
10 week I asked her to go to the man camp kitchen
11 to verify this had been done. As you can see
12 from the attached forwards it remains
13 disgusting.
14 Did these E-mails concern you at
15 all about what the conditions were like in the
16 Texas kitchen facilities in the man camps?
17 A. Yes, and I asked questions about
18 what they did. I asked Anjay questions about
19 what was being done to try and alleviate these
20 conditions.
21 Q. Did you talk to Lisa Spears?
22 A. I didn't talk to her about this.
23 Q. Did you read her deposition in the
24 case?

**Page 225**

Shelley

1 A. No.
2 Q. Did you talk to Rodney
3 Meisetschlaeger?
4 A. Yes.
5 Q. What did he tell you about the
6 conditions in the Texas dining facilities; did
7 he agree they were disgusting?
8 A. I think that there were periods in
9 which there were serious problems in the
10 facilities, and there were efforts by Signal
11 to rectify them. That is what I understood
12 from some of my questions.
13 Q. At least according to Lisa Spears
14 for months nothing happened; correct?
15 A. I cannot say, this is the first
16 time that I am seeing this. So I cannot say
17 anything more on this than what I am reading
18 now.
19 Q. Professor Shelley, in your expert
20 report at page 3, paragraph 4 you state that:
21 You have served as an expert witness in many
22 asylum cases in the last twenty years and I
23 have also served as an expert witness in
24 complex litigation cases.

## Page 226

Shelley

1          What kinds of complex litigation
2   cases have you served as an expert witness in?
3          A.   I have served in litigation
4   concerning my other areas of expertise which
5   concerns privatization in Russia, problems of
6   rule of law.
7          Q.   Have you served as an expert
8   witness in any litigation case involving
9   forced labor or human trafficking?
10         A.   No.
11         Q.   Have you ever given an expert
12  report in any litigation involving forced
13  labor or human trafficking?
14         A.   No.
15         Q.   I believe according to the letter
16  that we got that you have not testified at
17  trial or by deposition during the previous
18  four years; is that correct?
19         A.   That is correct.
20         Q.   Have you ever previously testified
21  at a trial or at a deposition?
22         A.   No, I have never done a deposition
23  before.  I have testified once in a trial.
24         Q.   And what did that trial involve

## Page 227

Shelley

1   and when was it?
2          A.   It was in Los Angeles.  It must
3   have been at least six years ago.  It was
4   about a case concerning privatization.
5          Q.   Russian privatization?
6          A.   Yes.
7          Q.   Do you know how you came to the
8   attention or how the contact was made between
9   you and Signal or its attorneys to be engaged
10  as an expert in this matter?
11         A.   Absolutely.
12         Q.   How was that?
13         A.   The law firm went to the library
14  and read the books on human trafficking for
15  two weeks and found mine the most analytical
16  and contacted them.
17         Q.   Had you ever heard of them or
18  worked with them before?
19         A.   Never.
20         Q.   That is all I have, let's take a
21  break and I will turn it over to Ivy.  I thank
22  you for your patience with me today.
23              (Recess taken.)
24  EXAMINATION BY

## Page 228

Shelley

1   MS. SURIYOPAS:
2          Q.   Good afternoon Professor Shelley,
3   back on the record.
4          My name is Ivy Suriyopas, I am an
5   attorney for the plaintiffs, I work at the
6   Asian American Legal Defense and Education
7   Fund, and I will do my best to go through the
8   remaining time that we have together as
9   quickly as possible.
10         A.   Thank you.
11         Q.   Can you tell me who, in terms of
12  your background in trying to learn more about
13  trafficking, who have you interviewed to
14  further your understanding of the subject?
15         A.   I have worked on human trafficking
16  for over two decades.  I have been on every
17  continent but Australia.  I have interviewed
18  activists on human trafficking.  As I wrote in
19  reference to this case in India I worked with
20  one of the leading human rights activists on
21  India.  I have worked with her for months for
22  AID.  I have interviewed Indian activists
23  against child labor and labor trafficking.  I
24  have been in the Middle East, I have been in

## Page 229

Shelley

1   Russia, I have been in Singapore.
2          I don't want to go through I have
3   been there, I have been there, but I can go
4   through if you want to have me talk about
5   every place in the world that I have been.  I
6   have been in Latin America.  I have been in
7   Asia on this.  I have spoken to NGO's.  I have
8   been an expert.  I have worked with OECD,
9   which is the Organization For European
10  Cooperation and Development, where I have been
11  a speaker at conferences and met people doing
12  work against human trafficking.  Whether it is
13  from the financial sector where you are
14  learning how to mine data to look for sex
15  trafficking, to whether it is prosecutors of
16  cases.  I have sometimes met victims of human
17  trafficking, survivors I should say of human
18  trafficking.
19         Q.   For the victims of human
20  trafficking what types of human trafficking
21  have these victims that you interviewed
22  suffered from?
23         A.   Labor trafficking and sex
24  trafficking.

| | Page 230 | | | Page 231 |
|---|---|---|---|---|

Page 230

```
             Shelley
 1
 2      Q.   In what industries did they work?
 3      A.   Sex trafficking, they worked at
 4   all levels of sex trafficking, from street,
 5   you know, from women on the street to call
 6   girls.  And in labor trafficking primarily in
 7   the farming industry.
 8      Q.   Have you talked to H-2B workers in
 9   your group of interviewees for victims of
10   trafficking?
11      A.   I have talked to H-2B workers in
12   this case at Signal whose colleagues have
13   alleged they have been trafficked.
14      Q.   But you have not talked to H-2B
15   workers who have alleged trafficking; is that
16   correct?
17      A.   That is correct.
18      Q.   Including the plaintiffs in this
19   case; is that correct?
20      A.   I have not had access to them.
21      Q.   And in terms of the countries that
22   you listed in your report including the United
23   Arab Emirates where you have talked about the
24   conditions for workers in that country, did
25   you talk to the previous employers of the
```

Page 231

```
             Shelley
 1
 2   plaintiffs?
 3      A.   No.
 4      Q.   Have you talked to any of the
 5   plaintiffs' previous employers?
 6      A.   No because the identities and
 7   almost everything about the plaintiffs has
 8   been hidden from this side.  So there has been
 9   no possibility to follow up on where they
10   worked before.  Almost everything in this
11   case, that kind of information has been
12   anonymized.
13         MS. SURIYOPAS:  Would you mark
14   this document as Shelley Exhibit 13,
15   Expert Report of Florence Burke.
16         (Shelley Exhibit 13, Expert Report
17   of Florence Burke, marked for
18   identification, as of this date.)
19      Q.   Before I ask you questions about
20   the exhibit before you I have one more
21   question about the identities of the clients
22   in this case.  You have seen the names of the
23   plaintiffs in the complaint, is that not
24   correct?
25      A.   Correct.
```

Page 232

```
             Shelley
 1
 2      Q.   You have also seen the names of
 3   the plaintiffs in the other cases outside of
 4   the David case; is that correct?
 5      A.   I have seen the names of many
 6   plaintiffs.
 7      Q.   So you in fact do know the
 8   identities of the plaintiffs in the cases
 9   against Signal; is that correct?
10      A.   Yes.  But anything more than that
11   such as you asked if I have spoken to their
12   former employers, that I would not know.
13      Q.   But it is correct that they
14   have -- the identities of the plaintiffs have
15   not been anonymized as you characterize it?
16      A.   No, but the identities of where
17   they worked and much of their background that
18   would allow me to do this kind of analysis
19   have been anonymized.
20      Q.   In front of you is what has been
21   make as Exhibit 13.  Have you seen this
22   document?
23      A.   Of course.
24      Q.   And in your analysis of your
25   report you go into great detail analyzing
```

Page 233

```
             Shelley
 1
 2   Ms. Burke's report that was submitted on
 3   behalf of the plaintiffs in these cases; is
 4   that correct?
 5      A.   That is correct.
 6      Q.   Can I direct your attention to
 7   paragraph 25.  I might have mislabelled this,
 8   excuse me.  I think I mis-marked the
 9   paragraph, so I will come back to that
10   question.
11         Your earlier testimony you --
12      A.   Can you tell me where you are
13   looking?
14      Q.   I need to review the -- I have the
15   wrong paragraph marked, I apologize.
16      A.   Okay.
17      Q.   In your earlier testimony you
18   listed the factors that are involved in
19   trafficking; is that correct?
20         MR. ROUX:  Objection as to the
21   form.
22      Q.   Let me rephrase.
23         Did you list in your earlier
24   testimony factors that you see in many cases
25   of human trafficking?
```

Page 234

```
 1                 Shelley
 2        A.  I wouldn't call them -- I listed
 3   some conditions that I have identified in
 4   cases of human trafficking.
 5        Q.   And those conditions included the
 6   pay that the workers are receiving; correct?
 7        A.  Yes.
 8        Q.   Whether or not they were receiving
 9   benefits?
10        A.  Yes.
11        Q.   Whether or not their passports
12   were taken?
13        A.  Yes.
14        Q.   Whether their mobility was
15   restricted?
16        A.  Yes.
17        Q.   And whether they experienced
18   trauma; is that correct?
19        A.  Yes.
20        Q.   Is that an exhaustive list?
21        A.  No.
22        Q.   What are the other conditions?
23            MR. ROUX:  Objection as to the
24   form.
25        A.  I mean one of the conditions is
```

Page 235

```
 1                 Shelley
 2   whether people have been exposed to extreme
 3   violence.  I mean there are other conditions
 4   in trafficking, that can exist in sexual
 5   trafficking or in labor trafficking in which
 6   people are subjected -- they are made
 7   disposable people in that they are placed into
 8   extremely dangerous environments in which they
 9   are given no protections, in which they are
10   given no medical treatment.
11        Q.   Any other conditions?
12        A.  I can go on.  I mean there are
13   many, many kinds of -- you can be subjected to
14   sexual abuse.
15        Q.   Specifically in the labor
16   trafficking context, or forced labor rather,
17   what other conditions can exist in trafficking
18   cases?
19        A.  What do you mean what --
20        Q.   In forced labor cases?
21        A.  In the forced labor cases
22   individuals can be compelled to work for long
23   hours, they can be given no vacation time, no
24   weekends off.
25        Q.   Anything else?
```

Page 236

```
 1                 Shelley
 2        A.  In forced labor they can be placed
 3   in a very dangerous work environment.  They
 4   could be coerced in a variety of ways that
 5   have been laid out in the law.
 6        Q.   Are there any other conditions in
 7   the forced labor context?
 8        A.  Those are what I would consider
 9   the primary conditions.
10        Q.   Now of all the conditions that you
11   listed, do all of those conditions need to be
12   present for the case to be a forced labor
13   case?
14        A.  Under provision 1589 you can have
15   threats or serious harm or physical restraint
16   against that person or another person.  Means
17   of a scheme, plan or pattern intended to cause
18   the person to believe that if the person did
19   not -- let me read it.
20            Section 1589, whoever knowingly
21   provides or obtains the labor or services of a
22   person, 1, by threats of serious harm to or
23   physical restraint against that person or
24   another person by means of any scheme, plan or
25   pattern intended to cause the person to
```

Page 237

```
 1                 Shelley
 2   believe that if the person did not perform
 3   such labor or services, that person or another
 4   person would suffer serious harm or physical
 5   restraint.
 6            So that is not a -- you can have
 7   condition 2 or you can have condition 3.  So
 8   it is not and.
 9            3, by means of the abuse or
10   threatened abuse of law or the legal process
11   shall be fined under this title or imprisoned
12   not more than 20 years or both.  If death
13   results from the violation of this section, or
14   if the violation includes kidnapping or an
15   attempt to kidnap, aggravated sexual abuse, or
16   the attempt to commit aggravated sexual abuse,
17   or an attempt to kill, the defendant shall be
18   fined under this title or imprisoned for any
19   term of years or life or both.
20            That is the conditions of forced
21   labor.
22        Q.   Are you a lawyer?
23        A.  No.
24        Q.   Have you gone to law school?
25        A.  I have taken law courses, but I
```

60 (Pages 234 to 237)

Case 2:15-cv-02296-SM-DEK Document 72-2 Filed 01/15/15 Page 62 of 85
Case 1:13-cv-00499-MAC-ZJH Document 92-3 Filed 01/15/15 Page 62 of 85 PageID #:
1727

## Page 238

```
 1              Shelley
 2   have not gone to law school.
 3       Q.   Have you taken law courses in the
 4   United States?
 5       A.   Yes.
 6       Q.   Have you taken law courses in any
 7   other country?
 8       A.   In Russia.
 9       Q.   Any other country outside of the
10   United States and Russia?
11       A.   No. I have lectured at Law School
12   Number 2, the University of Paris, but I have
13   not taken classes there.
14       Q.   Now in the provision that you read
15   does it have any requirement about the pay for
16   the workers?
17           MR. ROUX: Objection as to the
18   form.
19       A.   Can you repeat the question?
20       Q.   In the statute that you just read
21   is there any requirement about what the pay
22   should be for a victim of forced labor?
23           MR. ROUX: Objection as to the
24   form.
25       A.   This does not talk, this provision
```

## Page 239

```
 1              Shelley
 2   does not talk about pay. But in many cases of
 3   human trafficking one of the central issues is
 4   the pay of the workers.
 5       Q.   Does that provision that you just
 6   read include any conditions about benefits for
 7   the worker?
 8           MR. ROUX: Objection as to the
 9   form.
10       A.   No.
11       Q.   Does that provision that you just
12   read include any language about mobility of
13   the victim?
14           MR. ROUX: Objection as to the
15   form.
16       A.   In the United States as you know
17   as a lawyer so much of our law is not just the
18   code, but the cases of practice of law, and so
19   in many of the cases of human trafficking that
20   I have reviewed and read in my life central
21   provisions include how much individuals are
22   paid, how much they have mobility. So you
23   cannot just look at these provisions as
24   provisions of code, we are not in New Orleans
25   focusing on code, but on precedent and legal
```

## Page 240

```
 1              Shelley
 2   cases. So I have read a lot of legal cases
 3   that have informed my opinions as well.
 4       Q.   Are there any provisions in the
 5   statute that you just read that provide for
 6   vacation time or time off?
 7           MR. ROUX: Objection as to the
 8   form.
 9       A.   This does not provide for this,
10   but in many cases in which individuals have
11   been prosecuted for human trafficking or in
12   which there has been a decision of human
13   trafficking individuals have worked for 70
14   hours a week without any vacation time. And
15   in discussions with key officials in the
16   Department of Justice it is one of the key
17   components of what they look for in a human
18   trafficking case.
19       Q.   Is it accurate to say that when
20   you are examining a human trafficking case you
21   have to look at the totality of the
22   circumstances?
23       A.   Absolutely.
24       Q.   So turning to your report, Exhibit
25   1, can you direct your attention to your
```

## Page 241

```
 1              Shelley
 2   paragraph number 25?
 3           MR. ROUX: Is that the David
 4   report?
 5           MS. SURIYOPAS: Yes.
 6       A.   Is that the one that starts I now
 7   turn to the expert witness report?
 8       Q.   Yes?
 9       A.   Yes.
10       Q.   Is it your opinion that
11   Ms. Burke's analysis doesn't reflect the
12   contemporary reality of the Indian economy?
13       A.   That is correct.
14       Q.   On what basis do you make that
15   opinion?
16       A.   Ms. Burke does not understand much
17   about the social situation of the Indian
18   workers. She does not show an understanding
19   of the regional differences in India. Her
20   analysis of debt is focussed much more on
21   rural debt, while the situation of these
22   workers are individuals of basically the
23   middle class in India who are not rural
24   workers. They are not farm workers with this
25   exception that I mentioned earlier.
```

Page 242

```
 1              Shelley
 2      Q.   And how did you come to your
 3   understanding about the social situation in
 4   India?
 5      A.   I have been to India.  I have read
 6   much on India.  I have worked with Indian
 7   activists on labor and sex trafficking in
 8   India.  I have a family that is deeply
 9   connected to India and is very knowledgeable.
10      Q.   And specifically with respect to
11   your understanding of the Indian economy in
12   India, how do you have the ability to opine on
13   that particular subject?
14      A.   I am not saying that I am an
15   expert on India, but I have done a lot of
16   reading.  What makes a researcher but somebody
17   who can read.  I have written on trafficking
18   in India in the context of employment, of
19   labor, of the growth of the Indian economy.
20      Q.   Do you consider yourself an expert
21   on the Indian economy?
22          MR. ROUX:  Objection as to the
23      form.
24      A.   No.  I was hired as an expert on
25   human trafficking, not as an expert on the
```

Page 243

```
 1              Shelley
 2   Indian economy.
 3      Q.   Do you consider yourself as an
 4   expert on the social situation in India?
 5      A.   That is such a broad question.  I
 6   understand elements of Indian society, but it
 7   is one of the most diverse societies in the
 8   world.
 9      Q.   And when you stated earlier that
10   the plaintiffs are middle class workers, what
11   is the basis for your stating that opinion?
12      A.   I didn't say they are middle
13   class, but I am saying that their economic
14   situation that they have had with years of
15   remittances places them in the middle class.
16   One of the things that is particularly telling
17   is that one of the statements that I have read
18   on the debt burdens of Indian workers,
19   yesterday mentioned that about 8 percent --
20   she was deposed yesterday, that about 8
21   percent of Indians have access to the banking
22   system.
23          In reading through the T visa
24   applications that I have had the opportunity
25   to read quite a number of them have expressed
```

Page 244

```
 1              Shelley
 2   the ability to borrow money from banks.  That
 3   tells you something because a very small
 4   percentage of the Indian population has income
 5   levels sufficient to have access to the
 6   banking system.  And therefore when many of
 7   them have secured some of the money that they
 8   needed to pay the recruiter through loans from
 9   banks, this shows where they stand in the
10   Indian social system.
11      Q.   And what makes you think that all
12   of their loans are from banks?
13          MR. ROUX:  Objection as to the
14      form.
15      A.   I did not say that.  I said that a
16   component that in reading the T visa's many of
17   them -- of the ones that I had access to many
18   of them explained that they had borrowed some
19   of their money from banks.  That tells you
20   where they stand in the Indian economic system
21   that they have access to the banking system
22   and are deemed credible from a bank to receive
23   a loan.
24      Q.   But you don't know that from
25   independently verifying what their economic
```

Page 245

```
 1              Shelley
 2   status is; is that correct?
 3          MR. ROUX:  Objection as to the
 4      form.
 5      A.   In their incomes and with their T
 6   visa statements where they talk about what
 7   their pay is in the Middle East, in analyses
 8   that I have read, and two thirds of the
 9   workers came from Kerala, there is a lot of
10   discussion of migration and income status in
11   relation to Kerala.  One of my colleagues in
12   my department is a specialist on
13   organizational management and development in
14   my school, he is from Kerala.  We have had
15   also discussions on migration, income, status
16   of workers.  Kerala has one of the highest
17   paid, or most educated work force in India
18   because of the generally low levels of
19   corruption in the Kerala government, and
20   therefore has had higher worker incomes.
21      Q.   So you are extrapolating this
22   information, this is not based on actually
23   looking at the financial records of the
24   workers in this particular case; is that
25   correct?
```

TSG Reporting - Worldwide - 877-702-9580

Page 246

Shelley
1    MR. ROUX:  Objection as to the
2 form.
3    A.   I have not had access to the
4 financial records of the workers other than
5 what they have said in their T visa
6 statements.  But when they have talked in
7 their T visa statements of what assets that
8 they have had and what they have earned, then
9 it gives you a picture of where they stand
10 which is totally consistent with what one
11 reads from other statements of what workers
12 are earning overseas, that a welder makes a
13 thousand dollars a month in UAE, and they have
14 reported that they have this.  So their
15 statements are totally consistent in that
16 respect.
17    Q.   When you testified earlier about
18 the man camps in which the plaintiffs have
19 resided and you opined about -- in your report
20 about how housing prices for non-citizens were
21 not necessarily higher than for the plaintiffs
22 in this case.  What is the basis for -- what
23 expertise in economics do you have for the
24 region?

Page 247

Shelley
1    A.   For what region?
2    Q.   For Pascagoula?
3    A.   As you can see from my footnotes
4 on expenses, on page I believe 29, I looked at
5 typical percentage budget, household budgets
6 for that period.  So that was a general
7 statement.  Then I went to this more specific
8 report published by Rand, which is funded by
9 the local communities there, very
10 comprehensive report on post Katrina recovery
11 of the housing market along the Mississippi
12 Gulf coast.  In reading through that report
13 carefully I looked at data on what people were
14 spending as their percentage of income in
15 Jackson County where Pascagoula is located,
16 and I looked at what the difference is of
17 expenditures for people who own housing in
18 Jackson County and for people who are renting
19 housing in Pascagoula area.  So that is how I
20 did my research.
21    Q.   But you are not holding yourself
22 out as a housing expert; correct?
23    MR. ROUX:  Objection as to the
24 form.

Page 248

Shelley
1    A.   I am not saying that I am a
2 housing expert, but I am a social science
3 expert who has done research in many areas of
4 social science for over three and a half
5 decades, so I know how to do reach.  I am in a
6 department where half my colleagues are
7 economists and work on economic policy, and I
8 listen and go to talks all the time on issues
9 like this.
10    Q.   For the report that you cite to in
11 your report for these housing statistics, what
12 kind of housing does the typical -- what kind
13 of housing does the typical resident in this
14 region expect to have?
15    MR. ROUX:  Objection as to the
16 form.
17    A.   I do not know exactly what the
18 expectation of the housing is, but I can say
19 that I interviewed people at Signal about what
20 kind of housing there is in Pascagoula, and
21 the explanation that many of them were
22 commuting 45 minutes away from work because
23 the quality of housing in Pascagoula is very
24 low, and in Moss Point it is dangerous and

Page 249

Shelley
1 low.
2    Q.   What kind of housing did they live
3 in 45 minutes away from Pascagoula?
4    A.   They said they lived in, you know,
5 nice middle class housing.  Now, not then.
6    Q.   I am talking about during the
7 relevant time period of 2006 to 2008?
8    A.   Many of them had their homes
9 destroyed.  Some of them were living in pup
10 tents.
11    Q.   And for the Signal staff that did
12 have housing in the region during the relevant
13 time period, what kind of housing did they
14 have?
15    MR. ROUX:  Objection as to the
16 form.
17    A.   Many of them had their homes
18 totally destroyed.
19    Q.   I am asking for the sub group of
20 Signal staff that did have housing?
21    MR. ROUX:  Objection as to the
22 form.
23    A.   I hardly met any of them that had
24 their old house preserved.

## Page 250

```
 1                    Shelley
 2        Q.   Were any of the Signal staff
 3   during that time period living in single
 4   family homes?
 5        MR. ROUX:  Objection as to the
 6   form.
 7        A.   I don't know, but some of them
 8   were actually living in pup tents.
 9        Q.   What is a pup tent?
10        A.   It is a house, you know, a
11   temporary facility that can get blown away.
12        Q.   And how many people lived in each
13   of these pup tents?
14        A.   Sometimes there would be two
15   people that would live in them.
16        Q.   What was the square footage of the
17   pup tent?
18        A.   That I don't know.
19        Q.   Did they live, did any of the
20   Signal staff live with some of the other
21   co-workers?
22        MR. ROUX:  Objection as to the
23   form.
24        A.   Not that I know of, but there were
25   many Signal staff that lived, or there were
```

## Page 251

```
 1                    Shelley
 2   people that lived in FEMA shelters that were
 3   extremely undesirable, that much I know.
 4        Q.   How much were they paying?
 5        MR. ROUX:  Objection as to the
 6   form.
 7        A.   That I don't know.
 8        Q.   And how much were they paying when
 9   they were living in pup tent?
10        MR. ROUX:  Objection as to the
11   form.
12        A.   I don't know what they were
13   paying.  I know what people were paying at
14   this time in the market in this area which was
15   31 percent of their income.  So I don't -- I
16   am not going on what specific people were
17   doing, but what the region -- not the region,
18   but the exact locale that we are talking
19   about, what the general statistics are.
20        Q.   So for the general statistics what
21   kind of housing did these people live in?
22        MR. ROUX:  Objection as to the
23   form.
24        A.   These people were living -- many
25   of them were living in extremely bad temporary
```

## Page 252

```
 1                    Shelley
 2   housing.  It is traumatic talking to many
 3   people from this region of what they were
 4   living in.
 5        Q.   Were they living with two dozen
 6   other people in the traumatic housing that
 7   they were living in?
 8        MR. ROUX:  Objection as to the
 9   form.
10        A.   There was one person who got
11   interviewed in a deposition that said she
12   would have liked to live in the Indian
13   housing, where she was worse.
14        Q.   That is one person?
15        A.   Right.  I am just saying I can't
16   make generalizations, but nobody was living
17   well at that time.
18        Q.   But you were trying to make
19   generalizations in your report; is that
20   correct?
21        MR. ROUX:  Objection as to the
22   form.
23        A.   If you are doing an analysis of
24   how much people spend on their housing, I am
25   drawing on statistics that are what qualified
```

## Page 253

```
 1                    Shelley
 2   specialists in housing have prepared.  I can
 3   tell you having visited Pascagoula even now
 4   six years after Katrina, there is not a lot of
 5   good housing there.
 6        Q.   Moving on to paragraph 37 of your
 7   report.  In paragraph 37 you state:  In most
 8   labor trafficking cases where there is concern
 9   about geographic location there are
10   problems on remote farms and --
11        A.   Geographic isolation.
12        Q.   Sorry:  In most labor trafficking
13   cases where there is concern about geographic
14   isolation there are problems on remote farms
15   and forest sites.
16        Is that accurate?
17        A.   Yes.
18        Q.   What percentage of labor
19   trafficking cases take place on remote farms
20   and forest sites?
21        MR. ROUX:  Objection as to the
22   form.
23        A.   We cannot tell you how much
24   percentage there is because the only time that
25   a trafficking case becomes a trafficking case
```

TSG Reporting - Worldwide - 877-702-9580

## Page 254

```
 1              Shelley
 2   is after it has been identified by law
 3   enforcement and investigated as a trafficking
 4   case.  And because so many of these problems
 5   go on in remote farms and forest sites we
 6   don't know how many there are.
 7        Q.   But you indicated most labor
 8   trafficking cases; is that correct?
 9             MR. ROUX:  Objection as to the
10        form.
11        A.   Where there is concern about
12   geographic isolation, because I have talked to
13   many activists who have worked in these areas
14   in Buffalo, in Florida, in the Carolinas and
15   elsewhere, and they have the greatest problems
16   of getting a trafficking case initiated and so
17   forth because of the isolation and getting to
18   the workers and documenting it.
19        Q.   But when you are referring to and
20   most laboring cases where there is geographic
21   isolation, is it safe to say that it is at
22   least about 51 percent?
23             MR. ROUX:  Objection as to the
24        form.
25        A.   There are so -- if you look at
```

## Page 255

```
 1              Shelley
 2   this statistic, there is a study I cite in
 3   here done by the Bureau of Justice Statistics
 4   in which they inventoried the number of
 5   trafficking cases that were investigated in
 6   the United States.  There were so few that to
 7   say -- to make any generalization on this
 8   limited number of cases is totally ineffective
 9   from a social science point of view.  The data
10   is so small as to be meaningless.
11        Q.   Well let me ask you this.  When
12   you say that in most labor trafficking cases
13   where there is concern about geographic
14   location, does that foreclose the possibility
15   that labor trafficking can exist in other
16   industries outside of farms and forest sites?
17             MR. ROUX:  Objection as to the
18        form.
19        A.   Labor trafficking can exist in a
20   wide range of sectors.  But this, I am talking
21   here about the problem of geographic
22   isolation.  But you can have human trafficking
23   two blocks from here in a labor situation in a
24   hotel here.
25        Q.   My question is about those labor
```

## Page 256

```
 1              Shelley
 2   trafficking cases where there is concern about
 3   geographic location, and you are saying in
 4   most labor trafficking cases where there is
 5   geographic location?
 6             MR. ROUX:  Objection as to the
 7        form.
 8        A.   I am talking not about geographic
 9   location, I am --
10        Q.   I am sorry, geographic isolation,
11   and you say that there are problems in remote
12   farms and forest sites.  Does that mean that
13   these kinds of problems of geographic
14   isolation cannot occur in other industries as
15   well?
16        A.   Does not preclude this, that is
17   correct.
18        Q.   So it can happen in non-farm and
19   non-forest site industries; is that correct?
20        A.   There is enormous ingenuity in the
21   field of human trafficking.
22        Q.   Paragraph 38 where you indicate
23   that public display of power is not a
24   condition of trafficking.
25        A.   Where?
```

## Page 257

```
 1              Shelley
 2        Q.   Where you indicate that public
 3   display of power is not identified as a
 4   criteria for trafficking.  Is that accurate?
 5        A.   As one looks through lists of
 6   criteria from the sources that I have cited it
 7   has not been identified as a stand alone
 8   factor of human trafficking, no.
 9        Q.   What does public display of power
10   mean to you in the context of Ms. Burke's
11   report?
12        A.   I don't know what Ms. Burke means.
13   I know what I mean of public display of power.
14        Q.   What do you mean?
15        A.   Such as I have seen in other
16   trafficking cases where people, employers come
17   after workers with knives, with guns, with
18   whips.
19        Q.   Is it possible that targeting
20   specific groups or a specific group of workers
21   within the larger number of workers at Signal
22   by making an example of them in a public event
23   such as March 9th would constitute a public
24   display of power?
25             MR. ROUX:  Objection as to the
```

TSG Reporting - Worldwide - 877-702-9580

**Page 258**

```
 1              Shelley
 2       form.
 3          A.    The events of March 9th are so
 4       complex that I would not say that they
 5       necessarily constitute something of a public
 6       display of power.
 7          Q.    Would you say that workers who try
 8       and resist the way Mr. Vijayan and
 9       Mr. Kadakkarappally did on March 9th was a
10       form of resistance to the Signal management?
11              MR. ROUX:  Objection as to the
12       form.
13          A.    Form of resistance; no, I would
14       not say it was a form of resistance.
15          Q.    Would you say the fact that
16       Mr. Kadakkarappally and Mr. Vijayan had
17       contacted lawyers was a form of resistance
18       against Signal management?
19              MR. ROUX:  Objection as to the
20       form.
21          A.    I would say they contacted
22       lawyers.  I would not say it was a sign of
23       resistance.
24          Q.    What is a sign of resistance?
25          A.    I mean first human trafficking is
```

**Page 259**

```
 1              Shelley
 2       not about a sign of resistance.  I would say
 3       that contacting lawyers is a way of finding a
 4       way to stay in the United States.
 5          Q.    Would you say complaining about
 6       the working conditions and promises that were
 7       made to the workers was a form of resistance?
 8              MR. ROUX:  Objection as to the
 9       form.
10          A.    I have very serious questions
11       about some of the statements made by
12       Mr. Joseph.
13          Q.    You mean Mr. Kadakkarappally?
14          A.    Yes, Mr. Joseph Kadakkarappally.
15          Q.    In what transpired on March 9th as
16       well as the speech that Mr. Schnoor made, does
17       that together demonstrate to you a public
18       display of power on the part of Signal
19       management?
20              MR. ROUX:  Objection as to the
21       form.
22          A.    To me that is not what I would
23       call a public display of power because it was
24       not meant to be a public display of power.  It
25       was turned into a public display of power by
```

**Page 260**

```
 1              Shelley
 2       some of the Signal workers.
 3          Q.    In what way?
 4          A.    In that from what I understand
 5       there was media that was outside the camp
 6       which was then to record it and take what
 7       would have been a private action and make it
 8       public.
 9          Q.    And --
10          A.    So this was not the intention of
11       Signal, it was something that happened as a
12       result of Signal workers.
13          Q.    But what happened for a handful of
14       workers in front of other Signal workers even,
15       if there was no media presence, would that
16       constitute a public display of power?
17              MR. ROUX:  Objection as to the
18       form.
19          A.    This is not the case so I am not
20       making a hypothetical statement.
21          Q.    Do public displays of power only
22       have to be violent in nature?
23          A.    If you have -- if you are
24       talking -- I mean you could have a royal
25       procession that is a public display of power
```

**Page 261**

```
 1              Shelley
 2       that does not use or involve violence.  There
 3       are many different ways to communicate power
 4       that are public and that are not coercive.  So
 5       therefore to talk about the impact of a public
 6       display of power you need to understand the
 7       circumstances of it.
 8          Q.    I forget your response, in
 9       evaluating the criteria of trafficking is it
10       your position that a public display of power
11       is not one of them?
12          A.    I think that is too broad a
13       statement.  One has to look at what is the
14       impact of this power, and what it does to the
15       individuals, and the circumstances in which it
16       occurs.
17          Q.    So you are saying that that
18       statement is too broad; is that correct?
19          A.    Yes.
20          Q.    Did you work with any colleagues
21       in compiling your report?
22          A.    No.
23          Q.    Do you have any associates,
24       employees, independent contractors that
25       assisted you in this report?
```

Page 262

Shelley

1
2    A.   No.
3    Q.   Did you have an intern?
4    A.   No.
5    Q.   Did you communicate with other
6  experts about this case?
7    A.   No.
8    Q.   Did you communicate with other
9  experts that have been called for this case
10  before today?
11    A.   No.
12    Q.   In paragraph 63 of your report
13  when you refer to --
14    A.   Is that the one that begins in
15  conclusion?
16    Q.   Yes.  You indicated that Dewan and
17  the local lawyer and recruiter were the ones
18  who engaged in quote, duplicitous practices;
19  correct?
20    A.   Yes.
21    Q.   Isn't it true that once a person's
22  labor is exploited by psychological coercion,
23  abuse of legal process, or deception, the
24  person's previous consent or effort to obtain
25  employment becomes irrelevant?

Page 263

Shelley

1
2    MR. ROUX:  Objection as to the
3  form.
4    A.   You are talking in a generality,
5  and I am not saying that any of that occurred
6  at Signal.
7    Q.   Well in this particular situation
8  at Signal your position is that the recruiters
9  were the ones who defrauded the workers in
10  this case; is that correct?
11    A.   That is correct.
12    Q.   Both Dewan and Michael Pol as well
13  as the immigration lawyer Malvern Burnett;
14  correct?
15    A.   Yes.
16    Q.   Once they arrived here in the
17  United States to work and were living in the
18  man camps and eating the food that they had,
19  doesn't that eviscerate any kind of consent
20  that they experienced at the time of their
21  recruitment?
22    MR. ROUX:  Objection as to the
23  form.
24    A.   I don't know how it eviscerates
25  their consent.

Page 264

Shelley

1
2    Q.   You indicate several times in your
3  report that Signal's safety record is one of
4  the safest shipyards in the United States; is
5  that correct?
6    A.   Yes.
7    Q.   How is that relevant to whether or
8  not they have engaged in trafficking in this
9  case?
10    A.   In many cases of human trafficking
11  that have been investigated in the United
12  States one of the key factors is the safety
13  of the workers and whether they have more
14  accidents and whether they are provided
15  medical treatment for their accidents, and I
16  write about several of these cases in the
17  United States in which the high level of
18  accidents and the mistreatment of the workers
19  following accidents has been a key component
20  in the decision that this was human
21  trafficking.
22    So that as well as Kevin Bales who
23  testified in the Pickle case writes a book in
24  which he talks about disposable people in
25  which the exposure to individuals in an

Page 265

Shelley

1
2  environment of high rates of accidents, lack
3  of protection, lack of safety, is one of the
4  key components of human trafficking because
5  the people are seen as disposable.
6    Therefore placing individuals in a
7  work environment in which safety is paramount
8  belies a lot of what is being said about this
9  being an enterprise that is engaging in human
10  trafficking.
11    Q.   If someone receives an award does
12  that mean that they can't be found liable for
13  trafficking?
14    MR. ROUX:  Objection as to the
15  form.
16    A.   This is not just an award.  I have
17  reviewed the statistics of Signal for safety
18  and accidents.  I have asked to see all the
19  data on the period from 2006 to 2008 of all
20  the workers who were injured at Signal, and
21  the division of injuries among Indian workers
22  and non-Indian workers.  I have examined what
23  happened in each of these cases after the
24  accident.
25    Therefore when I am making

Case 1:13-cv-00499-MAC-ZJH Document 72-3 Filed 01/15/15 Page 69 of 85
Case 2:15-cv-02296-SM-DEK Document 78-2 Filed 01/15/15 Page 69 of 85 PageID #:
1734

| Page 266 |
|---|

```
           Shelley
 1    comments on getting an award, this is not just
 2    taking something as somebody getting a prize.
 3    I have done careful analysis based on data
 4    that I pulled up not only and demanded from
 5    Signal to get deeper and deeper into this, but
 6    other data that I have pulled up on
 7    comparative rates of safety in this highly
 8    dangerous industry.
 9        Q.   Did you examine the criteria that
10    was used to determine what constitutes a safe
11    shipyard?
12        A.   Yes.  I mean if you go to the
13    web-site of the shipyard, you are talking
14    about accidents and fatalities of shipyards.
15        Q.   And does that include the
16    conditions of the housing and lodging?
17        A.   No, it concerns safety.
18        Q.   Does it include the food that is
19    provided to the workers?
20        A.   No, we are talking about safety.
21    Housing, I mean if there were dangerous
22    housing and workers were dying in the housing,
23    in a facility and the workers were dying, that
24    might go under safety issues.  But beyond that
```

| Page 267 |
|---|

```
            Shelley
 1    we are talking about workplace safety issues.
 2        Q.   What about workers that are
 3    falling ill?
 4        MR. ROUX:  Objection as to the
 5    form.
 6        A.   People get ill especially when
 7    they go overseas and have exposure to
 8    different food and water.
 9        Q.   What if they felt in this
10    situation in this case where the plaintiffs
11    have alleged poor food that was provided to
12    them and became sick as a result?
13        MR. ROUX:  Objection as to the
14    form.
15        A.   I have seen this, but they are
16    alleged.  I have not seen that there was an
17    actual certification that the workers were
18    getting food related illnesses that were
19    certified through clinical tests.
20        Q.   But that wasn't part of the
21    criteria for how Signal's safety record was
22    achieved; is that correct?
23        MR. ROUX:  Objection as to the
24    form.
```

| Page 268 |
|---|

```
            Shelley
 1        A.   It has nothing to do with it.  I
 2    told you what I used to analyze Signal's
 3    safety record.
 4        Q.   In your view of the quote
 5    thousands of E-mails of Signal staff that you
 6    poured over did you review any E-mails between
 7    Signal and Signal's counsel?
 8        A.   Signal had other counsel at that
 9    time, and there was not much counsel.
10        Q.   And what were the names of the
11    E-mails of the Signal counsel that you read
12    over at that time?
13        MR. ROUX:  Objection as to the
14    form.
15        A.   I don't know.
16        Q.   Did you review any E-mails in
17    which Signal's counsel was cc'd?
18        A.   I don't remember that.
19        Q.   Did you review any E-mails between
20    Signal and Signal's current counsel?
21        A.   I am sure I looked at something, I
22    can't tell you what.
23        Q.   Do you remember the subject
24    matter?
```

| Page 269 |
|---|

```
            Shelley
 1        A.   No.
 2        Q.   Do you have them in your
 3    possession?
 4        A.   I have binders in my possession,
 5    yes, but not here.
 6        Q.   Did you take notes as part of your
 7    preparation for your report?
 8        A.   Did I take notes as part of what?
 9        Q.   The preparation for your report?
10        A.   Of course.  I already mentioned
11    and said today that I have notes attached to T
12    visa's.  So I am just saying that I already
13    told you that.
14        Q.   You indicated that you have
15    binders; correct?
16        A.   Yes.
17        Q.   How many binders do you have?
18        A.   Several.
19        Q.   More than six?
20        A.   No.
21        Q.   Less than six?
22        A.   Yes.
23        Q.   And how thick are the binders;
24    probably a foot high?
```

TSG Reporting - Worldwide - 877-702-9580

| Page 270 | Page 271 |
|---|---|
| Shelley | Shelley |

**Page 270**

Shelley

1  A.   No, not that high.  I have one
2 that is this high and I have some other
3 smaller ones.
4  Q.   Are there other materials you
5 poured over concrete other than the ones in
6 the binders, such as you mentioned video?
7  A.   Yes.  I have extensive materials I
8 have reviewed other than the binders.  The
9 binders are just the E-mails and some of the
10 contracts, the worker statements.  I mean the
11 T visa's, some of the depositions, the court
12 findings, the court pleadings, the expert
13 witness statements.
14  Q.   You have all those in your
15 possession?
16  A.   Yes.
17  Q.   When you referred to the
18 restaurant, the caterer that you ate at in New
19 Orleans, when did you visit that restaurant?
20  A.   In July.
21  Q.   And how many times did you go?
22  A.   Once.
23  Q.   How many meals did you eat?
24  A.   One.

**Page 271**

Shelley

1  Q.   How many dishes did you eat?
2  A.   Probably about six or seven.
3  Q.   And did you consume any of the
4 food that was consumed by the plaintiffs in
5 Mississippi from 2006 to 2008?
6  A.   No.
7  Q.   When you went to the man camps was
8 that also in July?
9  A.   Yes.
10  Q.   How many times did you go?
11  A.   Once.
12  Q.   How long was the visit?
13  A.   A day and a half.
14  Q.   And how much of that time was
15 spent visiting the man camps?
16  A.   As long as it took to walk through
17 and see the man camps.
18  Q.   Did it take an hour?
19  A.   Probably.
20  Q.   How many man camps or trailers did
21 you see?
22  A.   I saw eating areas.  I saw lounge
23 areas.  I saw kitchen areas.  I saw areas
24 where the telephones were set up.  I saw

**Page 272**

Shelley

1 shower areas.  I saw housing areas.
2  Q.   So when you are saying it took you
3 about an hour to see all the facilities, that
4 included not just the residential facilities,
5 but also recreational areas and as well as
6 eating areas?
7  A.   It was all together, they are all
8 in the same area.  So I took a tour of what
9 survives.
10  Q.   And for the rest of time that you
11 spent at the man camp what did you do?
12  A.   Well the man camp adjoins the
13 Signal facility, so I spent time at the Signal
14 facility interviewing people, determining what
15 I further wanted to see based on my
16 interviews, what further documents.
17 Determining what I wanted to understand about
18 the region, the housing issues, the security
19 issues.  It laid out a research agenda for me
20 apart from the time that I spent with
21 management.
22  Q.   Were all the interviews that you
23 conducted during that one and a half day
24 visit?

**Page 273**

Shelley

1  A.   Primarily yes.
2  Q.   When you saw the residential
3 facilities did you see anyone living there?
4  A.   No.
5  Q.   You said you interviewed two H-2B
6 workers; is that correct?
7  A.   Yes.
8  Q.   What were the names?
9  A.   One was named Ramesh and I am not
10 sure of the other one.  I can check my files.
11  Q.   When did you interview them?
12  A.   I can tell you the date.  It was
13 July 17th or July 18th.
14  Q.   How long were each of these
15 interviews?
16  A.   I think they were probably
17 somewhere between an hour and two hours.
18  Q.   Each?
19  A.   I interviewed them together.
20  Q.   You interviewed both of them
21 together?
22  A.   Yes.
23  Q.   And how many times did you
24 interview them?

Shelley

1
2       A.   One time.
3       Q.   Did you use an interpreter?
4       A.   One of them has excellent English
5   who had been an interpreter for many of the
6   workers before.
7       Q.   Who else was in the room when you
8   interviewed those workers?
9       A.   At least one of the lawyers, I
10  think Patricia was there.
11      Q.   Was she there for the entire
12  length of the interview?
13      A.   I believe so.
14      Q.   When you visited the eating area
15  did you eat any of the food?
16           MR. ROUX:  Objection as to the
17  form.
18      A.   There was no food left.  The
19  eating facility had been closed a long time.
20  I did ask some of the staff who had eaten
21  there about what their experiences were.  But
22  I wasn't able to eat it, they were closed down
23  for years.
24      Q.   Other than your one and a half day
25  visit did you interview Signal's staff in

Shelley

1
2   preparation for your report?
3       A.   Yes, and I interviewed Signal
4   staff, I requested information through the
5   lawyers such as I asked -- mentioned about
6   safety records, and I had follow up questions
7   for some of them.
8       Q.   You indicated that you listened to
9   recordings of Saket Soni; correct?
10      A.   Yes.
11      Q.   How many recordings?
12      A.   I would say at least four or five.
13      Q.   These were audio recordings;
14  correct?
15      A.   Yes, but I saw his lecture at SUNY
16  Stony Brook, so that wasn't an audio, that was
17  a visual one.
18      Q.   How long were each of these
19  records?
20      A.   Some of them were short.  It was
21  quite a lengthy lecture at Stony Brook.
22      Q.   How long were the short audio
23  recordings?
24      A.   Maybe five minutes.
25      Q.   Do you know when those recordings

Shelley

1
2   were made?
3       A.   Over the past several years.
4       Q.   You referred to an interview that
5   you conducted with Kalish Satyarthi; is that
6   correct?
7       A.   Yes.
8       Q.   And you interviewed him for his
9   insight into trafficking or child labor; is
10  that correct?
11      A.   Yes.
12      Q.   Did you interview him about
13  trafficking of adults?
14      A.   In discussing with him why he
15  concentrated on child labor I asked him why on
16  child labor versus adults, and he said that
17  the problem of child labor in India was so
18  extensive and so large that the base of his
19  activism in India was focussed on child labor,
20  and he had led huge protests of tens of
21  thousands of people against child labor
22  trafficking in India.
23      Q.   How did your interview -- how long
24  was that interview?
25      A.   Since we were together at a

Shelley

1
2   meeting of the Global Agenda Council, the
3   World Economic Forum, this was not a fixed
4   interview, but was time that we spent together
5   discussing human trafficking over a period
6   that we were at this meeting.  So there may
7   have been recurring discussions over a couple
8   of days in which we discussed it, then come
9   back, had some more questions, because we have
10  a whole group within there that works on human
11  trafficking issues.
12      Q.   And how did your interview with
13  him provide insight into trafficking of adult
14  skilled labor to locations outside of India?
15      A.   Most Indian's would say that this
16  is Indian labor overseas, and they don't even
17  define this as labor trafficking.  Only
18  recently as hundreds of workers, something
19  like 500 Indian workers have died in Qatar
20  recently as laborers is there beginning to be
21  more awareness of labor trafficking into the
22  Gulf.  But for most people this is not even a
23  trafficking issue in India.
24      Q.   But in your interview with him did
25  you discuss trafficking of adults to locations

| Page 278 | Page 279 |
|---|---|

**Page 278**

Shelley

1           Shelley
2 outside of India?
3     A.  No.  I asked him why he focussed
4 on labor trafficking of children as opposed to
5 adults, and his answer was that this is the
6 acute problem of India.
7     Q.  You also referred to a U.S. Aid
8 report that you --
9     A.  Yes, that I contributed to.
10    Q.  What was that report about?
11    A.  That report was on the problems of
12 economic vulnerability.  Of problems of caste
13 in India.  Of how individuals become
14 vulnerable to trafficking not only in India
15 but other states in southeast Asian.  And what
16 can be done about this problem.
17    Q.  And how did your contribution to
18 that report provide insight into the plight of
19 adult workers who are trafficked to outside of
20 India?
21    A.  My understanding of working with
22 one of the leading prize winning Indian
23 activist on human trafficking, that this
24 problem is not even considered part of the
25 human trafficking problem from an Indian

**Page 279**

Shelley

1           Shelley
2 perspective.
3     Q.  And that was in your report?
4     A.  No, that is not in the report, but
5 that is what I have understood after working
6 with this Indian person Ruchira Gupta over
7 this period.
8    MS. SURIYOPAS:  Five minute break.
9 Off the record.
10    (Recess taken.)
11    Q.  I just have one more question.  Is
12 your payment contingent upon the opinions that
13 you have given in this case?
14    A.  Absolutely not.  I am free to say
15 whatever I want.
16    MS. SURIYOPAS:  Thank you, that is
17 all for me.
18 EXAMINATION BY
19 MR. RAMSEY:
20    Q.  Good afternoon Professor Shelley.
21 I know we are getting late into the day, I
22 will --
23    A.  Tell me a little bit more about
24 who you are and what you represent.
25    Q.  My name is Shane Ramsey, I

| Page 280 | Page 281 |
|---|---|

**Page 280**

Shelley

1           Shelley
2 represent the Samuel plaintiffs, we have an
3 action pending in District Court in Texas?
4    A.  Beaumont.
5    Q.  Correct.
6    MR. SHAPIRO:  Excuse me, are we
7 going into the Texas case now?
8    MR. ROUX:  Yes, the experts were
9 for all cases.
10    MR. SHAPIRO:  I do want to make
11 sure I get a few questions in.
12    MR. FLEMING:  I may have a few
13 questions as well.  This is John Fleming.
14    MR. ROUX:  It is 5 o'clock now,
15 we are finishing at 5:30, if that governs
16 how you want to split up your remaining
17 time.
18    MR. RAMSEY:  I will move as fast
19 as I can.
20    Q.  Professor Shelley, do you recall
21 testifying earlier that in your expert report
22 you indicated that quote, safety record is the
23 key indicator?
24    A.  It is a key indicator, yes.
25    Q.  Is your testimony that it is the

**Page 281**

Shelley

1           Shelley
2 biggest indicator of whether or not there is
3 human trafficking?
4    A.  No, but it is a very important
5 indicator because it reflects the concern of
6 the employer for the worker.
7    Q.  Aren't you aware that with respect
8 to the Signal facilities in both Texas and
9 Mississippi that the Indian H-2B workers were
10 working alongside American workers as well?
11    A.  Yes.
12    Q.  So the safety was not only for the
13 benefit of the Indian H-2B workers, but it was
14 also for the benefit of the American workers;
15 isn't that correct?
16    A.  Absolutely, it is Signal's -- I
17 mean one of things that I have learned and
18 probed is how deep this culture of safety is
19 in Signal.
20    Q.  And isn't it true in your expert
21 report you make the assertion that the safety
22 record is one of the key indicators, but you
23 cite no authority for that; isn't that true?
24    A.  As I say I have written about it
25 extensively in my work, so I am the authority.

TSG Reporting - Worldwide - 877-702-9580

| Page 282 | Page 283 |
|---|---|
| Shelley<br>1<br>2   I mean I have done so much work, if you go<br>3   back to my book on human trafficking and read<br>4   where I have 1,000 footnotes in my book, I can<br>5   find you some footnotes to cite it.<br>6        Q.   But as someone just reading the<br>7   report and as an academic wouldn't you agree<br>8   that it would be helpful to the reader to have<br>9   citations for the propositions and statements<br>10   that are set forth in your expert report?<br>11        A.   I think --<br>12             MR. ROUX:  Objection as to the<br>13        form.<br>14        A.   Considering the fact that I got<br>15   involved in this case in July I did my<br>16   interviews, I read large amounts of material,<br>17   and produced the first report.  I provided<br>18   documentation.  I could certainly with time<br>19   provide more extended documentation and amend<br>20   the report.  But when I started this I had a<br>21   limited amount of time because we did not<br>22   anticipate that I would have to do an expert<br>23   statement for Beaumont in July, it was moved<br>24   up.<br>25        Q.   Do you recall Mr. Howard asking | Shelley<br>1<br>2   you some questions earlier about paragraph 17<br>3   of your expert report?<br>4        A.   Is that for Beaumont?<br>5        Q.   It is paragraph 17 in both,<br>6   Exhibit 1.<br>7        A.   Yes.<br>8        Q.   And in that paragraph you allude<br>9   to the fact that there is evidence of some<br>10   Indian H-2B workers cheating on their welding<br>11   test, do you recall that?<br>12             MR. ROUX:  Objection as to the<br>13        form.<br>14        A.   I didn't say that they cheated, I<br>15   said that there was fraud in this.<br>16        Q.   Okay.<br>17        A.   That is different from cheating.<br>18        Q.   If they had somebody take --<br>19   strike that.<br>20             Can you name one plaintiff in any<br>21   of the cases that are pending in Texas or<br>22   Mississippi that you know for a fact committed<br>23   fraud as you put it in taking the welding<br>24   test?<br>25        A.   Yes, there is the farmer, I can go |

| Page 284 | Page 285 |
|---|---|
| Shelley<br>1<br>2   into my files and look for it, but there is<br>3   this farmer who paid a large amount of money<br>4   who did not have a background as a welder, was<br>5   not recognized by the people from Signal who<br>6   did the testing, yes, I have the name in here.<br>7        Q.   Other than the farmer that you<br>8   just mentioned is there anyone else that is a<br>9   plaintiff in any of the lawsuits pending in<br>10   Texas or Louisiana?<br>11        A.   I would say that Mr. Khuttan, it<br>12   is not clear that he really has extensive<br>13   experience as a welder.  He has admitted in<br>14   his deposition that he was a history graduate<br>15   of the University of Delhi.<br>16        Q.   But do you have any evidence that<br>17   the individual that you just mentioned<br>18   committed fraud in his welding testing?<br>19             MR. ROUX:  Objection as to the<br>20        form.<br>21        A.   I have reviewed the files of the<br>22   individuals who were found not to be qualified<br>23   because they had their salaries reduced.  I<br>24   went through the hundreds of records and there<br>25   were about twenty percent of them that had | Shelley<br>1<br>2   their salaries reduced.  Once I determined<br>3   that I questioned Signal's staff on whether<br>4   those individuals were ones that they met when<br>5   they were doing the testing.  And there were<br>6   several of them that there was no recognition<br>7   that they had met them in person before they<br>8   came to Signal.  And these were individuals<br>9   who I determined separately, not through their<br>10   statements, but through financial records,<br>11   that they had had their salaries reduced for<br>12   their inability to perform at the needed<br>13   level.<br>14        Q.   But you can't as you sit here<br>15   today give me any other names other than what<br>16   you have just provided in answer to my last<br>17   question?<br>18             MR. ROUX:  Objection as to the<br>19        form.<br>20        A.   I can go back into my records, but<br>21   these are not the plaintiffs that I am writing<br>22   about in this case.  But in these 400 odd<br>23   people there are quite a number of them that<br>24   fit this description, but that is not all in<br>25   these initial two cases. |

TSG Reporting - Worldwide - 877-702-9580

Case 2:15-cv-02296-SM-DEK Document 72-2 Filed 01/15/15 Page 74 of 85
Case 1:13-cv-00499-MAC-ZJH Document 91-3 Filed 01/15/15 Page 74 of 85 PageID #:
1739

| Page 286 | | Page 287 |
|---|---|---|

**Page 286**

Shelley

1
2    Q.   Professor Shelley, is it possible
3  to have a case of human trafficking where the
4  alleged human trafficker does certain things
5  to, I will use the word appease the workers
6  who are being trafficked in whatever effort to
7  make them feel somewhat more comfortable, make
8  them not want to be not -- make them not want
9  to report things to authorities; is that
10  possible?
11       MR. ROUX:  Objection as to the
12  form.
13    A.   This is a pattern that is
14  associated with sex trafficking rather than
15  with labor trafficking.  It is a very known
16  phenomenon in sex trafficking.
17    Q.   Can you explain what you mean by
18  that?
19    A.   Certainly.  In sex trafficking
20  when women threaten to leave, instead of the
21  trafficker withholding all of their salary he
22  may start to share more of the money that they
23  earn with the women, so that they don't
24  totally withhold their salaries from them.
25  And as there have been more prosecutions of

**Page 287**

Shelley

1
2  sex trafficking and more investigations, the
3  whole pattern of the sex trafficking
4  phenomenon has changed in that women are
5  receiving more money so that they were -- that
6  they have something to send home as
7  remittances.
8       This has not been in any of the
9  research that I have read on labor trafficking
10  identified as an attribute of labor
11  traffickers.
12    Q.   In your opinion is it possible
13  that a labor trafficker could engage in
14  similar behavior?
15       MR. ROUX:  Objection as to the
16  form.
17    A.   There are cases in which I have
18  talked about in the United States in which
19  individuals have been prosecuted for labor
20  trafficking in which they have grossly
21  underpaid the workers.  I am not aware of
22  cases in which they have appeased them, but
23  that could be at some point, you know, in
24  another hypothetical case.  But this is not
25  what we are talking about in this case.

**Page 288**

Shelley

1
2    Q.   But it is possible?
3       MR. ROUX:  Objection as to the
4  form.
5    A.   We are not talking about
6  hypotheticals, but there are endless
7  variations in human trafficking and every week
8  I learn about something new.  So I am not
9  going to deny the possibility of some new
10  variation in this phenomenon.
11    Q.   Do you recall putting in your
12  expert report that Signal provided Cricket
13  equipment at significant expense so that the
14  Indian H-2B of workers could play a game that
15  was central to their culture?
16    A.   Yes, on family day they provided
17  them with Cricket equipment.
18    Q.   Why is that significant?
19    A.   Because it is important or it
20  reflects the effort by Signal to be culturally
21  sensitive and understand that Cricket is
22  central to Indians as opposed to soccer or
23  basketball, it is the fact that after working
24  with them they have learned something about
25  their culture.

**Page 289**

Shelley

1
2    Q.   Couldn't that be a form of
3  appeasement that we just spoke about?
4       MR. ROUX:  Objection as to the
5  form.
6    A.   I don't think that that is
7  appeasement.  I think of it as a cultural
8  learning process that has gone on, because
9  that is the context in which I was learning
10  about how they learned about Indian culture
11  when they didn't know much about it before.
12    Q.   Did you ever interview anyone at
13  Signal about why they provided Cricket
14  equipment?
15    A.   Yes, several people.
16    Q.   What did they say?
17    A.   First Anjay who was the caterer
18  told them that they should be ensuring that
19  the workers should play Cricket, that is
20  what they need when everybody else has family
21  day that they don't feel excluded.  He talked
22  to some of the staff people.  Then they
23  decided that they would appropriate the money
24  to buy the Cricket equipment so that they
25  would not feel excluded at the family day,

Case 2:15-cv-02296-SM-DEK Document 72-2 Filed 01/15/15 Page 75 of 85
Case 1:13-cv-00499-MAC-ZJH Document 93 Filed 02/15/15 Page 75 of 85 PageID #:
1740

Page 290

```
 1              Shelley
 2  because they didn't have their families with
 3  them and therefore they should have some
 4  activity that was relevant, appropriate to
 5  their lives.
 6        Q.   How much money was spent on the
 7  Cricket equipment?
 8        A.   Maybe it was a thousand dollars,
 9  something like that.  But that is not a
10  trivial amount of money, it is not like buying
11  everybody some kind of soda pop or something
12  like that.
13        Q.   You testified earlier I believe
14  that you were contacted in May of 2014
15  regarding this case?
16        A.   Yes.
17        Q.   You were contacted by Signal's
18  lawyers based on the review of your treatise?
19        A.   Yes.
20        Q.   Did you begin reviewing materials
21  at that time in May of 2014 regarding this
22  case?
23        A.   Before I took on this case I could
24  review publicly available documents and I
25  wanted to do a careful review of what was
```

Page 291

```
 1              Shelley
 2  available and that I could review before I
 3  decided to take on this case.
 4        Q.   Back up one minute.  Were you
 5  aware of the Signal case prior to being
 6  contacted in May of 2014?
 7        A.   Yes.
 8        Q.   What did you know about it?
 9        A.   I knew that it was a case of
10  alleged human trafficking, labor trafficking.
11        Q.   How did you know that?
12        A.   I am a specialist on human
13  trafficking.
14        Q.   I understand that.
15        A.   I mean how do I know about it; how
16  do you know about something in your field that
17  has gotten so much publicity and so much
18  visibility.
19        Q.   Let me ask you more specifically.
20  How many articles did you read about it?
21        A.   I can't tell you how many
22  articles.  It is not only a number of
23  articles, it is a question of people referring
24  to cases within professional meetings.
25        Q.   Did you read any articles about
```

Page 292

```
 1              Shelley
 2  it?
 3        A.   I am sure that I have read some
 4  articles because I knew about it.  But I can't
 5  tell you exactly that I read this many
 6  articles or that I saw this many broadcasts on
 7  it, I can't tell you.  I am just telling that
 8  I knew that this case existed, I knew that
 9  there were other cases that existed in
10  Louisiana.  I mean this is my field.
11        Q.   So you first were contacted in May
12  of 2014; is that correct?
13        A.   Yes.
14        Q.   And then in July of 2014 you
15  agreed to take on this representation?
16        A.   No.  In May after I first spoke to
17  Brian and Erin I read documents prepared by
18  Erin for the court.  I read Judge Zainey's
19  decision, and I read a few other documents of
20  public record that I could see before I agreed
21  to take on this case, and before I signed any
22  agreement that would allow me to see any other
23  material.  And then I read many documents,
24  many articles on this case.
25        Q.   Do you have a signed engagement
```

Page 293

```
 1              Shelley
 2  letter regarding the terms of your retention
 3  in this case?
 4        A.   Absolutely I do.
 5        Q.   When was that signed?
 6        A.   It is right here on my computer, I
 7  think it was in July, but I can check, because
 8  I was away the whole month of June.  I don't
 9  know when it was signed, but I know I came
10  back in July and I have this agreement.  So I
11  am not sure.
12        Q.   But it was signed at some point in
13  July?
14        A.   Yes.
15        Q.   You could give me that information
16  now if you look it up?
17        A.   I probably can.  I have a hard
18  copy in my files at home, but I will look and
19  see.  I can't --
20        Q.   That is fine.
21             Does the term of your engagement
22  letter reflect the hourly rate that you are
23  being paid in this case?
24        A.   Yes.
25        Q.   You testified earlier that that is
```

TSG Reporting - Worldwide - 877-702-9580

| Page 294 | Page 295 |
|---|---|

**Page 294**

```
                 Shelley
 1     $400; is that correct?
 2          A.   Yes, and 200 for travel time.
 3          MR. RAMSEY:  I have no further
 4     questions, thank you very much.
 5     EXAMINATION BY
 6     MR. FLEMING:
 7          Q.   This is John Fleming, I just have
 8     a couple of short questions and then I will
 9     let Mr. Shapiro finish up.
10          A.   Can you explain who you are first
11     or where --
12          Q.   Yes, ma'am, I am a lawyer at the
13     Sutherland firm in Atlanta and we are
14     representing the plaintiffs in the Joseph case
15     which is also pending in the Beaumont, Texas
16     Federal Court.
17          Professor Shelley, it appeared to
18     me that your report in our case, the Joseph
19     case, and your report in the Samuel case, both
20     filed in late July were identical.  Is that
21     your understanding?
22          A.   The cases relating to Beaumont are
23     yes, I filed one expert witness for the cases
24     in Beaumont, Texas, yes.
25
```

**Page 295**

```
                 Shelley
 1          Q.   And then a few weeks later you
 2     filed a report in David and you had added a
 3     few paragraphs relating to the individual
 4     plaintiffs in David; correct?
 5          A.   No, I added much more than a few
 6     paragraphs.  I added about twelve pages to the
 7     statement that was prepared for Beaumont,
 8     including insights on the Pascagoula region
 9     and on the T visa applications that I had
10     access to.
11          Q.   For the Joseph report and the
12     Samuel report as I reviewed your list of
13     materials considered it appeared that you did
14     not look at any pleadings that were filed by
15     the plaintiffs, the complaint, or RICO fraud
16     chart or anything like that that was filed by
17     the plaintiffs in the Beaumont cases; is that
18     correct?
19          A.   I have certainly at that RICO
20     fraud charts.
21          Q.   You looked at the RICO fraud
22     charts in the David case in New Orleans --
23          A.   Right, I think that I may have
24     looked at this before, but not to the extent
25
```

| Page 296 | Page 297 |
|---|---|

**Page 296**

```
                 Shelley
 1     in July that I was listing it the way I knew
 2     that I had reviewed it in depth in August.
 3          Q.   So you had not looked -- by the
 4     time you filed your report in the Joseph and
 5     Samuel case you had not looked at the RICO
 6     fraud chart in the Joseph case; is that
 7     correct?
 8          MR. ROUX:  Objection as to the
 9     form.
10          A.   No, that is not what I said.  I
11     have said that I had looked at some of this,
12     but not in the depth that I would that I would
13     list it as a source, but I have looked at
14     them.  But come August I looked at them much
15     more thoroughly all these RICO charts.
16          Q.   All these RICO charts, meaning you
17     looked at the one in the Joseph case in Texas
18     as well?
19          A.   Yes.  I have been reviewing RICO
20     cases, yes.
21          Q.   As of the time you filed the
22     report at the end of July in Joseph however
23     you did not have any opinions about the
24     individual plaintiffs in Joseph and Samuel,
25
```

**Page 297**

```
                 Shelley
 1     correct, as opposed to your general
 2     conclusions about trafficking?
 3          MR. ROUX:  Objection as to the
 4     form.
 5          A.   I requested T visa applications
 6     for all the people in Texas, and it was
 7     explained to me that they were not open and
 8     available.  But I certainly sought them and it
 9     was a great disappointment to me that I did
10     not have access to this material.
11          Q.   And you had access to the RICO
12     fraud chart in Joseph, but had not reviewed it
13     thoroughly enough to feel like you could have
14     cited it in your materials considered;
15     correct?
16          MR. ROUX:  Objection as to the
17     form.
18          A.   I had looked at it, but the extent
19     to which I would say that I was immersed in it
20     the way I looked at RICO fraud charts in
21     August is not comparable.  I have a very high
22     level of what I consider research that I have
23     done.  But I certainly was aware of these.
24          Q.   Professor Shelley, you talked at
25
```

| Page 298 | Page 299 |
|---|---|
| Shelley | Shelley |
| 1          Shelley | 1          Shelley |

Page 298

1          Shelley
2  some length about the early March 2007
3  incident, the either suicide attempt or self
4  mutilation that you called it, and then the
5  Schnoor meeting in Mississippi.  Are you aware
6  that the Texas workers in their allegations in
7  Joseph and Samuel alleged that they quickly
8  got news of these events and were told
9  effectively that if they made trouble they
10 were going to be deported; are you aware of
11 that?
12     A.   Yes, I was aware of that.
13     Q.   Do you have any basis to doubt
14 that the individuals heard quickly about --
15 the individuals in Texas heard very quickly
16 about what was happening in Mississippi with
17 the deportations and restraints of workers?
18        MR. ROUX:  Objection as to the
19 form.
20     A.   I believe that there was a close
21 network between the workers in Pascagoula and
22 the workers in Beaumont, and therefore there
23 were rumors and discussions, there were things
24 that they didn't know firsthand, but learned
25 about through the grapevine as I would say.

Page 299

1          Shelley
2        MR. FLEMING:  I am going to leave
3  it there because I know Mr. Shapiro has
4  a few questions.
5  EXAMINATION BY
6  MR. SHAPIRO:
7     Q.   Hi Professor Shelley, how are you
8  doing this afternoon?
9     A.   I am getting a little tired.
10    Q.   I am Steve Shapiro and I represent
11 the Dewan defendants.  Professor Shelley,
12 during this deposition you made reference to
13 Signal ending its contracts with Dewan
14 Consultants; isn't that correct?
15        MR. ROUX:  Objection as to the
16 form.
17    A.   I made a reference to it's
18 termination first with Mr. Pol, and then
19 subsequently to terminating their relationship
20 with Dewan.
21    Q.   That is what I was trying to ask
22 you, and that is did you ever -- you state the
23 relationship.  Did you ever see a written
24 contract between Dewan Consultants and Signal?
25    A.   I saw legal documents between

Page 300

1          Shelley
2  Signal and Dewan Consultants, yes, I did.
3     Q.   You saw legal documents --
4        MR. ROUX:  Steve, you are talking
5  over Dr. Shelley.
6     A.   I saw letters of agreement or
7  letters, representations of Signal with Dewan.
8  There was correspondence I saw between Signal
9  and Sachin Dewan.
10    Q.   But you never saw a stand alone
11 written contract between Sachin Dewan and
12 Signal; is that correct?
13    A.   At this moment I can't tell you
14 anything to be frank, after eight hours of
15 this.
16    Q.   I know, and I understand that, but
17 I am entitled to ask you questions.
18    A.   I am answering your question.  I
19 am answering it as honestly as I can at this
20 moment.
21    Q.   I appreciate that.  I will -- do
22 you need to take a break, would that help you?
23        MR. ROUX:  There is one minute
24 left, ask your question.
25        MR. HOWARD:  I think you can

Page 301

1          Shelley
2  accommodate him a little bit, if you want
3  to take a little bit of a break.
4        THE WITNESS:  I just want to get
5  this over with.  I had a break, I am
6  ready to go.  I am just not thinking as
7  clearly as I did seven hours ago.  I am
8  just being -- or eight hours ago -- I am
9  being very frank with you.
10        MS. HANGARTNER:  Steve are you
11 comfortable with that?
12        MR. SHAPIRO:  Not entirely, I
13 understand the question, but my witnesses
14 have gone through the same thing.
15    Q.   If you feel like you are not -- do
16 you feel like you are not prepared to answer
17 these questions?
18    A.   I could have answered these
19 questions about four hours ago.  I am not in
20 my prime form at the moment, I am being very
21 honest with you.
22        MR. SHAPIRO:  What are we going to
23 do about it folks.
24        MR. HOWARD:  How much do you have
25 Steve?

Case 2:15-cv-02296-SM-DEK Document 72-2 Filed 01/15/15 Page 78 of 85
Case 1:13-cv-00499-MAC-ZJH Document 92-3 Filed 01/15/15 Page 78 of 85 PageID #:
1743

| Page 302 | Page 303 |
|---|---|

Page 302

```
1              Shelley
2        MR. SHAPIRO: About ten minutes or
3  so.
4        THE WITNESS: I will try.
5        MS. HANGARTNER: Do you want to
6  re-ask the initial question.
7     Q.  I will ask it more one more time.
8        Professor Shelley, did you ever
9  see a document that appeared to you to be a
10 stand alone written contract between Sachin
11 Dewan or Dewan Consultants and Signal?
12    A.  I believe that I saw a document,
13 of an agreement between Dewan and Signal. But
14 at this moment under an oath I took I will not
15 swear up and down under a code or whatever
16 oath that I have absolutely seen it. But I
17 have seen many documents between, or
18 correspondence, and I believe I have seen
19 documents concerning their relationship.
20    Q.  I guess I am just going to move on
21 from there because I didn't get a response
22 answer.
23        It looks like you have a
24 substantial amount of experience in the study
25 of human trafficking; is that correct?
```

Page 303

```
1              Shelley
2     A.  Most people would say so, yes.
3     Q.  And it looks like you have -- you
4  have been testifying about laws and different
5  regulations and other things. In all of your
6  vast experience and in the human trafficking
7  field have you ever given legal advice to any
8  entity or organization?
9        MR. ROUX: Objection as to the
10 form.
11    A.  I am not a lawyer.
12    Q.  Does that mean no?
13    A.  I can give people advice, I cannot
14 give people legal advice.
15    Q.  Now it looks, from your report it
16 looks like you did quite a few things to
17 prepare this report. Did you happen to read
18 the deposition transcript of Sachin Dewan that
19 was taken in the end of August?
20    A.  No. It is not ready yet. I have
21 had some discussions with the lawyers of what
22 is in it, I am looking forward to reading it
23 as soon as it becomes available.
24    Q.  Did you ever read his deposition
25 testimony from 2009?
```

Page 304

```
1              Shelley
2     A.  I have read some things from him
3  from 2009, but I did not read the whole
4  deposition.
5     Q.  Do you remember what parts of the
6  deposition you read?
7     A.  I read some parts about his
8  business and how it operates.
9     Q.  And in paragraph 12 of your expert
10 report, the second sentence you say if there
11 was fraud committed by these three, referring
12 to Mr. Dewan, Mr. Pol and Burnett?
13    A.  Yes.
14    Q.  Are you forming any kind of
15 opinion that Mr. Dewan or Dewan Consultants
16 had committed any kind of fraud in his
17 recruitment effort in India?
18    A.  Yes. And I am not just venturing
19 this opinion, I have read the Indian case done
20 by the Delhi court in which Mr. Dewan sued to
21 have his license restored in that, which is a
22 very thorough review of the case. The Indian
23 court has said that Mr. Dewan engaged in
24 fraud, deception, and engaged in a conspiracy
25 with Pol and Burnett. And this is not a
```

Page 305

```
1              Shelley
2  document that is superficial, it represents a
3  very serious judgment by a very serious court
4  in India.
5     Q.  Do you know how that case came
6  about?
7     A.  The extent to which I know about
8  this case is that after the protests that
9  occurred, or the events in 2007 there came to
10 be the involvement of the Indian embassy and
11 the Indian consulate in Texas which launched
12 an investigation of this case and at which
13 point, I am not exactly sure, I would have to
14 review the details of the case, but the Indian
15 government after this preliminary inquiry
16 lifted the license of Mr. Sachin Dewan.
17    Q.  But you don't know any of the
18 background of that case and how that decision
19 came to be, and what the actual decision was,
20 do you?
21        MR. ROUX: Objection as to the
22 form.
23    A.  What do you mean the actual
24 decision; I read through the whole court
25 opinion.
```

Page 306

```
 1              Shelley
 2       Q.   Ma'am, I am not talking about what
 3    you read.  Do you understand the background of
 4    that case in India; do you understand how it
 5    came to be?
 6       A.   I told you how it came to be,
 7    because the case in the document reviews how
 8    the reports came in, when the investigation
 9    was launched, when the Indian workers came to
10    Washington to protest.  This was taken at high
11    level consideration by the Indian foreign
12    ministry.  The license was lifted -- wait, let
13    me finish, this I know.  The license was
14    lifted by the organization that oversees
15    Indian recruitment, and it is listed on the
16    Indian web-site to that effect.
17           From what I know having met many
18    Indians, the Indian foreign ministry is an
19    elite of India that has much less corruption
20    than other Indian agencies, and therefore
21    their findings of concern in terms of what the
22    Indian workers had reported in terms of
23    overpayment of recruiting fees and how they do
24    not correspond to Indian norms resulted in an
25    investigation in India.  It was the first time
```

Page 307

```
 1              Shelley
 2    that Mr. Sachin Dewan had his license removed
 3    in the decades that the family had been in
 4    business.
 5           So in reading through this case
 6    there is a lot of background material on how
 7    this case came to be.
 8       Q.   Now do you understand that that
 9    case was mainly decided based on newspaper
10    reports?
11           MR. ROUX:  Objection as to the
12       form.
13       A.   No, it was not decided based on
14    newspaper reports.
15       Q.   You understand it was not a real
16    investigation that went on, do you understand
17    that?
18           MR. ROUX:  Objection as to the
19       form.  Are you referring to the Delhi
20       case or to the proceedings before the
21       Delhi case?
22           MR. SHAPIRO:  I am referring to
23       all of the proceedings -- actually the
24       initial proceeding in the lower court
25       which was brought by Mr. Dewan.
```

Page 308

```
 1              Shelley
 2       Q.   Ma'am, do you have firsthand
 3    knowledge, any kind of firsthand knowledge
 4    that the Indian government actually conducted
 5    an investigation of Dewan Consultants for
 6    example by interviewing witnesses and
 7    interviewing other people; yes or no?
 8       A.   I know in that case I read of the
 9    interviews that the Indian Council General in
10    Houston and was done at the embassy that are
11    included the reports where they talked to the
12    workers, which is when they decided that
13    excessive fees had been paid.
14       Q.   And do you understand that the
15    final decision was not based on an excessive
16    fee?
17       A.   The final decision was that Mr.
18    Dewan had lost his license, it should be
19    returned, and that there had been no
20    complaints filed from anyone supporting any of
21    the witnesses that were filed in Indian court.
22    So there was nothing done from this side to
23    try and obtain justice or shut down a
24    trafficker in India.
25       Q.   I am sorry, I don't understand the
```

Page 309

```
 1              Shelley
 2    response.  The question was vastly different
 3    from what you responded to.  I would really
 4    appreciate it if -- I am trying to be as nice
 5    as I can, get through this as quickly as
 6    possible, but I would appreciate your not
 7    giving a narrative on every single question
 8    because we are going to be here all afternoon
 9    if that is the case.
10       A.   You asked me a question of what I
11    knew, so I am telling you what I knew.
12       Q.   You are entitled to explain the
13    answer, but you can't go on to a long
14    narrative and start talking about anything you
15    want.
16       A.   I am not talking about anything
17    you want.  You asked me about this case, I am
18    telling you that I am actually informed on
19    this case, and I am showing you that I am
20    informed on this case.  I know who the lawyers
21    were.  I have checked through Indian
22    colleagues who were informed about the nature
23    of the lawyers that defended Mr. Dewan.  I
24    know that the lawyer who defended Mr. Dewan,
25    the chief, the head of the law firm has become
```

```
               Shelley
 1      the attorney general of India in the last few
 2      months.  I am not ignorant on this case.
 3             MR. ROUX:  Steve, do you have any
 4      more questions?
 5             MR. SHAPIRO:  I am going to ask my
 6      questions, and we are going to stay here
 7      for as long as we have to --
 8             MR. ROUX:  That is not the case.
 9      The witness is getting incredibly tired
10      and --
11             MR. SHAPIRO:  Let me just say this
12      came up in another deposition, you know
13      what, I am going to move to strike the
14      responsiveness of many of the answers so
15      far.
16         Q.   Now ma'am I am going to get back
17      to the original question.  In paragraph 12 it
18      says if there was fraud that was committed by
19      these three, if there was fraud.  Now are you
20      saying if there was fraud.  Does that mean
21      that it is your opinion that Mr. Dewan
22      committed a fraud, yes or no?
23         A.   Yes.  I believe that Mr. Dewan,
24      Pol and Burnett were engaged in fraudulent
```

```
               Shelley
 1      activity.  And as I said to you the Indian
 2      court has also found that in relation to Mr.
 3      Dewan.  This is a reputable court with
 4      reputable lawyers and a reputable system.
 5         Q.   This is all your opinion; isn't
 6      that correct?
 7         A.   When I read legal opinions it
 8      doesn't become my opinion.  I mean if you call
 9      a -- you read cases, does it become your
10      opinion?
11         Q.   Ma'am I am not here to be
12      argumentative, I am asking questions, and I am
13      entitled to get answers to those questions and
14      you are not answering them, okay.
15             Now if you believe Mr. Dewan or
16      Dewan Consultants committed a fraud then why
17      did you couch this in terms if there was a
18      fraud committed --
19         A.   Okay, maybe I could have phrased
20      it better, but that is the language that I
21      chose to use.
22         Q.   Well you used the same language, I
23      am going to point it out throughout your
24      report, and the next question I have for you
```

```
               Shelley
 1      is how do you -- how are you qualified to
 2      render an opinion that Sachin Dewan or Dewan
 3      Consultants committed a fraud in India?
 4             MR. ROUX:  Objection as to the
 5      form.
 6         A.   As I said to you since I am not a
 7      lawyer I am not capable of saying or ruling
 8      myself that there was a fraud.  But I have
 9      read what he did.  I have read what the Indian
10      courts have said what he did, and that is the
11      conclusion that I have come to.  If you call
12      that my opinion, that is my opinion.
13         Q.   So you have not undertaken any
14      kind of independent analysis of this to come
15      up with your conclusion that Mr. Dewan or
16      Dewan Consultants committed a fraud; correct?
17             MR. ROUX:  Objection as to the
18      form.
19         A.   I have read so much on Mr. Dewan
20      and his what I would call bad behavior.  But
21      whether you call this -- I probably would call
22      it -- I might call it fraud.  I am not a
23      person who qualifies on a legal judgment, but
24      I would say that is why I am calling it fraud.
```

```
               Shelley
 1      He deceived people.  He violated Indian
 2      regulations on the amount that you are allowed
 3      to charge as a recruiter.
 4         Q.   I will ask you another time.
 5             Now are you an expert in
 6      recruitment of workers to work overseas; are
 7      you an expert in this area?
 8             MR. ROUX:  Objection as to the
 9      form.
10         A.   I know a significant amount about
11      recruitment of workers for overseas
12      employment.  I have written about it in my
13      book on human trafficking.
14         Q.   In this case are you seeking to be
15      qualified as an expert in recruitment, worker
16      recruitment from India?
17         A.   I am seeking to be qualified as an
18      expert on human trafficking.
19         Q.   So you are not an expert in the
20      area of recruitment; is that correct?
21         A.   I would say that recruitment is a
22      very narrow issue, and part of human
23      trafficking may include individuals being
24      brought into a traffic situation.  And I have
```

| Page 314 | Page 315 |
|---|---|

**Page 314**

Shelley
1 written much on the situation in which workers
2 are brought in to trafficking situations.
3     Q.   Well you allude to a statute -- if
4 you are not an expert you alluded to a
5 statute where you say that Mr. Dewan
6 overcharged the job candidates; is that
7 correct?
8     A.   Yes.
9     Q.   How much should Mr. Dewan have
10 been charging for a recruitment fee?
11     A.   The charges depend on different
12 conditions, but the recruitment fees that
13 Indians can charge for recruitment overseas
14 are quite low.  I don't remember exactly.  I
15 have read the provisions.  But maybe in the
16 thousands and sometimes less than that.
17     Q.   So you are basically telling me
18 that you are not an expert in this area
19 because you don't know; is that right?
20     MR. ROUX:  Objection as to the
21 form.
22     A.   I don't remember every provision
23 of every statute.  I certainly know the
24 difference between the sums that were paid by

**Page 315**

Shelley
1 the workers and the sums that I read in the
2 statute on what was allowed.
3     Q.   Are you relying mainly on the fact
4 that the folks at Signal told you that the
5 fees were exorbitant?
6     A.   No, absolutely not.  I have
7 read -- absolutely not.  That I can tell you,
8 that is easy.
9     Q.   Now you alluded to the fact that
10 Signal had no knowledge of a recruitment
11 effort that began late in 2003, pre Katrina;
12 is that correct?
13     A.   That is correct.
14     Q.   And do you know, has anybody ever
15 explained that recruitment effort to you?
16     A.   I have read -- I have not had it
17 explained to me, I have read some of this on
18 that recruitment effort in 2003, yes.
19     Q.   So you seem to suggest that Signal
20 was deceived because they allegedly did not
21 know about the earlier recruitment effort; is
22 that correct?
23     A.   That is not the only reason that
24 Signal was deceived.

| Page 316 | Page 317 |
|---|---|

**Page 316**

Shelley
1     Q.   I am asking you specifically you
2 state that Signal was deceived because they
3 were not made aware of the original
4 recruitment effort?
5     A.   Signal was not aware that the
6 workers were initially recruited for other
7 places of work, and that some of them had paid
8 money as early as 2003 to be hired in other
9 places, and go to work in other places.
10     Q.   Would that have made any
11 difference, the fact that they had been
12 originally recruited in a different effort?
13     A.   It does make a difference,
14 absolutely it makes a difference.
15     Q.   Explain to me how?
16     A.   It makes a difference because
17 there was deception of Sachin Dewan, Mr. Pol
18 and Mr. Burnett for many years before the H-2B
19 workers ever arrived in the United States to
20 work for Signal.
21     Q.   Do you understand that these
22 workers that were originally recruited only
23 paid a very modest sum in addition to what
24 they paid originally to come to Signal on an

**Page 317**

Shelley
1 H-2B and a Green Card?
2     A.   Can you repeat that.
3     Q.   Yes I can.
4     Were you aware or did you read
5 anywhere, you seem to read a lot, did you read
6 anywhere that the workers who were originally
7 recruited by Mr. Dewan and Dewan Consultants
8 in late 2003 only paid a nominal fee to come
9 over to work for Signal on an H-2B visa?
10     A.   Many of them had paid significant
11 fees to Dewan Consultants before they came to
12 Signal.  So I don't understand your question.
13     Q.   That is true.  The question is do
14 you understand that this was an opportunity
15 for them to come to Signal on an H-2B visa and
16 they only had to pay just a little bit more
17 for that opportunity, do you understand that?
18     MR. ROUX:  Objection as to the
19 form.
20     A.   What I have read is that the
21 workers who were in process to go to these
22 other companies that were -- where they
23 were supposed to get H-2B work or Green Cards,
24 were told that they could move much more

| | |
|---|---|
| Page 318 | Page 319 |

**Page 318**

Shelley

1
2 rapidly to go work at Signal after Katrina,
3 and this agreement was established between
4 Pol, Burnett and Sachin Dewan.  And some of
5 them paid a little bit more to Signal.
6      Q.   And did you ever read anywhere
7 that this was an opportunity given to these
8 workers and they could certainly refuse it if
9 they wished?
10      A.   Yes.
11      Q.   Where did you read that?
12      A.   I read that in some of the
13 background material on this case.
14      Q.   Did you read anywhere where many
15 of these workers decided that they waited too
16 long and they decided to get out of the
17 original recruitment effort; did you read that
18 somewhere?
19      A.   I have not been -- the workers who
20 may have waited -- waited too long and then
21 decided to come to Signal; or do you mean they
22 opted out of the process of coming to the
23 United States on H2-B visa; what is your
24 question?
25      Q.   The question was very clear and I

**Page 319**

Shelley

1
2 will make it clearer.
3      A.   Not to me, sorry.
4      Q.   I am talking about the individuals
5 who opted out of the original permanent
6 resident recruitment effort in late 2003, do
7 you understand that those workers were under
8 no obligation to go to Signal whatsoever?
9      A.   There were workers that were told
10 that if they wanted to get to the United
11 States more quickly they could go to Signal,
12 yes, that I am aware of.
13      Q.   And those workers could have
14 decided to cancel their -- opt out as you say
15 of the original permanent resident visa
16 recruitment; is that correct?
17      A.   Yes, they didn't have to come to
18 Signal.
19      Q.   Do you understand that Mr. Dewan
20 refunded hundreds of thousands of dollars to
21 these individuals?
22      A.   I understand, and I have not seen
23 this yet, but the lawyers have told me that
24 Dewan talked about refunding money in his
25 deposition, but I have not read it or seen it.

| | |
|---|---|
| Page 320 | Page 321 |

**Page 320**

Shelley

1
2 So I only know this secondhand.
3      Q.   Would that make any difference to
4 you?
5      A.   It would, but I would like to read
6 the context and read the deposition and read
7 his statements before I make any more comments
8 on that.
9      Q.   I appreciate that.
10           You talked about some plaintiffs
11 who committed fraud in the testing in India?
12      A.   Yes.
13           MR. ROUX:  Before you go any
14      further, can you wrap up in six minutes,
15      we have gone over the ten minutes you
16      asked for.
17           MR. SHAPIRO:  I am pretty sure I
18      can, I am near the end.
19      Q.   Now let me jump back to the
20 original recruitment effort we were talking
21 about in 2003.  If these workers who had paid
22 money to Dewan Consultants and Mr. Pol and
23 Mr. Burnett and other individuals, and they
24 were only going to pay a little extra to come
25 to Signal, in your professional opinion how

**Page 321**

Shelley

1
2 would that have deceived Signal in any way?
3      A.   How would that have deceived
4 Signal; I believe that the whole recruiting
5 effort was a deception to the workers, and
6 that what you are talking about of the small
7 payment is not a part of the problem.  The
8 part of the problem is the large recruiting
9 fees that were paid in their entirety.
10      Q.   But again you are not an expert on
11 recruiting fees or recruitment efforts; is
12 that correct?
13           MR. ROUX:  Objection as to the
14      form.
15      A.   I have read on recruitment,
16 recruitment fees, recruitment from Kerala.  I
17 am not an expert the way I am on other topics,
18 but I do know something about this.
19      Q.   I am sure you do ma'am, I am not
20 trying to criticize you, I am just trying to
21 get an answer to my question, that is all.
22           Now have you read anywhere that
23 recruiters are exempt from the immigration act
24 for recruitment to North America?
25      A.   I have not been reading about

81 (Pages 318 to 321)

---

Page 322

Shelley

1 recruiters in North America, no.
2
3       Q.   Well that is part of this case,
4 isn't it, recruiting to North America?
5           MR. ROUX:  Objection as to the
6 form.
7       A.   I have not been reading about
8 Indian law in reference to these -- to what
9 you are referring to.
10      Q.   Well ma'am you just testified and
11 you testified several times about the fact
12 that Mr. Dewan's fee was somehow greater than
13 what the law allows in India.  So which is it,
14 do you know what Indian law is on this or not?
15      A.   I have certainly read what Indian
16 law is because it was outlined in the case,
17 but I am not able to give you at this point
18 chapter and verse back what it said.  But I
19 did absorb what the recruiting fees were.  I
20 read through the extensive documentation that
21 was provided by the plaintiffs of what they
22 paid, and the two are not -- what the workers
23 paid was excessive.
24      Q.   What are you basing excessive on,
25 please tell me?

---

Page 323

Shelley

1
2       A.   All right.  In most cases Indian
3 workers who go to the Middle East will pay a
4 few thousand dollars to a recruiter to go for
5 a period of time, and sometimes this period of
6 residence is not even sufficient to pay back
7 their recruiting fees.  A recruiting fee is --
8       Q.   Do you --
9       A.   Let me finish, I am about to
10 explain it.  A recruiting fee of 15 to $20,000
11 as has been paid by many of the plaintiffs in
12 this case is excessive.  It is excessive in
13 relation to what Indian law stipulates.  It is
14 excessive in terms of the expectation of how
15 long they would be able to reside in the
16 United States under an H-2B visa.
17      Q.   Well we are getting back to your
18 knowledge of India.  You are not aware of any
19 exemption under Indian law that says the fees
20 to be -- the fees to be charged are at a set
21 amount, but the recruitment to North America
22 is exempt from that specific fee?
23          MR. ROUX:  Objection as to the
24 form.
25      A.   I am not -- there has been --

---

Page 324

Shelley

1
2 there is very little Indian recruitment of
3 workers to the United States.  This is a very
4 rare case, and therefore I am -- it is
5 hundreds of thousands of workers that go to
6 the Middle East, that go to Singapore, that go
7 elsewhere.  We are talking no more than a few
8 thousand Indian workers per year that come
9 into the United States, and therefore this is
10 not a normal operating procedure for Indian
11 recruiters.
12      Q.   But you agree and as you have
13 testified that working in the Middle East is
14 vastly different from coming to work in the
15 United States; isn't that correct?
16      A.   Yes.
17      Q.   And that is including the amount
18 of money that one makes in his or her job, and
19 the accommodations, it includes all
20 consequences; correct?
21      A.   Absolutely, as well as the
22 practice of religion.
23      Q.   So if you are going to make more
24 money in the United States then the fees would
25 be higher; isn't that correct?

---

Page 325

Shelley

1
2       A.   It could be, which is exactly why
3 the Indian workers agreed to pay this money,
4 that they would earn more and they had a dream
5 of getting a Green Card and coming to the
6 United States with their families.  That is
7 exactly what they are were thinking, that it
8 was worth this extra money.
9       Q.   Right.  Just a couple more
10 questions.
11          The testing that you mentioned
12 about, Signal went over to India to test
13 workers and it is your position as an expert
14 that some of the workers may have committed
15 fraud in connection with their testing, and
16 you gave us two possible examples.  Do you
17 remember if this was fraud on a written test
18 or a practical test?
19      A.   I believe that there was fraud
20 committed in the entire testing procedure.  I
21 hate to say it, but this is a norm in India.
22 So it could be on the written test, it could
23 be on the actual physical test which is
24 probably more likely in the second part of it
25 because the Signal recruiters did not

| Page 326 | Page 327 |
|---|---|
| Shelley | Shelley |

**Page 326**

1  Shelley
2  recognize some of the workers who arrived.
3  MR. ROUX: Steve, we are past 6,
4  we are a half hour past.
5  MR. SHAPIRO: Two more questions.
6  MR. ROUX: Okay.
7  MR. SHAPIRO: Who is this on the
8  phone?
9  MR. ROUX: This is Brian.
10  Q. Wouldn't it be Signal's
11  responsibility in India to ensure that they
12  knew exactly who they were dealing with during
13  the testing, and they would not allow any
14  fudging or fraud on the testing?
15  A. You don't understand India at all.
16  This is so institutionalized in India, so
17  professionalized that Indians can't prevent
18  this. The United States with it's specialists
19  in the embassy can't prevent fraud. We have
20  had cases investigated of fraud within the
21  U.S. embassy.
22  Q. Are you suggesting that not only
23  was Signal defrauded, but that Mr. Dewan and
24  Mr. Pol and Mr. Burnett were defrauded as well
25  by the workers?

**Page 327**

1  Shelley
2  A. I am not suggesting that they
3  defrauded them. I am saying that it is
4  standard operating procedure in India. I hate
5  to say this as a specialist on corruption that
6  individuals routinely hire other people to
7  take tests for them. And therefore to say
8  that somebody is deceived, this is just
9  standard operating procedure.
10  MR. ROUX: That is by my count
11  your two questions. So with all due
12  respect given that it is over a half hour
13  when we were supposed to go, we are going
14  to end the deposition at this point, we
15  are going off the record.
16  MR. SHAPIRO: Did I ask two
17  questions or just one?
18  MR. ROUX: You asked two.
19  MR. SHAPIRO: That is okay, I am
20  (Continued on next page)
21
22
23
24
25

**Page 328**

1  Shelley
2  done anyway.
3  MR. ROUX: We are done.
4  (Time noted: 6:03 p.m.)
5  _____
6  LOUISE I. SHELLEY
7
8  Subscribed and sworn to before me
9  this ___ day of _____, 2014
10
11  _____
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 329**

1
2  C E R T I F I C A T E
3  STATE OF NEW YORK   )
4  : ss.
5  COUNTY OF NEW YORK   )
6
7  I, Philip Rizzuti, a Notary
8  Public within and for the State of New
9  York, do hereby certify:
10  That LOUISE I. SHELLEY, the
11  witness whose deposition is hereinbefore
12  set forth, was duly sworn by me and that
13  such deposition is a true record of the
14  testimony given by the witness.
15  I further certify that I am not
16  related to any of the parties to this
17  action by blood or marriage, and that I am
18  in no way interested in the outcome of this
19  matter.
20  IN WITNESS WHEREOF, I have
21  hereunto set my hand this 29th day of
22  September, 2014.
23  _____
24  PHILIP RIZZUTI
25

## Page 330

```
 1
 2    ----------------- I N D E X ----------------
 3    WITNESS          EXAMINATION BY      PAGE
 4    LOUISE I. SHELLEY  Mr. Howard        6
 5             Ms. Suriyopas      228
 6             Mr. Ramsey         279
 7             Mr. Fleming        294
 8             Mr. Shapiro        299
 9
10    ------------- INFORMATION REQUESTS -----------
11    DIRECTIONS:     None
12    RULINGS:        None
13    TO BE FURNISHED:  None
14    REQUESTS:        None
15    MOTIONS:         None
16
17    ----------------- EXHIBITS -----------------
18    Shelley Exhibit 1, expert        6
19    report,
20    Shelley Exhibit 2, E-mail dated   49
21    March 13, 2008,SIGE 0163151 to
22    153,
23    Shelley Exhibit 3, E-mail dated   73
24    August 24, 2006, numbered SIGE
25    0329048 through 50,
```

## Page 331

```
 1
 2    Shelley Exhibit 4, handwritten     83
 3    note Bates numbered SIGP
 4    0053101,
 5    Shelley Exhibit 5, letter dated    86
 6    December 1, 2006, Bates numbered
 7    HRT_SIB 000368444,
 8    Shelley Exhibit 6, E-mail dated    119
 9    March 5, 2007, Bates numbered
10    SIGE 0011482 and 483, and SIGE
11    0055312 and 313,
12    Shelley Exhibit 7, letter dated    130
13    February 26, 2007, numbered
14    HRT_SIB 000506100,
15    Shelley Exhibit 8, E-mail dated    133
16    March 6, 2007, numbered HRT_SIB
17    000527725,
18    Shelley Exhibit 9, rough           146
19    transcription of audio tape,
20    3/12/07,
21    Shelley Exhibit 10, one-page       199
22    excerpt from Mr. Sanders diary
23    dated Friday, January 19, 2007,
24    numbered SIGE 0556816,
25    Shelley Exhibit 11, E-mail dated   200
```

## Page 332

```
 1
 2    June 14, 2007, numbered SIGE
 3    0048939,
 4    Shelley Exhibit 12,              211
 5    photographs.,
 6    Shelley Exhibit 13, Expert       231
 7    Report of Florence Burke,
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 333

```
 1
 2        *** ERRATA SHEET ***
 3
 4    NAME OF CASE: Kurian David v. Signal International LLC
      DATE OF DEPOSITION:  September 23, 2014
 5    NAME OF WITNESS:  LOUISE I. SHELLEY
      PAGE  LINE      FROM            TO
 6    _____|_____|_____|_____
 7    _____|_____|_____|_____
 8    _____|_____|_____|_____
 9    _____|_____|_____|_____
10    _____|_____|_____|_____
11    _____|_____|_____|_____
12    _____|_____|_____|_____
13    _____|_____|_____|_____
14    _____|_____|_____|_____
15    _____|_____|_____|_____
16    _____|_____|_____|_____
17    _____|_____|_____|_____
18    _____|_____|_____|_____
19    _____|_____|_____|_____
20    _____
21           LOUISE I. SHELLEY
22    Subscribed and sworn to before me
23    this _____ day of _____, 2014.
24    _____
25    (Notary Public)    My Commission Expires:
```