Case 2:15-cv-02296-SM-DEK   Document 73-5   Filed 01/15/15   Page 1 of 49

# **<u>EXHIBIT C</u>**

Summary of Education and Experience

1. I am a University Professor and Director of the Terrorism, Transnational Crime and Corruption Center at the School of Public Policy at George Mason University. I am the author of *Dirty Entanglements: Corruption, Crime and Terrorism* (Cambridge University Press, 2014); *Human Trafficking: A Global Perspective* (Cambridge University Press, 2010); the co-editor with Shiro Okubo of *Human Security, Transnational Crime and Human Trafficking* (Routledge, 2011); and with Sally Stoecker of *Human Traffic and Transnational Crime* (Rowman and Littlefield, 2005). My 2010 *Human Trafficking* book is used as a text at many universities in the United States and Canada including Harvard, University of Toronto, Duke, Georgetown University, Michigan State University, and many more. I am the series editor of the TraCCC book series with Routledge, that has published two books on labor exploitation and trafficking. Recipient of numerous fellowships including the Guggenheim, two Fulbright awards, NEH (National Endownment for the Humanities) fellowship, I have written numerous newspaper and magazine articles on human trafficking and transnational crime. My particular focus has been the business of human trafficking, and the role of organized crime in this activity, from a global perspective.

2. I hold a BA from Cornell University and an MA in Criminology and a PhD in Sociology from the University of Pennsylvania, earned in 1977. I have had a Fulbright fellowship for study in Russia for my doctoral dissertation, and taught under a Fulbright in Oaxaca, Mexico, a major source region for smuggled and trafficked labor into the United States.

Case 2:15-cv-02296-SM-DEK Document 73-5 Filed 01/15/15 Page 3 of 49

3. I have studied and worked to address all forms of human trafficking since the early

1990s. To understand the problem, I have travelled extensively in the United States and

abroad, visiting many of the places where the Signal workers have been employed before

coming to Signal, including Abu Dhabi, Azerbaijan, Dubai, Russia and Singapore.  I have

seen some of the work conditions, the absence of safety, overcrowded housing and talked

to specialists on migration and officials of the International Organization for Migration

(IOM) on the conditions in these locales. I have worked for the adoption of the US anti-

trafficking law, having testified before the US Congress on several occasions on human

trafficking, and testified in the State of Virginia, the state of my employment, in order to

achieve passage of a state law on human trafficking. I have taught human trafficking, first

in the context of transnational crime, and now I teach a dedicated class in the George

Mason University curriculum on human trafficking. I have inspired many students to

work in this field. I lecture widely at universities, public fora, and at training programs

for law enforcement on the issue of human trafficking. TraCCC, the research center that I

direct, has hosted many public events on human trafficking that have brought together

government officials from many agencies, community members and NGOs. I have

appeared on radio and television, and my presentations on human trafficking are widely

available. I presently chair the human trafficking group of the Organization of Economic

Cooperation and Development (OECD) which has representatives from ILO

(International Labour Organization), UNODC (United Nations Office on Drugs and

Crime), OSCE (Organization For Security and Co-operation in Europe) and I co-chair the

working group against Human Trafficking of the World Economic Forum (WEF) that

works with the business community and NGOs. The highlights of my anti-trafficking

work in the last five years are presented in an attached list separate from my resume.


4.  I have served as an expert witness in many asylum cases in the last twenty years.  I

have also served as an expert witness in complex litigation cases. I have done much work

with law enforcement to help prepare training materials on how to combat human

trafficking. I have worked with Ruchira Gupta in 2004, one of the leading anti-human

trafficking activists in India, on developing a roadmap for the USAID (US agency for

International Development) on combating human trafficking in India and other regions of

Asia.[1] I have interviewed Kailash Satyarthi at the World Economic Forum, a leading

human rights figure in India, who has led marches against child labor trafficking.[2]

5.  I base my opinions in this statement on my understanding of human trafficking,

gathered from years of experience of interviewing individuals, and reading case files of

successfully prosecuted human trafficking cases. I have worked with members of the

business community and NGOs trying to address labor trafficking. I have a comparative

perspective on this issue, knowing both the Trafficking Victims Protection Act of 2000,

the Trafficking Victims Protections Reauthorization Acts, and the work of the United

Nations Office of Drugs and Crime, and the Organization and Security and Cooperation

in Europe, of which the US is an active member, on the issue of labor and sexual

trafficking.

---

[1] Ruchira Gupta, Lisa Kurbiel, Louise Shelley, Jill Tirnauer, "Trafficking in the ANE Region: Problem Analysis and Proposed Framework for USAID Reponse," June 2014, http://pdf.usaid.gov/pdf_docs/PNADC972.pdf.
[2] For mention of his work, see http://www.oxotower.co.uk/events/talk-human-rights-defender-kailash-satyarthi/.

Case 2:15-cv-02296-SM-DEK Document 73-5 Filed 01/15/15 Page 5 of 49

6. The materials which I considered in formulating my opinions are included as an attachment to this report (see Appendix I). They include legal filings concerning the case from both the plaintiffs and Signal, financial and safety records of Signal, thousands of emails of Signal staff and an extensive literature review and reports on human trafficking both in the US, India and other countries, where Signal's H2B workers were employed previously. I have examined conclusions of the US government of previous investigations of Signal. I have visited New Orleans and met and ate at the restaurant of the food caterer, discussed his food menus and preparation, and tasted common items served to the Indian H-2B workers. I visited Pascagoula, Mississippi and interviewed top staff of Signal Corporation, including individuals who went to India to test employees. I have also interviewed two current Signal employees who arrived at Signal as H-2B workers. While in Pascagoula, I visited the shipyard and also the man camps where the workers were housed. I saw the residential facilities, including the mess hall and the fences and security controls of the facility. I saw some of the trailers that were transported from Orange, Texas to Pascagoula, Mississippi. I have seen a video of the man camp in Texas filmed in 2008.

I have examined the open Facebook pages of the plaintiffs in the case. I have studied the case of Chellen vs. John Pickle Co. which is referred to in the plaintiffs' submissions and which provides a pattern used by the plaintiffs' in this case. I have read the Indian court opinion in the case that Sachin Dewan brought against the Indian government concerning the suspension of his license that contains information on the Indian government investigation of Signal. I have examined the crime data and the housing data for Pascagoula and the neighboring community of Moss Point for the years 2006 and 2007 to

4

understand the environment in which the plaintiffs' lived. I have read the t-visa and u-visa applications for the planiffs that were available. I have read the deposition of Malvern Burnett as well as reviewed depositions of one of the plaintiffs. I have listened to recordings of Saket Soni on his involvement with the H2B workers at Signal as well his activism on behalf of guest workers as well as  Mark Massey's Freedom From Fear speech.  I have also watched the program that Dan Rather produced on the Signal case.

**Analysis of Human Trafficking**

7. The eighth chapter of my book, *Human Trafficking: A Global Perspective*  discusses the United States. My analysis there of labor trafficking in the US has been very much shaped by the reports of individuals and organizations active in this case. I cite their research in discussing labor trafficking in the South, and human trafficking post-Katrina. On p.233 of my book, I cite the first edition of a  report from the Southern Poverty Law Center entitled, "Close to Slavery: Guestworker Programs in the United States." [3] According to the Southern Poverty Law Center Report's 2007 version, human trafficking of guest farm workers who enter on H-2 visas occurs when they are "held virtually captive by employers or labor brokers who seize their documents; forced to live in squalid conditions; and denied benefits for on-the-job medical injuries."[4] These are important criteria by which I and many others doing official assessments recognize human trafficking. In the Signal case, no one has held captive, no documents were seized,

---

[3] Louise I. Shelley, *Human Trafficking: A Global Perspective* (New York and Cambridge, 2010),  233.
[4] Southern Poverty Law Center, "Close to Slavery: Guestworker Programs in the United States." http://www.ncfan.org/storage/Close%20to%20Slavery.pdf, 2. This is the 2007 version.

and, in contrast to what might be expected in trafficking cases, both health insurance and medical care were provided to workers employed in what has been demonstrated to be one of the safest shipyards in the United States. (See Appendix II.) This **safety record is the key indicator** because only individuals who can sleep, eat properly, and have sufficient rest periods can function to maintain an accident rate that is a small fraction of the industry standard.

8. Trafficking is a legally defined concept and is not subject to shifting definitions to suit the occasion. Authoritative definitions are those provided by the UN and the TVPA. The definition of labor trafficking was established under the Trafficking Victims Protection Act, first adopted into law by the US Congress in 2000 and subsequently reauthorized in 2003, 2005, 2008 and 2011. It provides criteria by which to determine labor trafficking and defines labor trafficking as: "The recruitment, harboring, transportation, provision, or obtaining of a person for labor or services through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery."[5] The United Nations defines human trafficking under Article 3, paragraph (a) of the Protocol to Prevent, Suppress and Punish Trafficking in Persons. According to the UN Protocol, of which the US is a signatory nation, Trafficking in Persons is defined

> as the recruitment, transportation, transfer, harbouring or receipt of persons, by means of the threat or use of force or other forms of coercion, of abduction, of fraud, of deception, of the abuse of power or of a position of vulnerability or of the giving or receiving of payments or benefits to achieve the consent of a person having control over another person, for the purpose of exploitation. Exploitation shall include, at a minimum, the exploitation of the prostitution of others or other forms of sexual exploitation, forced

---

[5] See https://www.bja.gov/ProgramDetails.aspx?Program_ID=51; provision 8 severe forms of trafficking.

labour or services, slavery or practices similar to slavery, servitude or the removal of organs.[6]

9. In 2013, The Southern Poverty Law Center reissued a revised version of their earlier report, "Close to Slavery: Guestworker Programs in the United States." and included significant material on the Signal case.[7] This updated report is not consistent with their earlier report on human trafficking but alters the criteria defining human trafficking, providing analyses that are consistent neither with the Trafficking Victims Protection Act (TVPA) legislation nor the UN legislation or with the facts of the Signal case. On p.16 of the Southern Poverty Law Center's 2013 version, the report states, "Joey's first child was born shortly after he arrived in the United States. He was unable to travel home to see his new born daughter, but the desire to take care of her fueled him to keep fighting through the indignities and hardships too common in the guest worker program."[8] Many Signal workers returned home to India during their employment, according to examined records, and others took extended leave of absences for familial reasons. During the greatest recession the United States has known since the 1930s, many American workers could not afford to take time off or pay for transport to visit family members. This is not a criterion of human trafficking according to either the UN definition or TVPA, but rather it is a new criterion added by SPLC to attack Signal.

---

[6] See http://www.unodc.org/unodc/en/human-trafficking/what-is-human-trafficking.html.
[7] "Close to Slavery: Guestworker Programs in the United States. 2013 edition," http://www.splcenter.org/sites/default/files/downloads/publication/SPLC-Close-to-Slavery-2013.pdf,  10-11, 15-16, 32-3, 35-36, 46-7.
[8] Ibid, 16.

7

10. In my book, *Human Trafficking:A Global Perspective*,  in discussing labor trafficking I also used the report "And Injustice for All: Workers' Lives in the Reconstruction of New Orleans."[9]  This study was authored by Judith Browne-Davis, Jennifer Lai of the Advancement Project, Marielena Hincapie of the National Immigration Law Center and Saket Soni of the New Orleans Worker Justice Coalition/Advancement Project. Mr. Saket Soni has been deeply involved in this case against Signal.[10] As I quote this report on p.253 of my book, post- Katrina construction workers residing in New Orleans lived "in an unprecedented level of exploitation, …without any guarantee of a fair day's pay or any pay at all."[11]Another part of the report is cited in which "one group of Asian reconstruction workers was "held captive by contractors in a mid-city hotel."[12] These situations described in the report and cited in my book shaped my understanding of the problem of labor trafficking in the South and are all fully consistent with the TVPA legislation. I also read John Bowe's discussion of the John Pickle Case in *Nobodies: Modern American Slave Labor and the Dark Side of the New Global Economy* that is also consistent with my understanding of human trafficking.[13] This case cited in submissions with the plaintiffs' statements is extensively analyzed in  *Nobodies*. But the John Pickle case differs in many essential elements from the Signal case as the Indian workers were

---

[9]  Judith Browne-Davis, Jennifer Lai, Marielena Hincapie, and Saket Soni, "And Injustice for All: Workers' Lives in the Reconstruction of New Orleans," July 1, 2006, www.nilc.org/document.html?id=19.
[10] Julia Preston, "Suit Points to Guest Worker Flaws,"  February 1, 2010. http://www.nytimes.com/2010/02/02/us/02immig.html?_r=0
[11]  Shelley, 253 citing 8 of note 9.
[12] Ibid.  citing 47 of  note 9.
[13] John Bowe, Nobodies: *Modern American Slave Labor and the Dark Side of the New Global Economy* (New York: Random House 2008), 87-150.

not on H2B visas and John Pickle Co. had "knowingly obtained improper visas for defendants", had been recruited directly by the company, were paid less than the minimum wage, were provided inadequate quantities of food, were inattentive to their medical needs, and on occasion confined them to the facility.[14]

11. In contrast, the conditions in the Signal case are completely different from these examples, and once again, as in the case with the Southern Poverty Law Center, Mr. Saket Soni's statements against Signal reflect differing and shifting criteria for trafficking that are inconsistent with his earlier description of trafficking, and with American law as well. Signal did not obtain workers for its facilities in Texas and Mississippi through the use of force, fraud or coercion. The workers who came to Signal were recruited by Sachin Dewan and worked with the recruiter Michael Pol and the lawyer, Malvern C. Burnett, none of whom were Signal employees. None of the workers allege that force was used to recruit them to the United States. In the Signal case, the qualified workers were paid $18 an hour, with 50 percent overtime. Their pay was deposited directly into their bank accounts so that it was available for immediate withdrawal. As will be discussed later, the workers were not confined and enjoyed access to the outside world.

12. The recruiting activities of Dewan, Pol and Burnett began several years before there was any contact with Signal International. If there was fraud committed by these three, as alleged in the complaints, this began in late 2003 in the pre-Katrina environment[15] and

---

[14] Chellen v. John Pickle Co. United States District Court for the Northern District of Oklahoma, May 24, 2006.

[15] Third Amended Complaint, Exhibit 1, Specific Fraud Allegations Related to Named Plaintiffs ("RICO Fraud Chart"), filed 9/21/12, 1 of 102.

9

was not known to Signal when they signed the contract with the recruiters Global Resources, when Signal's testers travelled to India, or before the arrival of the workers. Signal was deceived as well as the workers, as they were told that recruitment fees were $2,000 to 3,000 while the workers were charged a multiple of this. The detailed opinion in the Indian court case that challenged the suspension of the recruiting license of Dewan Consultants, as will be discussed more fully later, discusses Burnett and Pol as Sachin Dewan's accomplices but does not find fault with Signal in the recruiting process. [16] (paragraph 48).

13. The workers were not exposed to "involuntary servitude, peonage, debt bondage, or slavery" while working at Signal. The workers were hired as direct employees of Signal and received the same wages as other employees of Signal for similar labor. In many cases, as Signal employees, they worked in conditions that were superior to those of American workers at similar shipyards that do not have the exemplary safety record of Signal.

As Judge Zainey has written in his statement denying class certification,

In other words, some "choices" might be so illegitimate that any decision to work is "involuntary." See Kozminski, 487 U.S. at 959 (Brennan, J., concurring). But this case does not present one of those situations. To the contrary, this case involves paid workers who in fact could leave their jobs at any time, albeit under penalty of returning to their home countries but that restriction was dictated by U.S. immigration law. The workers were for the most part paid well, free to come and go as they pleased, and some even took vacations and bought cars. The

---

[16] IN THE HIGH COURT OF DELHI, AT DELHI WP(C)No.5794/2008 *Judgment pronounced on 3rd November, 2009*. # M/s Dewan Consultants & Pvt. Ltd. ….. Petitioner Through: Mr.Mukul Rohtgi, Sr. Advocate with Ms. Manali Singhal & Mr. Shantosh Sachin, Advs. Versus $ Union of India & Ors. …. Respondents Through: Mr. P.P. Malhotra, ASG with Ms. Monika Garg, Mr. Chetan Choudhary, Mr. Shankar Chhabra and Mr. Gaurav Shankar, Advs.

pressure to work for Signal arguably came at least in part from a set of circumstances that each plaintiff individually brought upon himself when he elected to pay what is now characterized as "exorbitant" fees to participate in the green card program. Part of the "serious harm" that Plaintiffs claim that they faced was financial and reputational harm which are uniquely individual in nature. And the "threats" that Plaintiffs allege were made to compel them to work were often made to individuals, not to the class as a whole.[17]

14. The complaints have alleged that the workers were required to work in order to pay off the debts that they incurred to the recruiter. Even if these debts exist in India to friends, family and banks, they do not fit the definition of debt bondage that is cited either in the TVPA legislation or in the UN legislation.

15. Article 1(a) of the 1956 United Nations Supplementary Convention on the Abolition of Slavery defines debt bondage as "the status or condition arising from a pledge by a debtor of his personal services or of those of a person under his control as security for a debt, if the value of those services as reasonably assessed is not applied towards the liquidation of the debt or the length and nature of those services are not respectively limited and defined".[18]

TVPA 2000 law on debt bondage is as follows: The term 'debt bondage' means the status or condition of a debtor arising from a pledge by the debtor of his or her personal services or of those of a person under his or her control as a security for debt, if the value of those

---

[17] Opinion of Judge Jay C. Zainey, in Kurian David et. al. vs. Signal International, denying class certification, United States District Court, State of Louisiana, July 3, 2012, 58-59.

[18] http://www1.umn.edu/humanrts/instree/f3scas.htm Supplementary Convention on the Abolition of Slavery, the Slave Trade, and Institutions and Practices Similar to Slavery, 226 U.N.T.S. 3, entered into force April 30, 1957.

services as reasonably assessed is not applied toward the liquidation of the debt or the

length and nature of those services are not respectively limited and defined.[19]

The Indian H-2B workers did not offer their labor for repayment of a debt. Therefore,

there was no debt bondage in this case under either the American or UN definitions.

Furthermore, the Indian court stated that the Indian workers had made a substantial sum

of money while in Signal's employ citing a figure of $75,000.[20]

16. The element of coercion under the TVPA definition is also not present as evidenced

by the finding of the Department of Justice. The TVPA's definition of coercion is:

(A) threats of serious harm to or physical restraint against any person;

(B) any scheme, plan, or pattern intended to cause a person to believe that failure to

perform an act would result in serious harm to or physical restraint against any person; or

(C) the abuse or threatened abuse of the legal process.

Signal has been cleared of alleged violations of 8 U.S.C. § 1324b (Unfair immigration-

related employment practices) by the Office of Special Counsel, Unfair Immigrated-

related practices of the Civil Rights Division of the Department of Justice on March 14,

2008.[21] Provision 5 of 8 U.S. Code § 1324b states: (5) **Prohibition of intimidation or**

**retaliation**

"It is also an unfair immigration-related employment practice for a person or other entity

to intimidate, threaten, coerce, or retaliate against any individual for the purpose of

---

[19] Victims of Trafficking and Violence Protection Act, 2000, October 28, 2000,
http://www.state.gov/j/tip/laws/61124.htm.
[20] OP. cit. note 16, paragraph 18 noting that the workers at Signal had made about
$75,000 during their period of employment.
[21] Letter from Patrick Shen, Deputy Special Counsel, Office of Special Counsel, Unfair
Immigrated-related practices of the Civil Rights Division of the Department of Justice on
March 14, 2008.

interfering with any right or privilege secured under this section or because the individual intends to file or has filed a charge or a complaint, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this section. An individual so intimidated, threatened, coerced, or retaliated against shall be considered, for purposes of subsections (d) and (g) of this section, to have been discriminated against."[22]

17. Signal did not threaten its workers with physical harm or restraint. Rather, as will be discussed subsequently it worked hard to provide its workers a safe environment in a dangerous industry. People were not coerced to perform an act, especially if they were not qualified to do this.[23] There are strong indications that some individuals engaged in fraud in India by having other persons take the skills test for them as indicated by the fact that the Signal skills tester did not recognize them on their arrival in the US, and their failure to be able to perform the needed skills. But despite the arrival of unqualified workers, Signal did not coerce any workers to perform functions that they were not equipped to do.  Nor did Signal abuse or threaten to abuse the legal process.

18. The Signal situation differs significantly from the situation just previously described and the conditions identified both by Southern Poverty Law Center and the Advancement Project report which Saket Soni co-authored on human trafficking in New Orleans.

---

[22] http://www.law.cornell.edu/uscode/text/8/1324b.
[23] Judge Zainey's opinion on. 33 refers to the fact that after the initial workers arrived, others who less qualified came as the recruiter gave preference to those paying higher recruiting fees.

19. The Signal case also differs significantly in terms of the treatment of the workers in the John Pickle Co. case, a federal case involving Indian workers that will be discussed subsequently, that is cited by the plaintiffs as a precedent for this case.

20. Moreover, the Signal situation differs from the US definition of human trafficking, as defined by the Trafficking Victims Protection Act, the prevailing federal law.

21. Independent government investigations by the Texas government and researchers of the Department of Justice determined the Signal case did not involve trafficking.   The Bureau of Justice Statistics 2011 report on "Characteristics of Human Trafficking, 2008-2011," analyzes individual trafficking case data from throughout the United States to provide its conclusions. This federal government report, by providing data on different categories of victims, clearly excludes the numerous plaintiffs of the Signal case in their categorization of human trafficking. The Bureau of the Justice Statistics, the in-house statistical research arm of the U.S. Justice Department, relied on data provided by human trafficking task forces throughout the country.[24] The Texas Task force on human trafficking, according to their report to the 2009 Texas state legislature, started supplying data to the federal authorities on January 2008, before the Signal case was filed. The Task Force report reveals that they actively pursued trafficking cases in Beaumont, Texas close to Orange, Texas where the Signal workers were employed.[25] Therefore, the Texas State

---

[24] Duren Banks and Tracey Kyckelhahn, "Characteristics of Suspected Human Trafficking Incidents, 2008-2010, Bureau of Justice Statistics, April 2011, 6, table 5,  http://www.bjs.gov/content/pub/pdf/cshti0810.pdf.

[25] Office of the Attorney General, The Texas Response to Human Trafficking,  Report to the 81st Legislature, 2009,  p.11, https://www.texasattorneygeneral.gov/AG_Publications/pdfs/human_trafficking_2008.pdf. Note that detectives in Beaumont were working on a sex trafficking case, p.20. Some of the workers in the Louisiana case previously worked in Texas.

Task Force Report reveals that law enforcement authorities were working on trafficking in the region of Orange, Texas and both the Texas Task Force and the Bureau of Justice Statistics determined that the Signal case was not trafficking, as it is not included either in the Texas State trafficking report or in the BJS Report.

22. Data in Table 5 of the Bureau of Justice Statistics Report shows that in the entire United States during this period, there were only 9 Asians identified nationally as victims of labor trafficking, and only 2 victims who were temporary workers, the classification for H2B visas. (See Table 5, Appendix III.) Because many more than two individuals at the Orange, Texas facility asserted that they were victims of human trafficking, it is clear that the state and federal authorities, after examination of the Signal case, excluded this data from their national assessment of labor trafficking.

23. There are some unidentified workers who are identified by Malvern Burnett in his deposition that were "leadermen" who did not pay the fees, a decision made by Mr. Dewan which resulted in absence of payments to Burnett and Pol. These individuals who incurred no debt had language fluency and years of experience.[26]

24.The leadermen may be different from those designated as leaders by Saket Soni among  Indian employees at Signal. As Saket Soni explains in the Freedom from Fear awards, his desire to mobilize H-2B guest workers in the South led him to designate organizers among the ranks of the H-2B visitors program.[27] This was part of a program he had announced previously to mobilize workers for a new labor movement.

---

[26] Deposition of Malvern C. Burnett, July 29, 2014, 137-41 of day 1 and 84-85 and 182-84 from the second day.

[27] http://freedomfromfearaward.com/tag/saket-soni.

25.  I will now turn to the expert witness report of Florence Burke.  Her analysis of the
situation of Indian overseas workers does not reflect the contemporary reality of the
Indian economy nor an in-depth understanding of the situation that Indian migrant
workers face when they travel to other parts of the world.

Ms. Burke wrote on p. 27 "The decision to leave family members at home is not an easy
one, but Plaintiffs came to the United States prepared to work hard, do well and make a
better life for themselves and their families." Most of the workers had been guest workers
previously, 19% of them were already living in Dubai. The majority of workers at Signal
were from Kerala, which has three million working overseas, and leads the country in the
amount of foreign remittances sent home.[28] The decision to go abroad is not an easy one
but is presently a condition of millions of migrant workers in the world, and is not to be
equated with the legal definition of trafficking or the conditions of trafficking that Ms.
Burke describes. It is, unfortunately a reality of life and especially in India, that is now
the largest recipient of remittances in the world from Indians who go overseas to work.[29]
The salaries that Indian workers make in the Persian Gulf are much less than in the US,
and the hours they work are much longer in less safe conditions.  A recently released
report from Amnesty International discussed the plight of 500,000 Keralites working in
Saudi Arabia, "Many workers complained that they were forced to work 15 to 18 hours a
day without a day off. The majority of them do not get their salaries, and some of them

---

[28] "Migrant Workers Changing the Face of Kerala," February 28, 2013,
http://www.ucanindia.in/news/migrant-workers-changing-the-face-of-kerala/20406/daily.
[29] India, according to the latest World Bank data is the largest recipient of  remittances,
http://siteresources.worldbank.org/INTPROSPECTS/Resources/334934-
1199807908806/Top10.pdf.

were not paid for several months by their employers in Saudi Arabia." [30] In Saudi Arabia, guest workers like all foreigners, are denied the practice of any religion outside of Islam.[31] There, as elsewhere in the Gulf, region they reside in sub-standard housing and lack medical insurance.[32] In the absence of Indian oversight of labor recruiters, many Indians incurred significant debts to work overseas that they could never pay off.

26. Ms. Burke on p.15 identifies the following features of human trafficking:

a)  High recruitment fees and deceptive practices that induce the individuals to incur significant debt or sell major assets;

b) Confusion, lack of time, absence of interpreters at the time of recruitment and other recruitment circumstances which make it difficult for recruited individuals to ask questions and ensure they understand documents they are signing

---

[30] "Indian migrant workers from Kerala face chronic rights abuses abroad Amnesty International India report cites physical abuse and deception by agents recruiting for jobs in Saudi Arabia," July 4, 2014
 http://www.ucanews.com/news/indian-migrant-workers-from-kerala-face-chronic-rights-abuses-abroad/71343.
[31] Nina Shea, "Obama and the Churches of Saudi Arabia,"
http://www.christianpost.com/news/obama-and-the-churches-of-saudi-arabia-116526/,
March 21, 2014, Annual Report US Commission of Religious Freedom,
http://www.uscirf.gov/sites/default/files/USCIRF%202014%20Annual%20Report%20PDF.pdf that discusses designation of Saudi Arabia as a country of particular concern. Note that Joseph Jacob Kadakkarappally who worked as a pipe fitter from 1996 to 2003 in Saudi Arabia where he could not practice his faith complains in the supplement to his complaint that Signal did not provide transport to the Catholic Church,  a mile and a half from Signal, a point that will be discussed in more detail subsequently in reference to the problems with the t-visa application.
[32] David Batty, "Conditions for Abu Dhabi's migrant workers 'shame the west'",
December 21, 2013, http://www.theguardian.com/world/2013/dec/22/abu-dhabi-migrant-workers-conditions-shame-west; Lisa Allen, "Dark side of the Dubai dream," April 6, 2009, http://news.bbc.co.uk/2/hi/uk_news/magazine/7985361.stm.

c) Immigration status that depends on the employer, and employer and recruiter promises
and/or threats regarding immigration status

d) Misleading or deceptive statements

e) Employer provided, substandard room and board

f) High employer deductions from wages

g) Different work duties and responsibilities than described during the recruitment stage

h) Different wages than described during the recruitment stage

i) Surveillance

j) Geographic Isolation

k) Public demonstration of power; and

l) Unequal treatment, especially based on race and/or national origin, including
comments/harassment, segregated housing, and other verbal and non-verbal assaults on
personal dignity

Responses to the points above:

27. Point a)  **Recruitment practices** response to pp. 14-16, paragraphs 33  and 34

The recruiter in India and his partners Michael Pol, Global Resources, and Malvern C.
Burnett might have engaged in deceptive promises, but as the chronology presented by
the plaintiffs in the third amended complaint,[33] Signal was not part of any deceptive
promises. This is also affirmed in the Indian case concerning who deceived the Indian
workers.

---

[33] Third Amended Complaint, Exhibit 1, Specific Fraud Allegations Related to
Named Plaintiffs ("RICO Fraud Chart"), filed 9/21/12.

18

As the Indian court wrote in its opinion,

> Learned Additional Solicitor General submits that even as per the writ
> petition Signal had required skilled foreign workers on temporary and
> permanent employment visas. Nowhere had Signal promised Green Card
> to prospective Emigrants which the petitioner had offered in his
> advertisements. This according to the respondent is a willful act of
> misleading the prospective workers in order to extract huge sums of
> money from the poor prospective emigrants who would not be aware of
> the fact that Green Card can only be granted by the US Government. The
> workers have been made to pay between Rs.6.00 lakhs and above to the
> petitioner for processing their recruitment and Green Card. Copy of the
> advertisement published by the petitioner has been placed on record. [34]

Therefore, the high-ranking Indian government official for Delhi, additional solicitor

general, responsible for defending the suspension of Sachin Dewan's license does not

find Signal responsible for any deceptive recruiting practices but instead places the

responsibility on the Indian recruiter and his American accomplices, Malvern Burnett and

Michael Pol. [35]

 The presence of Signal personnel in India was merely to test the skills of future

employees.  However, as Ms. Burke says, "The promise by Signal of applying for green

cards for Plaintiffs was uppermost in the workers' mind."

Signal did not promise the workers green cards, nor did they learn that this promise had

been made by the recruiters until after the workers arrived at Signal facilities. Burke

---

[34] Op. cit. note 16,  22 para. 46.
[35] Ibid, 33, para 67 as the Indian investigation of the recruiter by Indian authorities in the
United States revealed, "The reply of the recruiting agent has been received. Preliminary
reports from the CHI, Houston have also been received. It is observed that the workers
were sent on „guest worker visa." This amounts to cheating of innocent emigrants.
Further the question of payment of huge amounts by the workers have not been explained
by the recruiting agent. The matter is under consideration in consultation with the
Embassy of India, Washington/CGI, Houston."

continues "It became clear that Signal had no intention of attempting to obtain green cards for Plaintiffs." H2B visas do not convert into green cards and therefore, legally, Signal could not seek to obtain green cards for H2B workers as the Indian court recognizes correctly. It cites the view expressed by Sachin Dewan's defense attorney, Mukul Rohatgi, appointed as Attorney General of India in June 2014 for three years. [36]

> Based on the recruitment, the workers were provided gainful employment at Signal's shipyards. The workers have made substantial amounts of money, since their emigration to the USA, and the workers continued to work with Signal as they have got extension visas and the process for their permanent visas has also been commenced. Thus, none of the workers were either misled or cheated and that only some of the workers have raised false complaints for *mala fide* reasons. [37]

28. Issues raised by statements in the T-visa applications might confirm some of these assertions by the present Attorney General of India as to the false complaints of the workers. These are the problems that I have identified with the T-visa applications of the initial five H-2B workers whose cases will be heard. Kurian David; Sony Vasudevan Sulekha; Palanyandi Thangaman; Hemant Khuttan and Jacob Joseph Kaddakkarappally.

Jacob Joseph Kaddakkarappally, as I discuss further in my expert witness statement, states in his U-visa application that " This is the first time in my life that I have to experience a situation like this. I worked for ten years in Saudi Arabia but I never had to deal with these issues." Saudi Arabia has a notorious record of abusing Keralite workers, and denies the practice of worship to non-Moslems. Yet Mr. Kaddakkarappally is a

---

[36] "Senior advocate Mukul Rohatgi is new attorney general," *Times of India*, June 12, 2014, http://timesofindia.indiatimes.com/india/Senior-advocate-Mukul-Rohatgi-is-new-attorney-general/articleshow/36440670.cms.
[37] Op. cit., note 16, 17, paragraph 35.

religious Christian who seeks to practice his faith as is shown on his Facebook page in his church. Furthermore, he was a client of Dewan Consultants before Signal ever entered into the picture.

**Kurian David's** T-visa application is full of incorrect statements. On p.42 he says that he was restricted in coming or going from the camp. This is not true, as the workers had freedom of movement. He discussed not being given the choice of another bank. This is not a sign of trafficking as he was being given a chance to open an account at Capitol One, a reputable bank, even before he had a social security number. This special arrangement represents an effort by Signal to protect his funds.

In p.44 he says workers were not given 70 hours work, as promised by Sachin Dewan. This is deception by the recruiter but not by Signal. But workers had 40 hours of employment, which is a regular work week which Signal provided.

Point 46 indicates that with rain-out days, workers could not cover the costs of the housing and the debt he incurred to pay the recruiter to come to the United States. When there were rain-out days, Signal reduced the cost of the housing of the workers so they would not be charged, which is not stated here. In fact, Mr. David says the contrary.

In Point 48, Mr. David mentioned the need to pass through security and show his badge. This applies to all the employees at Signal, and I also had to go through security when I visited the facility. This is not surveillance, but standard security procedure where expensive or dangerous equipment is used.

In Point 52, Mr. David says that there was no safety equipment for the workers. This is not a true statement. This is a dangerous industry and, as I have written in my report, Signal has one of the best safety records in the industry, and this was not affected by the

arrival of the Indians. When he says no Americans had this work, this is also untrue, since there were mixed brigades doing the same job. The Department of Justice did not find discrimination.

In Point 57 the discussion of what happened in Mississippi is all based on hearsay and not what happened to him.

In Point 58 he states that he made almost the same money in Abu Dhabi as he did at Signal. In Abu Dhabi, the top pay is about $1000 a month. At Signal, even at 40 hours of work a week, he would be earning about $3200 a month.

As he complains about Sachin Dewan in India, why did he not file a formal complaint in India against him, with the help of his American lawyers?


**Hemant Khuttan**'s declaration raises many questions as to its veracity and the validity of his complaints.

Para. 31 There were only 28 washing machines for 450 people and many people could not wash their clothes. This amount of washing machines is many more than you would have in a large housing complex in the United States.  Furthermore, a free laundry service was set up after concerns were expressed by employees to Signal to ensure that clothes were washed.

Para. 34 I spoke to Americans who earned $2-3 more an hour. The Indian employees were paid the same as Signal employees. Many Signal employees have worked there for a long time and have higher pay for longevity of service.

Para. 39 Khuttan complains about his pay reduction but it is not clear that he has done welding work previously. I saw a photo of Khuttan's welding test as compared to those of

22

others and he was clearly an individual with inadequate or an absence of welding

experience previously. This is not surprising since he did not come from a working class

background but is the son of a high-level police official and stated in his deposition that

he is a graduate in history of the University of Delhi.

Para. 55 Khuttan says he paid $30 to a doctor to get a note saying that he needed a day

off. This is not an excellent work ethic.

Para. 63 Khuttan talks about the debt he has incurred. "I will lose my home, my future

and my family because of my debt." Yet his wedding picture on Facebook a few years

after this reveals that his wife is draped in diamonds and he has had a very expensive

wedding. In India, in which marriages are arranged between families, a woman from a

family of his social level would not accept him in marriage if he were in debt and could

not face his family.


**Sony Vadusevan-Sulekha**'s statement also has problems. In point 12 he states that after

going to a recruiting seminar of Sachin Dewan's company: "I went to an Internet café

and looked up Signal's website. I saw pictures of the website and the accommodation

facilities, which were shown as double rooms with washing machines, refrigerators and

microwave ovens in each room." He then says that when he saw the picture he knew he

would be able to settle with his family in the United States.

But the problem with this statement is that Signal never had any pictures of housing or

residential facilities on its website. This is a fantasy not a reality.

In point 52, he comments that at their residence they were surrounded by a high fence

with barbed wire. However, only the Signal work facility had barbed wire, and there was

Case 2:15-cv-02296-SM-DEK   Document 72-5   Filed 01/15/15   Page 25 of 49
Case 1:13-cv-00499-MAC-ZJH   Document 92-3   Filed 01/15/15   Page 25 of 49   PageID #:
1820

no barbed wire around the residential facility.

In point 53, he comments that they were warned that if they left the residential quarters
alone, they might be shot. Considering the high rate of violent crime in the region, this is
sound advice rather than a threat indicating trafficking.

**Palyandi Thangaman**—Apart from his personalized statement on his debt, his
statements on housing and food follow the formula presented in other affadavits. Point 43
states that he has worries that Signal would send the police or immigration after him.
There is no reason to explain why he has these fears and why they might be legitimate.

The discrepancies are even greater in the non-sworn statements given in Dan Rather's
television interview.

As Dan Rather, drawing on Khuttan's statements states, "Hemant Khuttan led a modest
but comfortable life in India. His father was a government worker, but Khuttan chose a
career in welding-a job he was good at." Khuttan has identified his father as an assistant
police commissioner in Delhi in his statements and he writes that he had his own
bedroom and bath in his class action declaration. As he states on Dan Rather, "I used to
have my own bike, I used to have my own car. I sold all these things to come here. I got
my own room to sleep. Nobody shared that room, even not my brother shared that room
with me. So in that condition I used to live there. And now in what condition I live here?"
His is not a modest life in India, but is evidence of a privileged life, with significant
financial resources. Examining his Facebook page reveals that he clearly comes from an
upper middle class family, consistent with his father's status as a high police official in

24

Delhi

In Dan Rather, he states "How I can face my family, my brother? By making them worse [than] before. I can't even think about that. I have to work there to get that money." But on his Facebook page, there are pictures of him visiting his brother's family in Milwaukee.

29. Point b) **Confusion, lack of time** not discussed by Ms. Burke

The majority of the analysis in para. 34 refers to Sachin Dewan and his recruitment practices and does not address the points concerning confusion. The expert opinion refers to Sachin Dewan and his associates in the United States as Signal's lawyers. There is no mention of the presence of these recruitment practices in 2004 by Dewan, Pol and Burnett**,** well before Signal was involved. Judge Zainey's opinion in denying class certification refers to this activity of the other defendants as Phase I that laid the groundwork for the developments that followed. Many of the H2B workers who came to Signal were recruited by Dewan Consultants for work in other locales and paid their recruitment fees to Dewan and his American associates before 2006 when Signal was offered Indian workers by the American associates of Dewan.

30. Point c) **Employer Control and Promise Regarding Immigration Status**, para. 34

The analysis provided in this point is different from the features of trafficking outlined on p. 12. in point c, in which the issue of  the immigration status depends on the employer

25

and employer and recruiter promises. I will discuss this typical characteristic of trafficking in reference to this case as the expert witness statement of Ms. Burke does not. The H2B program, which the workers entered on, does not provide for immigration and the plaintiffs went to their interviews at the embassy stating that they were applying for short-term employment. Therefore, there was no promise from the US government or Signal that they would get immigration status through this employment. The discussion in paragraph 34 about the promised green card is relevant to questions of deception but not to the attribute of trafficking that is raised in point c. The same point is made in the Indian court opinion.

31. Point d)  **Misleading or Deceptive Statements** response p.17 para 36

There might have been misleading or deceptive statement from the recruiter but not from Signal. As paragraph 46 of the Indian opinion suggests, Dewan Consultants were engaged in deceptive practices.[38] Signal interviewed for welders and pipe fitters, provided employment, met pay criteria and employment benefits in the contract, as well as the stipulation for deduction for housing and food. Signal did apply for Green Cards for all the H2B workers employed there at the end of the program, although they had to return home, under the conditions of US law, in order to receive them.

32. Point e) **Employer-provided substandard room and board** p. 18 (point 37 and 38)

---

[38] Op. cit. note 16, 22 , para.46.

"The H-2B working visa is a nonimmigrant visa which allows foreign nationals to enter into the U.S. temporarily and engage in nonagricultural employment which is seasonal, intermittent, a peak load need, or a one-time occurrence." [39]

The ability to arrange for a large number of H-2B visas was a consequence of the vast devastation post-Hurricane Katrina in which so much of the Gulf region housing was destroyed or made inaccessible. Therefore, Americans in the region did not have good housing and the temporary housing that was accessible only to American citizens through FEMA had serious problems and was sub-standard.[40]

The competition for housing in this region with so much destroyed housing was fierce. The workers, without provision of housing, could not compete for housing in the regional market as they did not have a credit history, had a nine month visa as H2B workers and could not sign a year long lease. They were not competitive renters in a limited housing market. Not having vehicles or driver's licenses that would allow them to drive, without the provision of housing close to work they could not be sure of getting to work at needed hours. The region around Pascagoula, as will be discussed subsequently, was a dangerous environment with very high crime rates.

In contrast, Signal tried to buy better quality trailers for housing that exceeded the quality used by other employers in the area. I have had a chance to see the trailers that were used in Texas and are now located in Pascagoula, Mississippi and to watch a video that was

---

[39] Website of U.S. Citizen and Immigration Service on H-2B visas, http://www.uscis.gov/working-united-states/temporary-workers/h-2b-non-agricultural-workers/h-2b-temporary-non-agricultural-workers.

[40] Bruce Watson, The Horrible Odyssey of Fema's Hurricane Katrina Trailers," August 28, 2010, http://www.dailyfinance.com/2010/08/28/the-awful-odyssey-of-femas-hurricane-katrina-trailers/.

made before the facilities were closed. These comments are informed by this direct
observation.

Signal rejected the use of temporary facilities that were used by other companies as being
inferior and inadequate for the workers at Signal. They went for higher-end trailers than
were used by other companies to house their guest workers and bought the modular units
from GE. When Bob Marler, the CEO, saw the occupancy density when the camps were
first set up, he ordered more trailers to reduce crowding.

Signal was exempt from OSHA standards for the housing of its H2B workers but,
nonetheless, tried to comply because it wanted to meet an established standard. This
housing was cleaned by a cleaning crew daily.

The food was provided by a caterer who runs a well-rated restaurant in New Orleans. I
was able to eat some of the dishes that were served and to discuss with the caterer the
challenges of serving food to Indians from many different regions and ethnic groups.
There were both Moslems and Hindus in the work camps, meaning that pork and beef
could not be used. Requests from workers for goat and lamb, expensive and not easy to
obtain items in the region, led to their addition to the menus a few times a month to
provide more variety. With workers from North and South India with distinctly different
cuisines, a compromise in the spiciness of the food was sought. As one Indian worker at
Signal explained, he did not like the food because it was not as spicy as he was used to.
But the food was adequate in quantity and was nutritional, with fresh fruit and needed
food groups represented, according to the menus.

On, p.18, paragraph 37 Ms. Burke comments that, "Plaintiffs reported to this Expert how
the conditions were much worse than what Plaintiffs expected and what they had been

accustomed to in their home countries and even in their experiences as guestworkers in other countries." Knowing the housing that guest workers are provided in the Gulf and Saudi Arabia and having seen the facilities for the Signal workers as well as videos of what they looked like in the mid-2000s, this represents a deliberate misrepresentation of the conditions that they had experienced previously overseas.

33. Point f **High employer deductions from wages** p.19 (paragraph 39)

The deduction of $1050 a month from Signal employees **was not** a source of profit for the company, rather, they did not even recoup the costs of the investment that Signal had made, an investment of $4.7 million to acquire the man camps. $15 a day for catered food in unlimited quantity is not excessive, nor is $20 daily for housing in an area in which there is not available housing, and there is an environment of scarcity. The average American pays 34% of their gross salary for housing and 13% for food and a minimum of 10% for transport.[41] If the wage earned is $18 an hour, then the housing and food price is approximately $260 a week out of a weekly paycheck of $720 (with no overtime) or 36% of their paycheck going for housing, food, transport, internet service and cable tv. In contrast, in Jackson Country where Pascagoula is located, renters were spending 31% of their income for housing alone.[42] This is well below the budget percentage that Americans would be paying out of their income for these goods and services, which would total 59% of their income. Housing prices for non-citizens were necessarily higher,

---

[41] http://budgeting.thenest.com/typical-percentages-household-budgets-3299.html.
[42] Kevin F. McCarthy, Mark Hanson, *Post-Katrina Recovery of the Housing Market Along the Mississippi Gulf Coast*, Rand Gulf States Policy Institute, 2008, 8.

29

Case 2:15-cv-02296-SM-DEK Document 72-5 Filed 01/15/15 Page 31 of 49
Case 1:13-cv-00499-MAC-ZJH Document 92-3 Filed 01/15/15 Page 31 of 49 PageID #:
1826

as the Indians were non-citizens and were not eligible for FEMA housing, nor could they

obtain housing in the competitive market for the limited existing housing supply post-

Katrina without a credit history in the United States. With only a nine month visa, Indian

workers did not have the possibility to sign a rental agreement for one year.

> As a Rand report states on housing in the region post-Katrina, the situation
> was difficult even before the hurricane. Finally, the very tight market for
> affordable housing pre-Katrina, the loss of a significant portion of the
> rental stock, a 20 percent increase in rents, and a substantial drop in
> employment, have created a very tight market for those households that
> the storm displaced. This problem is particularly acute in the affordable-
> rental sector. Alleviating this problem is important not just to the recovery
> of the housing market but also to economic recovery more generally.[43]

34. Point G not addressed by Ms. Burke **Different Work Duties and Responsibilities**

**than Described during the Recruitment Stage**

The workers at Signal performed the jobs that they were recruited for, and performed

these tasks if they had the skill sets required. As was previously mentioned, some of the

workers were not recognized by the testers on their arrival at Signal and were

subsequently found to lack the needed skill sets. This suggests that some of the H2B

workers hired someone to take the tests for them. They could not perform the job

contracted for, and so Signal chose to set up training for these H2B workers, at

considerable cost to the company, to provide them with useful work skills.

35. Point H not addressed by Ms. Burke **Different wages than described during the**

**recruitment stage**

The only workers who received less than the promised wage were those who were unable

to perform the expected work at the needed quality level. Based on my analysis of salary

---

[43] McCarthy and Hanson, xiii.

levels supplied by Signal, this represented approximately 8.5 percent of the work force.
As mentioned in the previous point, training was provided to workers, and some of them
managed after training to get better-paid positions commensurate with their new skill
level after training, but they did not get the wages of workers with long-term experience.
Signal made an effort to accommodate all the workers who arrived and provide them
employment even when they did not have the skills needed by the company.

36. Point I **Surveillance** pp.19-20 (response to para. 40)

Signal facilities maintain security services as workers are working on expensive rig
equipment that needs to be protected. There is security at Signal for all employees, and
not just for H2B workers. In light of the very high crime rates in Pascagoula, a level of
security was necessary at the camp to protect the workers and the equipment. In the US
as a whole in 2006, there were 1,418,000 violent crimes for a population of almost 300
million and almost 10 million property crimes. This means that there were there were
about 211, violent crimes per 100,000 population and one in thirty Americans were
victims of property crime annually.  In 2007, the number of crimes nationally was
slightly less for a few million more population. [44]  In 2006, in Pascagoula there were 116
violent crimes for a population of 25,082 or a rate of of over 450 per 100,000 (more than
double the national average) and there were 2236 property crimes or almost one in ten
residents of Pacagoula were victimized each year (triple the national average). In the next
town of Moss Point there were 105 violent crimes for 15,070  people (or over 6.5 times
the national average)  and 1350 property crimes (or  almost triple the national average) .
In 2007, there were also high figures with 122 violent crimes in Pascagoula and 77 in

---

[44] http://www.disastercenter.com/crime/uscrime.htm

Moss Point and 1701 property crimes in Pascagoula and 1036 in Moss Point. There was a need for security as these crimes were not ones of intrafamilial crime such as homicides but acts that were more likely to involve strangers.

In the Pascagoula facility of Signal, my interviews with personnel indicated that they felt that the security personnel were overbearing. This negative impression of Signal's security was not confined to the Indian H2-B workers but was a more endemic problem that I discovered during my interviews with Signal staff at Pascagoula.

Burke comments "Signal was watching them and could report to law enforcement officials if they left Signal for good." Signal not only could but was required under American law to report if the workers had left their employ, as the H2B workers were no longer in compliance with the terms of their visa.

37. Point J **Geographic Isolation** p.21 (Para. 42)

Ms. Burke writes, "The Texas camps were located in an East Texas town with limited community resources for recent arrivals from India." Orange, Texas, the most Eastern town in Texas has under 20,000 inhabitants and has limited resources for everyone. This was especially true after Hurricane Rita struck Orange, Texas in September 2005, devastating the region.[45] In most labor trafficking cases where there is a concern about geographic isolation, there are problems on remote farms and forest sites, where workers cannot have access to the outside world. The workers in East Texas were accommodated close to their work, which is the standard practice in the oil rig industry. East Texas is not Dubai where there are hundreds of thousands of guest workers from India and many

---

[45] http://www.beaumontenterprise.com/photos/article/Hurricane-Rita-Eight-years-ago-today-4836744.php

services catering to Indians. The residence of the workers was not an intentional decision
to isolate the workers, but rather a consequence of the locality where they would work
and the absence of much needed infrastructure post-Rita.[46]

38. Point K  Public Demonstration of Power, pp. 20-21 (para. 41)

Public display of power is not identified as a criteria of trafficking. Kevin Bales, in his
testimony in the Chellen vs. John Pickle Co. case, which the plaintiffs identified as a
precedent for this case, stated that the controls identified with trafficking were consistent
threats of deportation, confiscation of men's passports, immigration permits and plane
tickets, tapping of their phones, monitoring of their email.[47]  The Signal employees were
not threatened repeatedly with deportation, nor were their documents taken nor were their
communications monitored.

Mr. Kadakkarappally and Sabulal Vijayan are mentioned as being subject to deportation,
according to Ms. Burke, because they objected to the conditions at the man camp. Signal
did not seek to dismiss these two men for their comments but for the fact that their
comments agitated the workers undermining their work performance. Mr.
Kadakkarappally's statements in his U-visa affadavit reflect the problems of  veracity of
his statements. In this affadavit he states, "This is the first time in my life I have been in a
situation like this. I worked for ten years in Saudi Arabia but I never had to deal with
these issues." As Human Rights Watch wrote in 2004  just after Mr. Kadakkarappally's

---

[46] Jennifer Turnham, Jonathan Spader, Jill Khadduri  and Meryl Finkel,  **"**Housing
Recovery on the Gulf Coast Phase I: Results of Windshield Observations
In Louisiana, Mississippi, and Texas," December 2010,
http://www.huduser.org/Publications/pdf/Housing_Recovery_in_the_Gulf_Coast_Phase
I_v2.pdf.
[47] Bowe, p.137.

departure from Saudi Arabia, on migrant worker. "They often face exploitative working conditions, including twelve- to sixteen-hour workdays, often without breaks or access to food and drink, lack of pay for months at a time, and confinement to locked dormitories during their time off."[48] I know very well the high level US State Department officials who were responsible for the human rights and religious reports on Saudi Arabia at this time.  There was no possibility of religious expression for Mr. Kadakkarappally during his long residence in Saudi Arabia and he faced horrific punishments if he chose to exercise his faith. Moreover, there was absolutely no possibility of expressing any discontent with any aspect of his work or living conditions that are uniformly bad for all guest workers.

39. Point l **Discriminatory treatment, especially based on race and/or national origin** , pp., 21-22  (para. 43)

As previously mentioned, Signal was cleared of alleged violations of 8 U.S.C. § 1324b (Unfair immigration-related employment practices) by the Office of Special Counsel, Unfair Immigrated-related practices of the Civil Rights Division of the Department of Justice on March 14, 2008.

Signal made a significant effort to ensure good relations between the American and Indian workers. The American workers were informed by letter at the time of the Indian workers' arrival of the need for workers and the expectation that they would treat them with respect, the H2B workers worked on the rigs in mixed crews with American and contract wage employees.

---

[48] http://www.hrw.org/world-report-2005/saudi-arabia, Human Rights Watch. The country, as previously mentioned is a Country of Particular Concern because of its absence of religious freedom according to the US State Department.

They were included in the Family Day for Signal employees, cricket equipment was bought at significant expense so they could play a game central to their culture, and they even won raffle prizes such as televisions at Family Day.

40. There are many attributes of labor trafficking that are not included in the list prepared by Ms. Burke.

The following criteria are not included in Ms. Burke's list and have been identified as central to labor trafficking. Kevin Bales' refers to people who labor under the most exploitative conditions as "disposable people."[49] They suffer from the following as a result of labor trafficking: 1) they become emaciated, 2) work in dangerous work conditions, 3) have high rates of accidents, 4) absence of attention to their health needs.

41. **Weight:** The Signal employees did not become emaciated even though they complained about the food. Photographs of the employees show that many gained weight between the time they arrived and the photographs that were taken on family day.[50]

42. **Dangerous Work Conditions**: The shipbuilding industry is inherently dangerous, but Signal has one of the best, if not the best, safety record in the shipping industry. (see Appendix II)

43. **Rate of Accidents:** Examining Slides 1, 2 and 3 on Signal's safety performance reveals that it has an extremely low rate of accidents. Examining the data for the years,

---

[49] Kevin Bales, *Disposable People: New Slavery in the Global Economy* (Berkeley and Los Angeles: University of California Press, 1999).

[50] Only one plaintiff, Hemant Khuttan lost considerable weight during his work period at Signal. He is an individual of high social status in India. His father was a high official in the Delhi police and he was a graduate in history from the University of Delhi. His welding test was of someone who was not an experienced welder. Therefore, only Mr. Khutan who came from a very privileged background in India and not accustomed to physical labor lost weight.

2006 to 2008 when the Indian H2B workers were present, there was no increase in
accidents, rather the low rate of accidents was maintained. Considering that many of the
Signal employees had limited English, the company went to extraordinary lengths to
retain its safety record. Signs were translated and posted in Hindi and efforts were made
to ensure the continuation of established safety practices. During the time the Indian
workers were present, Signal International had an OSHA accident rate of .6 in 2007
and .67 in 2008  when the industry average is about 6.8  in other words, Signal had one-
tenth the accident rate of its competitors.  Signal received the Excellence in Safety Award
in 2009 for the sixth time in recognition of its superior performance relative to the other
43 companies and 100 shipyards that are operational in the United States.[51]

44. **Safety Issues:** Many Signal Indian H2B employees received hourly bonuses for their
adherence to safety norms and their safe performance. The H2B were working in the gold
standard of shipyard safety, the opposite  of the work environment of trafficked
employees.

### 45. Absence of Attention to their Health

Signal's attention to the health of its workers is not consistent with traffickers. Rather, the
H2B workers, as direct employees of Signal, had medical insurance, an attribute not
shared with many American workers in Texas and Mississippi who lack employer-paid
benefits, which is especially the case with blue-collar workers.

Signal provided all its Indian workers with medical insurance, invited them to fairs
concerning health benefits (according to internal corporate emails) and transported them

---

[51] Shipbuilders Council of America announcements. See criteria for the award and
Signal's further recognition in 2012 at https://shipbuilders.org/sca-announces-2012-
safety-awards.

to doctors, and provided translators and transport for these medical visits to ensure that the workers stayed healthy or were even treated for very serious illnesses such as cancer. In 2007, only 53.9 percent of blue collar Americans had medical insurance from their employers (see Table 3 in Appendix IV). The rates of insurance were especially low for employees in the construction sector as only 44.1 percent of American construction workers in 2007 had health insurance.

At the time that Signal's H2B workers were receiving insurance, they were working in the states of Mississippi and Texas where employers post-2000 were less likely to provide medical insurance to their workers. In 2001, the starting point for the analysis, only 60 percent of employers in Mississippi and Texas provided health benefits to their workers. This figure declined annually in these states post-2000. Therefore the H2Bworkers at Signal were provided medical insurance that at least 40 percent of American employees in these two states were not receiving.[52]

46. The access to medical insurance by the H2B workers contrasts sharply with the environments where they came from. The UAE is only now in 2014 requiring that employers provide health insurance, and it is only being phased in at the present time.[53] In India, in 2003-4, shortly before the Indian workers arrived in the US, only 55 million Indians had health insurance and only now are one-quarter of Indians covered.[54]

---

[52] Elise Gould, "Employer Sponsored Health Insurance Coverage Continues to Decline in the New Decade," Briefing Paper 353, December 5, 2012, http://www.epi.org/publication/bp353-employer-sponsored-health-insurance-coverage/
[53] http://www.thenational.ae/uae/health/dubais-mandatory-health-insurance-law-comes-into-force#ixzz38D6NcBTV.
[54] The World Bank, "Government -Sponsored Health Insurance in India: Are You Covered?," August 26, 2012, http://documents.worldbank.org/curated/en/2012/08/16653451/government-sponsored-health-insurance-india-covered.

Therefore, their situation at Signal was significantly different from what they had known in India or in their work abroad.

47. The U.S. State Department Trafficking in Persons Report for 2012 identifies Common Methods of Control of Victims by Human Traffickers. They are divided into the following three categories: Restriction of Movement, Harmful Living Conditions and Harmful Working Conditions[55].

48. The restrictions of mobility identified by the U.S. State Department are not present. These restrictions are listed as follows: 1) confiscating passports, visas and/ or identification documents 2) Constantly accompanying the victims, insisting on answering questions on behalf of the victim, and or translating all conversations 3) Isolating the victim by not disclosing his or her location or address 4) Requiring the victim to live and work in the same location.

49. The Indian H2B workers did not have their passports or visas confiscated, rather Signal employees went to great effort to ensure that their I-94 forms were in order even it meant driving them significant distances. The victims were not constantly accompanied, and translation was usually provided by another H2B visa worker. Signal had a bus service and provided transport to the workers 24/7; many of them both legally and illegally obtained drivers' licenses (many traveling to the Chicago area where they obtained licenses where they were not resident), many bought cars. Signal provided them parking spaces near to the trailers, where they were housed, in order that they had convenient parking. Some went out and purchased expensive new cars. The H2B

---

[55] U.S. Department of State, <u>Trafficking in Persons Report</u> June 2012 (Washington, D.C.: U.S. Department of State, 2012), 17.

workers were clearly known to Signal and many of them continue to receive their mail at
Signal long after their departure and Signal still receives important bills. Initially,
workers at Signal were required to live in the man camp, but this was not a requirement
after the initial housing contract. At the time, there was little or no alternative housing on
the market.[56]

50. Workers were not restricted in their mobility and travelled around the United States
during their vacations, including trips to the beach, to Disneyland and to Chicago and
other communities where there were Indian communities. Some of the workers travelled
back to India to see their family members, or to attend funerals following the death of a
family member. The Indian court case reports on the Signal employees returning to India
for vacation and then subsequently returning to their employer. [57]

51. Traffickers not only restrict mobility but try to isolate the victims, according to the
TIP report. In contrast with this, Signal did everything to try and allow communications.
Multiple telephones were installed at the man camp for which workers could purchase
phone card. Workers also saved and bought computers which allowed them to readily and
affordably communicate with their families at home through the internet and the free
Internet service provided at the man camp.

52. The traffickers were not deliberately kept in isolation, and no attempt was made to
hide their whereabouts from the outside world. Many trafficking victims are so afraid of
their traffickers that they seek to hide their new locale from their traffickers. But there are
large amounts of mail arriving for the former H2B workers at Signal even today, some of

---

[56] Turnham et.al.
[57] Op. cit, note 16, 9, Paragraph 18 .

it from banks and local government. This suggests that the individuals were not seeking

to hide sensitive information from Signal that could then determine their whereabouts.

53. Trafficking victims usually seek to hide their place of residence to ensure that their tra

fficker has not found them. I have done an extensive survey of Facebook and other social

media used by the plaintiffs. In review of their public pages, a significant amount of

information can be gained about their place of residence, familial and friendship and even

their homes and places of worship. These are public people, celebrating holidays,

enjoying trips and leading an open family life that is being shared with the world. They

reveal a tremendous amount, especially to someone from Indian culture such as Sachin

Dewan, about their daily lives, their whereabouts and the new lives they have created in

America. These are not "nobodies" or frightened individuals who fear traffickers coming

after them. (see attached information scraped from the Facebook page). (Appendix V)

54. Harmful living conditions specified by the TIP report include 1) restricting access to

food and appropriate clothing, b) forbidding access to appropriate medical

care, 3) not allowing time off or sufficient time to sleep

55. The workers at Signal had access to food in the cafeteria that was available before

and after their work shifts. They had work clothes and could go on the shuttle bus to

Walmart, which they did to purchase additional clothing at affordable prices. As

previously mentioned, the Indian H2B workers not only had access. to appropriate

medical care, but work provided medical insurance. They also had transport to church.

56. The last element of control associated with human trafficking, according to the 2012

TIP Report, are harmful working conditions. The elements of this are: in exchange for

work opportunity, charging a large employment fee that is difficult or impossible to pay

off; requiring unusually long work hours with few or no breaks; restricting the number of

days off; providing little to no pay or irregular pay.

57. Signal did not charge the workers any employment fee, and when they learned of the

situation with the recruiter, they broke off their relationship with Pol. They tried to

accommodate the workers, even those without the appropriate job skills, and give them

some kind of employment that would provide them pay and allow them to pay off their

debt.

58. Signal workers worked the same hours under the same conditions as American

workers that were in compliance with U.S. government regulations. The Signal

employees, as regular employees of the company, had vacation time, like their American

co-workers.  The workers had salaries way above the minimum wage, at $18 an hour

with 50 percent premium for overtime.  Many of them received safety bonuses on top of

this. There was direct deposit of their checks into the bank so that there was no delay in

payment, no possibility of loss through theft, and no expense of cashing checks.

59. In addition to these delineated criteria, I would also delineate another characteristic of

trafficking that my research has revealed. As I wrote in my human trafficking book, some

smugglers and traffickers do everything they can do economize on their expenditures for

their victims. In reviewing the thousands of Signal emails, I saw nothing in them

reflecting any effort to economize on the workers or to shortchange them. Rather, in one

case, I read of discussions of what to do with a worker with clogged arteries who was on

life support at the hospital. Signal was having internal discussions on whether to spend

$130,000 to fly him home on an equipped medical jet to India so that his wife could say

goodbye to him, as she did not have a visa to the United States nor could she obtain one

rapidly. When I asked Signal management what was the outcome of this sad situation, I was informed that Signal had flown home the worker at this cost, and his wife had been able to bid him farewell and detach him from life support. This is not the behavior of an inhumane organization that is engaged in trafficking or lacks concern for its employees.

60. The major problems faced by the workers at Signal was their indebtedness in India, the unscrupulous recruiter they dealt with in India,[58] and the absence of regulations and protections by the Indian government for workers seeking to travel overseas. Kerala, the source region of most of Signal's H2B visas, did not have a government information office on migration until 2008, after the period of employment at Signal was over.[59] India presently has such serious problems of sex trafficking and labor trafficking, particularly of child trafficking, that it has failed to address the problem of overseas recruitment in any meaningful way. As a United Nations publication from 2011 points out, there is limited oversight of employment recruiters[60].

61. Signal also faced a serious information deficit at the time that it was approached by Pol and Burnett as to the problems of recruitment of overseas workers. While there is more information now available, there was not publicly available information in 2006

---

[58] Op.cit, note 16, 35 (para. 68), states the following:
"That the US authorities who are otherwise very stringent in the matter of issuing visas, have given the U category visas to five of the workers clearly indicates involvement of the Recruiting Agent, M/s Dewan Consultant with trafficking in the matter of deployment of these workers to the US."

[59] http://moia.gov.in/services.aspx?ID1=325&id=m3&idp=92&mainid=73, the government website reveals that migrant center in Kerala was established only in 2008.

[60] UNODC, UN Women, UN Gift (Global Initiative to Fight Human Trafficking), (principal author Sarasu Esther Thomas), "Responses to Human Trafficking in Bangladesh, India, Nepal and Sri Lanka," 2011, BangladesUNhttp://www.unodc.org/documents/human-trafficking/2011/Responses_to_Human_Trafficking_in_Bangladesh_India_Nepal_and_Sri_Lanka.pdf, p.38.

when they chose to enter into the H2B visa program. Only in 2009, long after the H2B

visa had already ended at Signal, did the US State Department in its 2009 Trafficking in

Person Report place India on the Tier 2 Watch list for trafficking because of its

inattention to victims of trafficking. It wrote in reference to unskilled labor, "In some

cases, such workers are the victims of fraudulent recruitment practices committed in

India that lead them directly into situations of forced labor, including debt bondage; in

other cases, high debts incurred to pay recruitment fees leave them vulnerable to

exploitation by unscrupulous employers in the destination countries."[61] Yet this analysis

makes no reference to high-skilled workers which is what Signal recruited. Therefore,

there was no official government advice on the topic of recruitment.

62. At the present time, a prospective employer of H2B workers could go to the website

of Verité, a non-profit that advises employers on supply chains and labor practices

overseas. They now have a website to advise on problems of recruitment.[62] This webpage

was put up in the last year. Every reference and report in this section of the website was

prepared after Signal recruited its H2B workers. Therefore, there was no accessible

information in either print or web form to advise a corporation on the risks of recruiting

temporary workers overseas.

63. In conclusion, Signal did not have access to information that would allow it to be

aware of the problem of recruiters making false promises to its potential workers in India.

Neither, did it have a reason to suspect that the local lawyer and recruiter would be

---

[61] United States Department of State, Trafficking in Person Report, 2009,
http://www.state.gov/j/tip/rls/tiprpt/2009/123136.htm.
[62] I have worked with the founder and director of research at Verité through our anti-
human trafficking initiative of the World Economic Forum. See their general website at:
http://www.verite.org.

Case 2:15-cv-02296-SM-DEK   Document 72-5   Filed 01/15/15   Page 45 of 49
Case 1:13-cv-00499-MAC-ZJH   Document 92-5   Filed 05/15/15   Page 45 of 49 PageID #:
1840

engaged in duplicitous practices. Signal was not engaged in human trafficking at any stage of the process with the H2B workers, either at recruitment, on their arrival in the United States or in their employ.

64. The Indian case on the suspension of Dewan Consulting's license was not issued by the highest court of India. It was issued a year after the case was initiated in the United States in which time American lawyers had ample time to submit evidence on behalf of the plaintiffs. Since this case was not issued by the Supreme Court, it is still possible to provide further evidence and press charges against the company of Sachin Dewin. In the absence of complaints from several workers, the Indian government suspended Sachin Dewan's license for a period of one year and 8 months. If those seeking to fight trafficking of Indian guest workers were concerned about the trafficking problem, they should have used their legal expertise to 1) put Sachin Dewan, a person identified by the Indian government, as a trafficker permanently out of business 2) to seek damages within India against an individual identified by the Indian government as an individual who had intentionally deceived poor people.

The Indian case is not hard to follow and is easy to find in its entirety on the web. Therefore, with the quality of legal expertise in this case, it is surprising that all avenues have not been tried to find redress for the workers and to prevent future trafficking. No further case in the last five years has been filed against Dewan Consulting in India since the decision of 2009.

The failure to try all efforts to prevent trafficking suggests that the focus of this case is not on the prevention of trafficking or finding relief for victims of trafficking. Mr. Sachin

Dewan is still continuing to recruit workers for exploitative work environments like

Saudi Arabia.

Respectfully Submitted,

Louise Shelley                              8/29/2014

Louise Shelley  Appendix I

**Materials that I have reviewed:**


**Legal Materials:**

1)8 U.S. Code § 1324b

2)1956 United Nations Supplementary Convention on the Abolition of Slavery

3) TVPA Legislation  Trafficking Victims Protection Act 2000 and subsequent reauthorizations in 2003, 2005, 2008 and 2011

4) UN Protocol United Nations Convention against Transnational Organized Crime and the Protocols Thereto,  including the Protocol to Prevent, Suppress and Punish Trafficking in Persons

**Documents From the Case and related investigations**

 5) Kurian David et. al vs. Signal SIGNAL INTERNATIONAL LLC, MALVERN C. BURNETT, GULF COAST IMMIGRATION LAW CENTER, L.L.C., LAW OFFICES OF MALVERN C. BURNETT, A.P.C., INDO-AMERI SOFT L.L.C., KURELLA RAO, J & M ASSOCIATES, INC. OF MISSISSIPPI, GLOBAL RESOURCES, INC., MICHAEL POL, SACHIN DEWAN, and DEWAN CONSULTANTS PVT. LTD. (a/k/a MEDTECH CONSULTANTS), First Amended Complaint,  April 29, 2008

6) Exhibit I, Part 1I, Specific Fraud Allegations Related to Class Representatives 4/29/2008

7) Third Kurian David et. al vs. Signal SIGNAL INTERNATIONAL LLC, MALVERN C. BURNETT, GULF COAST IMMIGRATION LAW CENTER, L.L.C., LAW OFFICES OF MALVERN C. BURNETT, A.P.C., INDO-AMERI SOFT L.L.C., KURELLA RAO, J & M ASSOCIATES, INC. OF MISSISSIPPI, GLOBAL RESOURCES, INC., MICHAEL POL, SACHIN DEWAN, and DEWAN CONSULTANTS PVT. LTD. (a/k/a MEDTECH CONSULTANTS), Third Amended Complaint 9/21/12

8) Third Amended Complaint,Exhibit 1, Specific Fraud Allegations Related to Named Plaintiffs ("RICO Fraud Chart") 9/21/12

Case 2:15-cv-02296-SM-DEK Document 72-5 Filed 01/15/15 Page 48 of 49
Case 1:13-cv-00499-MAC-ZJH Document 92-5 Filed 05/15/15 Page 48 of 49 PageID #:
1843

9) ANSWER, AFFIRMATIVE DEFENSES AND CROSS CLAIMS OF
SIGNAL INTERNATIONAL, L.L.C. TO THIRD AMENDED COMPLAINT 1/11/13

10) Signal Answer to 3rd Amended Complaint 3/1/13

11) Fifth Amended Complaint 4/11/14

12) Exhibit 1 to Fifth Amended Complaint, "Rico Fraud Chart", 4/11/14

13) Exhibit II


14) Kurian David et. al. vs. Signal International, ORIGINAL MEMORANDUM OF
SIGNAL INTERNATIONAL
IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
February 11, 2011

15) Opinion of Judge  Jay C. Zainey, in Kurian David et. al. vs. Signal International,
denying class certification,  United States District Court, State of Louisiana, Jan 3, 2012

16) letter  from Patrick Shen, Deputy Special Counsel,  Office of Special Counsel, Unfair
Immigrated-related practices of the Civil Rights Division of the Department of Justice on
March 14, 2008.


17) IN THE HIGH COURT OF DELHI, AT DELHI WP(C)No.5794/2008 *Judgment
pronounced on 3rd November, 2009*. # M/s Dewan Consultants & Pvt. Ltd. …..
Petitioner Through: Mr.Mukul Rohtgi, Sr. Advocate with Ms. Manali Singhal & Mr.
Shantosh Sachin, Advs. Versus $ Union of India & Ors. .... Respondents Through: Mr.
P.P. Malhotra, ASG with Ms. Monika Garg, Mr. Chetan Choudhary, Mr. Shankar
Chhabra and Mr. Gaurav Shankar, Advs.

**Signal International**

The following documents and information were reviewed:

18) Thousands of relevant internal emails

19) Payroll of all workers paid less than $18 an hour

20) Safety record of Signal relative to the industry at large
Award notification for its safety awards

21) Reports on the injuries of Indian workers

22) videos of the mancamps at Pascagoula, Miss. And Orange, Texas

**Books Reviewed**

23) Ato Quayson and Antonela Arhin, eds. *Labour Migration, Human Trafficking and Multinational Corporations : The Commodification of Illicit Flows* (Abingdon, Oxon and New York, Routledge, 2012).

24) Kevin Bales and Ron Soodalter, *The Slave Next Door: Human Trafficking and Slavery in America Today* (Berkeley and Los Angeles: University of California Press, 2009).

25) David Kyle and Rey Koslowski, eds. *Global Human Smuggling: A Comparative Perspective* (Balitmore and London:Johns Hopkins University Press, 2001).

26) Louise I. Shelley, *Human Trafficking: A Global Perspective* (New York and Cambridge, 2010).

**Reports:**

Liliana Sorrentino & Anniina Jokininen, *Guidelines to prevent abusive recruitment, exploitative employment and trafficking of migrant workers in the Baltic Sea region* (Helsinki*:* European Institute for Crime Prevention and Control, affiliated with the United Nations (HEUNI), 2014).

All other materials are included in footnotes in the report.